**No. _____**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| IN RE: STATE OF OHIO | : | United States District Court |
| | : | for the Northern District of Ohio |
| [COUNTY OF SUMMIT, OHIO, ET AL., | : | Eastern Division |
| VS. PURDUE PHARMA, L.P., ET AL.] | : | |
| | : | District Court Case Nos. |
| | : | 1:18-op-45090 |
| [CUYAHOGA COUNTY V. PURDUE | : | 1:17-op-45004 |
| PHARMA, ET AL.] | : | [relates to: 1:17-md-02804] |
| {RELATES TO: NATIONAL PRESCRIP- | : | |
| TION OPIATE LITIGATION} | | |

---

## PETITION FOR WRIT OF MANDAMUS
## OF STATE OF OHIO

---

DAVE YOST
Ohio Attorney General (0056290)

JONATHAN BLANTON* (0070035)
Deputy Attorney General for
Major Litigation
  *Counsel of Record*

CHARLES MILLER (0073844)
Office Counsel
MICHAEL HENDERSHOT (0081842)
Chief Deputy Solicitor General
SAMUEL PETERSON (0081432)
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-728-1171
Jonathan.Blanton@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................iii

STATEMENT OF THE ISSUE..........................................................................1

INTRODUCTION ...............................................................................................2

STATEMENT .......................................................................................................4

ARGUMENT.......................................................................................................11

    I.    Mandamus is available to correct district court orders that threaten significant non-party interests that are not correctable on appeal. ................................................................................................12

    II.    A writ is necessary here because the bellwether trial is legal error that will harm Ohio's sovereign interests. ..........................................14

        A.    The bellwether trial invades Ohio's sovereign interests and threatens its ability to recover from many of the same defendants. ..........................................................................15

        B.    A writ is necessary to end legal error.......................................23

        C.    Because Ohio cannot be forced to join or intervene in the federal cases, mandamus is the appropriate remedy. ...............27

        D.    This petition raises important questions about state sovereignty and state resources...............................................28

        E.    The scheduled bellwether trial involves the type of error this Court has corrected through mandamus...........................29

    III.    Remedy.........................................................................................32

CERTIFICATE OF COMPLIANCE ..................................................................35

CERTIFICATE OF SERVICE..............................................................................36

APPENDIX:

*State ex rel. Yost v. Purdue Pharma, L.P.* Complaint, Ross County Court of Common Pleas, May 31, 2017

*State ex rel. Yost v. McKesson Corp., et al.* Complaint, Madison County Court of Common Pleas, February 26, 2018

The County of Summit, Ohio Complaint, United States District Court for the Northern District of Ohio, May 29, 2018

Opinion and Order, United States District Court for the Northern District of Ohio, December 19, 2018

Civil Jury Trial Order, United States District Court for the Northern District of Ohio, May 1, 2019

Letter from Attorneys General, United States District Court for the Northern District of Ohio, June 24, 2019

Letter from National Association of Attorneys General, United States District Court for the Northern District of Ohio, July 23, 2019

Letter from Ohio Attorney General, United States District Court for the Northern District of Ohio, July 24, 2019

Transcript of Proceedings, United States District Court for the Northern District of Ohio, August 6, 2019

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alden v. Maine,*
    527 U.S. 706 (1999) ................................................................. 20, 25

*Alfred L. Snapp & Son v. Puerto Rico,*
    458 U.S. 592 (1982) ...............................................................*passim*

*Allegheny Gen. Hosp. v. Philip Morris,*
    228 F.3d 429 (3d Cir. 2000) .............................................................22

*In re Am. Med. Sys.,*
    75 F.3d 1069 (6th Cir. 1996) ..............................................13, 29, 30

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997) ...........................................................................30

*State ex rel. Bd. of Educ. v. Gibson,*
    130 Ohio St. 318 (1935)...................................................................23

*Beacon Theatres, Inc. v. Westover,*
    359 U.S. 500 (1959)...........................................................................24

*In re Bendectin Prods. Liab. Litig.,*
    749 F.2d 300 (6th Cir. 1984) ...............................................13, 23, 28

*CBS, Inc. v. Young,*
    522 F.2d 234 (6th Cir. 1975)..........................................................14

*Cheney v. United States Dist. Court for D.C.,*
    542 U.S. 367 (2004) ...................................................................12, 23

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.,*
    615 F.3d 496 (6th Cir. 2010)............................................................22

*City of Columbus v. Ours Garage & Wrecker Serv.,*
    536 U.S. 424 (2002) ................................................................10, 17, 29

*Cmty. Commc'ns Co. v. City of Boulder,*
    455 U.S. 40 (1982) .......................................................................9, 17

iii

*Cty. of Summit v. Purdue Pharma L.P (In re Nat'l Prescription Opiate Litig.)*,
    No. 1:18-op-45090, 2018 U.S. Dis. LEXIS 176260 (N.D. Ohio Oct. 5, 2018) ...................................................................................... 25

*Cty. of Summit v. Purdue Pharma L.P. (In re Nat'l Prescription Opiate Litig.)*,
    No. 1:18-op-45090, 2018 U.S. Dist. LEXIS 213657 (Dec. 19, 2018) ................. 25

*Doe v. Univ. of Mich. (In re Univ. of Mich.)*,
    ____ F.3d ____, No. 19-1636, 2019 U.S. App. LEXIS 25304 (6th Cir. Aug. 23, 2019) ................................................................. 3, 12, 13

*Envtl. Def. Fund, Inc. v. Higginson*,
    631 F.2d 738 (D.C. Cir. 1979) ....................................................... 18

*Evans v. Buchanan*,
    582 F.2d 750 (3d Cir. 1978) ..................................................... 12, 14

*Georgia v. Pa. R. Co.*,
    324 U.S. 439 (1945) ................................................................. 17, 22

*In re Glenn W. Turner Enters. Litig.*,
    521 F.2d 775 (3d Cir. 1975) ........................................................ 21

*Goldman, Sachs & Co. v. Edelstein*,
    494 F.2d 76 (2d Cir. 1974) .......................................................... 24

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ................................................................. 17, 24

*HD Media Co., LLC v. United States DOJ (In re Nat'l Prescription Opiate Litig.)*,
    Nos. 18-3839/3860, 2019 U.S. App. LEXIS 18502 (6th Cir. June 20, 2019) ................................................................. 26, 29, 33

*Heath v. Alabama*,
    474 U.S. 82 (1985) ..................................................................... 25

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978) ..................................................................... 16

*Jackson v. Cleveland Clinic Found.*,
No. 1:11 CV 1334, 2011 U.S. Dist. LEXIS 101768 (N.D. Ohio Sept.
9, 2011) ............................................................................................10

*John B. v. Goetz*,
531 F.3d 448 (6th Cir. 2008) ....................................................13, 14

*Lehman Bros. v. Schein*,
416 U.S. 386 (1974) ........................................................................27

*Maryland v. Soper*,
270 U.S. 9 (1926) ........................................................................... 13

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ..........................................................................32

*In re Multidistrict Vehicle Air Pollution*,
481 F.2d 122 (9th Cir. 1973) ..........................................................22

*In re: Nat'l Prescription Opiate Litig.*,
____ Fed. App'x ____, No. 19-3682 (6th Cir. Aug. 15, 2019) ...........12

*In re NLO*,
5 F.3d 154 (6th Cir. 1993) ....................................................24, 30, 31

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ........................................................................30

*Principality of Monaco v. Mississippi*,
292 U.S. 313 (1934) ........................................................................28

*Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary (BAMN)*,
572 U.S. 291 (2014) ........................................................................16

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996) ....................................................................27, 28

*State v. Sullivan*,
38 Ohio St. 3d 137 (1988) ..........................................................22, 23

*Thomas v. FAG Bearings Corp.*,
    50 F.3d 502 (8th Cir. 1995) ........................................................ 27, 28

*Thornton v. State Farm Mut. Auto Ins. Co.*,
    No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83972 (N.D. Ohio Nov.
    17, 2006) ................................................................ 17, 18, 21, 22

*United States v. Kagama*,
    118 U.S. 375 (1886) ................................................................ 16

*Univ. of Tex. v. Vratil*,
    96 F.3d 1337 (10th Cir. 1996) ................................................... 14

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) ................................................................ 27

*Wisconsin Pub. Intervenor v. Mortier*,
    501 U.S. 597 (1991) ................................................................ 16

## Statutes and Rules

12 U.S.C. §5538 .......................................................................... 18

15 U.S.C. §15 ............................................................................. 18

15 U.S.C. §45 ............................................................................. 18

15 U.S.C. §6103 .......................................................................... 18

15 U.S.C. §6309 .......................................................................... 18

15 U.S.C. §6504 .......................................................................... 18

18 U.S.C. §248 ........................................................................... 18

18 U.S.C. §1595 .......................................................................... 18

42 U.S.C. §1320 .......................................................................... 18

49 U.S.C. §14711.......................................................................... 19

Fed. R. Civ. P. 24(c) ...................................................................... 28

Ohio Rev. Code § 109.21.................................................................................3, 20

Ohio Rev. Code §109.81 ....................................................................................18

Ohio Rev. Code §1345.07..................................................................................18

## Other Authorities

Alan Johnson, *OxyContin, other narcotic pain pills still plentiful in Ohio*, Canton Repository  (Jan. 15, 2017) ......................................................................6

Curtis Florence, et al., Nat'l Ctr. for Injury Prevention and Control, Ctrs. for Disease Control and Prevention, *The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013* (Oct. 2016) ........................................................................................6

Doug Caruson, JoAnne Viviano, Rita Price, *Billions of opioids shipped to Ohio in just 7 years*, The Columbus Dispatch (July 21, 2019) ............................6

Emily Mills, *Summit, Cuyahoga counties settle with drugmakers ahead of October opioid trial*, Columbus Dispatch (Aug. 20, 2019) ..................................28

Nat'l Inst. on Drug Abuse, *Ohio Opioid Summary* .....................................................6

## STATEMENT OF THE ISSUE

The Northern District of Ohio is the home for an MDL of nearly 2,000 law-suits where political subdivision plaintiffs have sued manufacturers, distributors, and others responsible for the nation's opioid epidemic.  The court has scheduled a consolidated seven-week bellwether trial for two of those subdivisions (Ohio's Cuyahoga and Summit counties) seeking $8 billion, and to begin on October 21, 2019.  If the consolidated trial proceeds on the theories pleaded in the complaints, it will include claims that belong to the State of Ohio.  This petition presents the following question:

Should a writ of mandamus issue to stop or delay the trial in order to protect Ohio's sovereign right to litigate on behalf of its citizens as parens patriae?

# INTRODUCTION

The State of Ohio seeks a Writ of Mandamus to preclude a United States District Court from trying non-justiciable claims in a trial that, if unchecked, will cripple the federal dual-sovereign structure of these United States.  Under this structure, only a State Attorney General has parens-patriae standing to prosecute claims vindicating generalized harm to a State's inhabitants.  Political subdivisions do not have parens-patriae standing.  In addition, the trial would fragment the State's claims, pose a high risk of inconsistent verdicts, result in duplicative or overlapping damages, and misallocate funds in the State.

The manufacturers and distributors of opioids ("the Industry") are defendants in a broad range of lawsuits brought by public entities—foremost among them, States—but also including localities—cities, counties, townships, and others. Claims by nearly 2,000 political subdivisions are consolidated in the U.S. District Court for the Northern District of Ohio as multi-district litigation ("MDL").  The States, as sovereigns, have chosen to pursue their cases in their own state courts.

In the MDL, two Ohio counties have been selected to begin a consolidated seven-week consolidated trial, as "bellwethers" of the localities' complaints, beginning October 21, 2019.  It is this trial—seeking an $8 billion recovery—that the State of Ohio asks this court to halt or delay.

The counties advance claims that belong to the State in an effort to com-
mandeer moneys that rightfully should be distributed across the state by Ohio.  *See*
Ohio Rev. Code §109.21.  The proposed trial seeks to use the federal court to real-
locate this internal balance of power away from the Statehouse and to local officials.
*See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 603-04 (1982) ("'[I]f the
health and comfort of the inhabitants of a State are threatened, *the State is the proper*
*party* to represent and defend them.'") (quoting *Missouri v. Illinois*, 180 U.S. 208,
241 (1901)) (emphasis added).  Reworking the internal structure of the States is not
the role of the federal courts.  *See Doe v. Univ. of Mich. (In re Univ. of Mich.)*, ____
F.3d ____, No. 19-1636, 2019 U.S. App. LEXIS 25304, at *14 (6th Cir. Aug. 23,
2019) ("Mandamus is also appropriate to prevent 'intrusion by the federal judici-
ary on a delicate area of federal-state relations'") (citation omitted).

In their respective cases, the State of Ohio and the bellwether counties assert
nearly identical claims.  Ohio and the counties also pursue the same relief:  injunc-
tive relief, monetary damages, punitive damages, restitution, civil penalties, abate-
ment of the nuisance, court costs, and attorneys' fees.  However, only the State as
parens patriae may advance claims and seek remedies on behalf of the general pub-
lic.  The question before this court is whether a writ of mandamus will issue to pro-

tect the State's sovereign right to seek such relief from interference by political subdivisions.

## STATEMENT

In 2017, the Ohio Attorney General brought a civil action in Ross County Common Pleas Court against several major opioid manufacturers (the "Ross County Defendants") seeking relief from the opioid epidemic on behalf of *all* of Ohio's citizens. *State ex rel. Yost v. Purdue Pharma, L.P.* No. 17 CI 000261 (Ross Cty. Ct. C.P.). In 2018, the Ohio Attorney General filed a second complaint, this time in Madison County Common Pleas Court, against several opioid distributors (the "Madison County Defendants") alleging additional facts and theories of liability. *State ex rel. Yost v. McKesson Corp., et al*, No. CVH 2018055 (Madison Cty. Ct. C.P.). Together these cases (the "Ohio cases") are poised to bring comprehensive statewide relief, accountability, and remediation to the citizens of Ohio for their past, present, and future injuries.

Five months after the Attorney General sued, Cuyahoga County filed a complaint in Cuyahoga County Common Pleas Court against nearly all of the Ross and Madison County Defendants, and others. *See* R.1, Notice of Removal, PageID#1, *Cty. of Cuyahoga v. Purdue Pharm L.P., et al.*, No. 1:17-op-45004 (N.D. Ohio Nov. 27, 2017). Nearly three months later, Summit County and several of its political

4

subdivisions filed suit in Summit County Common Pleas Court against a number of the Ross and Madison County Defendants. *See* R.1, Notice of Removal, PageID#3, *Cty. of Summit, et al. v. Purdue Pharma, L.P., et al.*, No. 1:18-op-45090 (N.D. Ohio Jan. 22, 2019). Both the Cuyahoga and the Summit County cases were removed to the United States District Court, Northern District of Ohio, based on diversity jurisdiction.

The complaints, from States and localities alike, all tell a similar story, and all assert nearly identical claims. For decades, the Industry aggressively marketed its opioid products, downplaying or outright misrepresenting their highly addictive nature. Ignoring their own data, the Industry dumped vast amounts of opioids into communities far exceeding any legitimate medical need. As addiction, misery, and overdose deaths skyrocketed, the Industry focused on only one goal: selling more product.

As the State struggled to control these floodwaters of opioid addiction by clamping down on "pill mills" and stepping up enforcement of its laws, a secondary, illegal black market emerged. Since the black market was supplied by diverting opioids from the medical market, the Industry was able to sell even more, fulfilling its overarching goal.

The scale of the crisis produced by the Industry's conduct is hard to overstate.

- The crisis involves "[b]illions of pain pills distributed, more than a million years of life lost, thousands of deaths by overdose." Doug Caruson, JoAnne Viviano, Rita Price, *Billions of opioids shipped to Ohio in just 7 years*, The Columbus Dispatch (online) (July 21, 2019), *available at* https://www.dispatch.com/news/20190721/billions-of-opioids-shipped-to-ohio-in-just-7-years; Nat'l Inst. on Drug Abuse, *Ohio Opioid Summary*, *available at* https://www.drugabuse.gov/opioid-summaries-by-state/ohio-opioid-summary (last visited Aug. 28, 2019) (4,000 Ohio opioid overdose deaths in 2017).

- One government study estimates the cost of the epidemic at $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal-justice involvement. Curtis Florence, et al., Nat'l Ctr. for Injury Prevention and Control, Ctrs. for Disease Control and Prevention, *The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013,* at 6, 14 (Oct. 2016), *available at* https://www.ncbi.nlm.nih.gov/pubmed/27623005.

- One Ohio public health nurse described her Ohio county as "awash in pain pills" because "[t]hey were available to everyone." Alan Johnson, *OxyContin, other narcotic pain pills still plentiful in Ohio*, Canton Repository (online) (Jan. 15, 2017), *available at* https://www.cantonrep.com/news/20170115/oxycontin-other-narcotic-pain-pills-still-plentiful-in-ohio. And when pills are available to everyone, kids "lose their parents," they "live amid trauma and chaos," "they need crisis counseling and speech therapy and tutoring," and they "wind up with disabilities and delays and problems that teachers can't fix." Caruson, *Billions of opioids, supra*.

The District Court here summarized the epidemic's scope well. "It is accurate to describe the opioid epidemic as a manmade plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated. … [I]t is hard to find anyone in Ohio who does not have a family member, a friend, a parent of a friend, or a child of a friend who has not been affected." R.1203, Opinion and Order, PageID#29057.

These are widespread, statewide harms, not local harms—the localities' nuisance claims even cite the wrongs done to "the general public." *E.g.*, R.513, Second Amended Complaint, PageID#10871 (unless noted, record numbers are in the MDL case, No. 17-md-02804). The District Court recognized this when it commented on its selected plaintiffs for the bellwether trial: "In terms of liability, I could probably substitute almost any other city or county for Summit and Cuyahoga and the trial would be similar. For damages, there would be – there would be differences." R.2147, Transcript of Proceedings of Aug. 6, 2019, 32:21–24 (PageID numbers not yet available) ("Aug. 6, 2019 Transcript"); *see* R.1598, Order Setting Trial, PageID#44988. The bellwether trial therefore will not focus on the particular Ohio county plaintiffs. It will examine the opioid crisis writ large—through complaints raised by small players.

The intrusion onto sovereign territory can be gleaned on a granular level by comparing the various complaints. The bellwether cases and the Ohio cases seek to rectify the same harms to Ohio citizens caused by common defendants including: (1) extremely high rates of opioid use among Ohio adults; (2) secondary effects on the children of opioid addicted parents and other family members including infants born already addicted to opioids; (3) the emotional and financial costs to Ohioans having to care for addicted family members; (4) higher health care costs for Ohioans; (5) less productive employees; (6) the creation of a secondary, criminal market for opioids which fueled "a new wave of addiction, abuse, and injury"; and (7) the increase in heroin and other illicit drug addiction in Ohio. *Compare State ex rel. Yost v. Purdue Pharma, L.P.* No. 17 CI 000261 (Ross Cty. Ct. C.P.), Complaint ¶163 (Attorney General lawsuit) and *State ex rel. Yost v. McKesson Corp., et al*, No. CVH 2018055 (Madison Cty. Ct. C.P.), Complaint ¶¶36-47, 130, 146 (Attorney General lawsuit), *with* R.513, Summit County Complaint, PageID#10842-43 (county lawsuit); *see also* R.521, Cuyahoga County Complaint, PageID#12818-19 (county lawsuit) (same).

The broad injunctive relief sought in the bellwether cases also intrudes onto sovereign claims. The counties request injunctions and continued court monitoring of the defendants in ways that would have a statewide impact such as: (1) future

8

marketing strategies; (2) disseminating "corrective" advertising statements; (3) prohibiting future lobbying; (4) limiting the defendants' ability to contract; and (5) creating a "National Foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the Defendants in an amount to be determined by the Court." R.513, Summit County Complaint, PageID#10852-53; *see also* R.521, Cuyahoga County Complaint, PageID#12819-20 (same). It is clear that the bellwether counties actually assert parens patriae claims.

The United States Supreme Court has long recognized that States have standing to bring claims like these—claims brought on behalf of all the people of a State—but that localities, which are merely parts or administrative subdivisions of the States, do not. These are, after all, the United States, not the United Counties and Cities of America. *See Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 54 (1982) ("'We are a nation not of "city-states" but of States'") (citation omitted). Our Republic's structure is *dual*, not triple, and that dual structure "has no place for sovereign cities" (or counties). *Id*. at 53.

Counties and cities are mere creatures of statute. "'The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its

absolute discretion.'  Whether and how to use that discretion is a question central to state self-government." *City of Columbus v. Ours Garage & Wrecker Serv.*, 536 U.S. 424, 437 (2002) (citation omitted).  Accordingly, a political subdivision "may not sue to enforce its residents' rights—'courts have consistently held that municipalities are not vested with the power to protect their residents' interests under the theory of *parens patriae*.'"  *Jackson v. Cleveland Clinic Found.*, No. 1:11 CV 1334, 2011 U.S. Dist. LEXIS 101768, at *17-18 (N.D. Ohio Sept. 9, 2011) (citation and brackets omitted) (collecting cases).

But the District Court recently explained that it sees Ohio's sovereignty as an obstacle to overcome.

> The problem is that in a number of States any money that is, that a State Attorney General obtains, either by victory in court, litigated judgment, or settlement, goes into the general fund. And the men and women who control what happens in the general fund are the elected state representatives and senators. That's what they do. And that's what happened in the tobacco litigation. Over $200 billion, far more than 90 percent of that was used for public purposes totally unrelated to tobacco smoking, lung cancer, whatever. And I believe that's why we have all these counties and cities that filed separate lawsuits, to make sure that doesn't happen again. … [Any settlement] has to address the problem of putting money into the state general funds or else it isn't going to fly.

R.__, Aug. 6, 2019 Transcript, 54:12-55:6.

For the reasons set out more fully below, the State of Ohio asks this Court to issue a writ of mandamus to the District Court ordering the dismissal of the Ohio

localities' complaints, or in the alternative, to stay the bellwether trial until the State of Ohio's claims have been adjudicated, limiting the relief in the bellwether to purely local monetary expenditures which are not subsumed by the State of Ohio's claims in its own courts.

## ARGUMENT

The District Court has effectively invited Ohio to seek this writ. At a recent hearing, plaintiffs' counsel noted that "you've got a couple of trials about to go and nobody, as far as I know, has come into the courtroom and said stop. So that is just an observation I'd like to make on behalf of the Class [of subdivisions] here." R. ____, Aug. 6, 2019 Transcript, 69:1-69:23. The Court agreed when addressing an Ohio Assistant Attorney General, attending the hearing for informational purposes: "I mean the corollary of what you're saying is the Attorney General represents everyone in Ohio, which he does. And so these cases should all be dismissed. If that's what you're saying, you should say it overtly that the Court should dismiss—should have filed, you know, say these cases are not justiciable; cities and counties in Ohio don't have a right to bring them, they should be dismissed." *Id.* at 61:7-14. That is what Ohio is saying.

Of course, Ohio is not party to any of the federal cases. Nor does it want to be. As a non-party Ohio cannot file a dispositive motion below. However, Ohio

11

may bring this original action to protect its interests.  *Cf. In re Univ. of Mich.*, 2019 U.S. App. LEXIS 25304, at *12 (writ appropriate to prevent intrusion by the federal judiciary on a delicate area of federal-state relations.); *Evans v. Buchanan*, 582 F.2d 750, 776-79 & n.25 (3d Cir. 1978) (granting writ in favor of non-party state, inter alia, to vindicate principles of federalism).

## I. Mandamus is available to correct district court orders that threaten significant non-party interests that are not correctable on appeal.

The All Writs Act gives courts a "'potent weapon[]'" in the writ of mandamus.  *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 381 (2004) (citation omitted).  Its potency requires care, and the weapon must be reserved for "really extraordinary cases."  *In re: Nat'l Prescription Opiate Litig.*, ____ Fed. App'x ____, No. 19-3682, at *3 (6th Cir. Aug. 15, 2019) (citation omitted).  That is why it comes with "demanding," but not "insuperable," prerequisites.  *Cheney*, 542 U.S. at 381.  The prerequisites are three: (1) the petitioner must "have no other adequate means to attain the relief he desires," (2) the petitioner must show a "clear and indisputable" right to the writ, and (3) the court "must be satisfied that the writ is appropriate under the circumstances."  *Id.* at 380-81 (internal quotation marks and citations omitted).  Among the relevant circumstances that "should inform" an appellate court's decision about whether to grant an extraordinary writ are structural constitutional issues, like "separation-of-powers considerations."  *Id.*

at 382; *see also Maryland v. Soper*, 270 U.S. 9, 29 (1926) (granting writ to protect "the jurisdiction of the courts of a State to try offenses against its own laws" from invasion by an "order of an inferior federal court").

This Court has clarified the considerations that govern when mandamus should be granted, explaining that it balances five non-exclusive factors to separate mere reversible error from error grave enough for mandamus. *John B. v. Goetz*, 531 F.3d 448, 457 (6th Cir. 2008). Those factors are: (1) absence of "other adequate means" to "attain the relief desired"; (2) damage or prejudice "not correctable on appeal"; (3) a district court order "clearly erroneous as a matter of law"; (4) an order that contains either an "oft-repeated" error or "manifests a persistent disregard of the federal rules"; and (5) an order that "raises new and important problems, or issues of law of first impression." *Id.*

Balancing these factors, this Court has issued writs, for example, to stop an order mandating extensive discovery from State officials, *id.* at 461, to vacate class certifications, *In re Am. Med. Sys.*, 75 F.3d 1069, 1074 (6th Cir. 1996); *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 301 (6th Cir. 1984), and earlier this month, to protect the delicate federal-state balance of power, *In re Univ. of Mich.*, 2019 U.S. App. LEXIS 25304, at *15.

This Court and others have also used the writ to protect non-parties from district-court orders. In *John B.*, this Court granted a writ to "set aside" parts of a discovery order against non-parties who contracted with Tennessee. 531 F.3d at 461; *see id.* at 462 (Cole, J., concurring) (flagging "unique" aspect of district court's order that reached non-parties); *CBS, Inc. v. Young*, 522 F.2d 234, 237, 242 (6th Cir. 1975) (granting writ to non-party affected by district court's gag order). The Tenth Circuit also issued a writ (there, prohibition) to shield many non-party state institutions from discovery. *Univ. of Tex. v. Vratil*, 96 F.3d 1337, 1339 (10th Cir. 1996). The Tenth Circuit grounded the writ in both the entities' non-party status and their federal-court immunity that flows from the Constitution's structural protections. *Id.* The Third Circuit has also used its writ power to protect a State when a district court's order did not afford Delaware's laws a "presumption of regularity." *Evans*, 582 F.2d at 778. Commenting on the mandamus aspect of the case, the court noted the "exceptional circumstances" in a petition where a nonparty state had an interest apart from the parties and aimed to "vindicate[]" "principles of federalism." *Id.* at 777 n.25.

## II.   A writ is necessary here because the bellwether trial is legal error that will harm Ohio's sovereign interests.

Viewed through this Circuit's five factors for evaluating a writ, this petition checks all the boxes. The planned bellwether trial before Ohio has had a chance to

resolve its own claims (1) prejudices Ohio and its citizens, (2) through a trial that is contrary to law, (3) in a way Ohio cannot correct on appeal or by other means; and whether that trial may proceed (4) raises an important legal question in a (5) context that warrants a writ.

### A. The bellwether trial invades Ohio's sovereign interests and threatens its ability to recover from many of the same defendants.

The prejudice to Ohio's sovereignty is twofold—only Ohio, not its counties, has the power and the right to represent the people of the State; and only Ohio, not its counties or a federal district court, has the responsibility and the right to distribute proceeds of those claims. As a result, Ohio's Attorney General is uniquely positioned to litigate on behalf of all Ohioans.

*Structural sovereignty.* The bellwether trial threatens Ohio's sovereign interest in vindicating its citizens' and subdivisions' rights—*all* of its citizens' and subdivisions' rights—against the various defendants who fueled the opioid epidemic in Ohio. The District Court has erroneously conflated Ohio with its political subdivisions, going so far as stating that the cities and counties bring their claims "*in their capacity as sovereigns.*" R.1203, Op., PageID#29039 (emphasis added). The State's interests are far greater than the sum of its subdivisions' interests—and the statewide, collective harms to Ohio's citizens are not rights that Ohio's political subdivisions can litigate or settle—let alone settle on their own.

15

The Supreme Court long ago described the grand architecture of the Republic. "The soil and the people within these limits are under the political control of the government of the United States, or of the states of the Union. There exists within the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies, with limited legislative functions, but they are all derived from[,] or exist in[] subordination to[,] one or the other of these." *United States v. Kagama*, 118 U.S. 375, 379 (1886). Political subdivisions like cities and counties are not sovereigns, but are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607 (1991) (internal quotation marks, alterations, and citations omitted).

The States have "extraordinarily wide latitude" in "creating various types of political subdivisions and conferring authority upon them." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978). This "near-limitless sovereignty" to "design [a] governing structure as it sees fit" means that a State "may give certain powers to cities, later assign the same powers to counties, and even reclaim them for itself." *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary (BAMN)*, 572 U.S. 291, 327 (2014) (Scalia, J., concurring). States' choices about "[w]hether and how" to give power

to political subdivisions "is a question central to state self-government." *Ours Garage & Wrecker Serv.*, 536 U.S. at 437. This structuring is a key part of how "a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). In short: "Ours is a 'dual system of government,' … which has no place for sovereign cities." *Cmty. Commc'ns Co.*, 455 U.S. at 53 (citation omitted).

The fact that the State, and not its subdivisions, provides the cornerstone of sovereignty has consequences for litigation. A State's sovereignty means it may, as "a representative of the public," sue to right a wrong that "limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States." *Georgia v. Pa. R. Co.*, 324 U.S. 439, 451 (1945); *cf. Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83972 (N.D. Ohio Nov. 17, 2006) (denying class certification in view of defendant's settlement with multiple states' attorneys general).

To protect their people, States have, for example, "represent[ed] the interests of their citizens in enjoining public nuisances." *Alfred L. Snapp & Son*, 458 U.S. at 603. States have also succeeded in protecting their citizens' economic interests. *See id* at 605; *Pa. R. Co.*, 324 U.S. at 472-73. The States have, the Court has said, "a quasi-sovereign interest in the health and well-being—both physical

17

and economic—of its residents in general." *Alfred L. Snapp & Son*, 458 U.S. at 607. If that health and well-being are injured, "'the *State* is the proper party'" to vindicate and protect the citizens' interests. *Id.* at 604 (citation omitted) (emphasis added).

This same point shows up both in decisions recognizing a state attorney general's unique role in protecting a State's citizens, and in statutory provisions giving attorneys general the power to vindicate state interests. Court decisions, for example, deny political-subdivisions intervention in a State's lawsuit and favor attorney-general suits over class actions. *See, e.g., Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979) (per curiam) ("[A] state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens."); *Thornton*, 2006 U.S. Dist. LEXIS 83972, at *8.

In statutory law, a State's Attorney General is often empowered to vindicate the peoples' common interests, such as in consumer-protection laws and antitrust restrictions. *E.g.* Ohio Rev. Code §1345.07(A); Ohio Rev. Code §109.81(A). Federal statutes that include the phrase 'parens patriae' refer to a State's Attorney General's power to act on behalf of its citizens. *E.g.* 12 U.S.C. §5538; 15 U.S.C. §§15c-15h, 45b-45c, 6103, 6309, 6504; 18 U.S.C. §§248, 1595; 42 U.S.C. §1320d-

5(d); 49 U.S.C. §14711.  Those statutes do not afford similar standing to political subdivisions.

The scheduled bellwether trial undermines all this because it lets political subdivisions act as representatives of the people's interests—and thereby appropriate remedies that belong to the State.  The complaints in these cases include claims brought "for the public health, safety and welfare of their citizens," public nuisance claims, claims for "indivisible" injuries, and damages for the increased use of the "judicial system," the decreased "efficiency" of the workforce, and "the societal harms caused by Defendants' conduct." *E.g.*, R.513, Summit County Complaint, PageID#10579, 10865-69, 10877, 10842, 10892.  These are not claims that counties or cities have standing to litigate.  They are claims that Ohio can litigate as parens patriae.  The injuries are injuries to the people of Ohio as a whole.

The bellwether trial strikes at our Republic's core structure, including its recognition of state sovereignty.  First, the political subdivisions plan to litigate Ohio citizens' "wellbeing," even though Ohio, as sovereign, is the only public body with standing to do so.  *Alfred L. Snapp & Son*, 458 U.S. at 607.  Second, the bellwether trial will undermine Ohio's "rightful status within the federal system," *id.*, by allowing counties to step into the State's shoes to distribute state funds and by endangering Ohio's efforts to resolve its own lawsuits.  Both invasions of Ohio's

19

sovereignty are all the worse because they come at the hands of the federal courts. *Cf. Alden v. Maine*, 527 U.S. 706, 751-52 (1999).

*Distributing funds*.  As the District Court stated frankly, these cases are intended to avoid Ohio Rev. Code §109.21, which states that all recoveries by the Attorney General will be placed into the general fund.  "The problem is that in a number of States, any money that … a State Attorney General obtains, either by victory in court, litigated judgment, or settlement, goes into the general fund."  R. __, Aug. 6, 2019 Transcript, 54:12-55:6. Of course, this policy choice is not a "problem" a district court can resolve.

The bellwether trial would undermine Ohio's sovereignty by providing political subdivisions with direct access to funds that by law go to the general fund for distribution by the legislature.  If the bellwether plaintiffs win their trial on the pleaded theories, they will recover money for harms to the general health, safety, and physical and economic wellbeing of Ohioans.  And if that happens, the trial will have created a mechanism that allows political subdivisions to take Ohio's place as the sovereign responsible for directing money to the appropriate places in the State. Ohio's "rightful status within the federal system," is denied when a federal court facilitates the efforts of political subdivisions to avoid state-wide fiscal laws.  *Alfred L Snapp & Son*, 458 U.S. at 607.

Ohio is prejudiced in another way—the MDL itself has hampered efforts to settle Ohio's state-court actions. And just as Attorney General actions may be a reason to deny parallel class litigation, the Attorney General actions here are a reason to question the MDL proceedings, including the bellwether. "[I]f courts consistently allow parallel or subsequent class actions in spite of state action, the state's ability to obtain the best settlement for its residents may be impacted, since the accused may not wish to settle with the state only to have the state settlement operate as a floor on liability or otherwise be used against it." *Thornton*, 2006 U.S. Dist. LEXIS 83972, at *10. A parallel MDL on behalf of political subdivisions is equally offensive. The MDL has made settlement more difficult for the States. *See* R.1726, June 24, 2019, Letter of 26 State Attorneys General, PageID#51635; R.1951, July 23, 2019, Letter of 38 State Attorneys General, PageID#119886; R.1973, Letter of Attorney General Yost, PageID#209115. Moreover, any judgment or settlement between two Ohio counties and the defendants will draw down a limited pool of money available to satisfy these claims, and will do so in a way that risks defenses that are unique as against the counties.

*Preferred Plaintiff Status.* State Attorneys General make better plaintiffs to litigate on behalf of a State's citizens. *Cf. In re Glenn W. Turner Enters. Litig.*, 521 F.2d 775, 779 (3d Cir. 1975) (reversing order in a multi-district class action that in-

terfered with a state attorney general's prior litigation against the same defendant);
*Thornton*, 2006 U.S. Dist. LEXIS 83972, at *16 (denying class certification in view
of defendant's settlement with multiple states' attorneys general).

A State Attorney General is also a better plaintiff in this case because the
counties will face defenses that the State is better positioned to surmount. Cities
(and other political subdivisions) have frequently lost claims like those in the bell-
wether trial because they have been unable to satisfy proximate cause. *E.g., City of
Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010). Unlike its
subdivisions, Ohio has standing to sue "without regard to proximate cause." *Alle-
gheny Gen. Hosp. v. Philip Morris*, 228 F.3d 429, 436 (3d Cir. 2000). As parens pa-
triae, Ohio has standing to assert claims based on harms to the health and welfare of
its citizens. *Alfred L. Snapp & Son*, 458 U.S. at 607; *see also Pa. R. Co.*, 324 U.S. at
447; *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 131 (9th Cir.
1973). Ohio's ability to bring such claims—and its political subdivisions *inability* to
do so—means that Ohio is better able to seek justice for its citizens.

Second, the State can maintain claims otherwise barred by statutes of limita-
tions. Statutes of limitations in Ohio generally do "not apply as a bar to the rights
of the state." *State v. Sullivan*, 38 Ohio St. 3d 137, 138 (1988). But, because "the
rule is an attribute of sovereignty only, it does not extend to townships, counties,

school districts or boards of education, and other subdivisions of the state." *Id.* at 139; *State ex rel. Bd. of Educ. v. Gibson*, 130 Ohio St. 318, syl. ¶2 (1935). As with proximate-cause defenses, the State is able to avoid limitations defenses that might block the bellwether counties from recovering. That is, the State can recover for its citizens where the counties cannot.

Whether the counties win or lose, the bellwether trial harms Ohio by diverting time and energy away from its own litigation to recover for all its citizens and subdivisions. The trial and resulting appeals will consume court and party resources that would not have been spent had the claims been brought by a sovereign State. These same kinds of concerns supported this Court's grant of a writ in the *Bendectin* litigation, where the court vacated a class certification that would have diverted attention from other litigation. 749 F.2d at 304. Ohio's energy should remain invested in its own litigation and negotiation rather than dealing with the fallout of a trial that should never go forward.

## B.    A writ is necessary to end legal error.

Ohio has shown a "clear and indisputable" right to relief. *Cheney*, 542 U.S. at 381. As detailed above, the bellwether trial is legally flawed because it invades Ohio's sovereignty and impedes the Ohio Attorney General's ability to litigate on behalf of all Ohioans. *See* above at 14-23. In many ways, the harms that Ohio will

suffer, and the District Court's legal error in allowing the bellwether trial to proceed, are two sides of the same coin.

Mandamus is appropriate to stop a trial that invades legal interests. This Court, for example, ordered a district court to vacate an order for a summary jury trial because such trials may not be conducted over a party's objection. *In re NLO*, 5 F.3d 154, 156-59 (6th Cir. 1993). Although the summary trial may well have lubricated settlement, this Court issued the writ because a district court's "'zeal to settle'" a case cannot trump restraints on the district court's powers. *Id.* at 158 (citation omitted).

And mandamus is used to protect constitutional interests. In one case, several plaintiffs sued the same defendant, and the cases had been consolidated for pretrial matters. *Goldman, Sachs & Co. v. Edelstein*, 494 F.2d 76, 77 (2d Cir. 1974). As the first trial neared, the district court decided to hear one case set as a non-jury trial ahead of another case set for a jury trial. *Id.* The Second Circuit issued the writ to protect the Seventh Amendment rights that were threatened by the judge's sequencing. *Id.* at 78; *cf. Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959).

If mandamus is appropriate to protect the Seventh Amendment, it is appropriate to protect the Tenth. *See, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 60, 463 (1991) (the Tenth Amendment protects States' interests in defining the "structure

24

of its government"). The need to protect public rights, like the Constitution's structural feature that "leaves in the possession of each State 'certain exclusive and very important portions of sovereign power,'" *Heath v. Alabama*, 474 U.S. 82, 93 (1985) (quoting The Federalist No. 9, at 55 (Hamilton) (J. Cooke ed. 1961)), is at least equal to, if not greater than, the need to protect private rights like those guaranteed by the Seventh Amendment. After all, if a State's sovereignty shields it from a Congressional command that it answer to private suit in its own courts, *Alden*, 527 U.S. 706, then surely it protects a State from federal-court suits that commandeer Ohio's sovereignty.

This litigation has placed political subdivisions like the two bellwether counties on equal footing with the States themselves. The Magistrate commented last year, for example, that "no other category of potential plaintiff groups, aside from states ***and their political subdivisions***, can be counted on to vindicate the law in the same manner." Report & Recommendation, *Cty. of Summit v. Purdue Pharma L.P (In re Nat'l Prescription Opiate Litig.)*, No. 1:18-op-45090, 2018 U.S. Dis. LEXIS 176260, *111 (N.D. Ohio Oct. 5, 2018) (discussing RICO claims) (emphasis added); *accord* Opinion & Order, *Cty. of Summit v. Purdue Pharma L.P. (In re Nat'l Prescription Opiate Litig.)*, No. 1:18-op-45090, 2018 U.S. Dist. LEXIS 213657, at *70 (Dec. 19, 2018) ("No other party can vindicate the law and deter Defendants' alleged

conduct because Plaintiffs' asserted damages are not recoverable by any other party.").  One of the District Court's premises was wrong—political subdivisions are not representatives of the State's citizens; only the State is.  The District Court's error will be compounded if the bellwether trial proceeds as planned.

Finally, to the extent that the District Court intends for the bellwether trial to help facilitate settlement, it has erred as well.  This Court has previously criticized actions taken based on the District Court's "desire to settle the litigation before it proceeds to trial." *HD Media Co., LLC v. United States DOJ (In re Nat'l Prescription Opiate Litig.),* Nos. 18-3839/3860, 2019 U.S. App. LEXIS 18502, at *3, 27–29 (6th Cir.  June 20, 2019).  No matter how strong the desire to settle, a district court abuses its discretion when it lets that desire replace legal analysis so that it has a "bargaining chip" to force settlement.  *Id.* at *28.

The District Court's statement regarding the potential class certification again shows its willingness to brush aside the law to facilitate a settlement, just as it does here.  "I'm not worried about the Supreme Court.  The issue is what will I do."  R.____, Aug. 6, 2019 Transcript, at 35:12–13; *see also id.* at 34:17–35:13.  A court cannot turn a blind eye to the law because it believes doing so will result in a better or fairer result.  "Address[ing] the problem of putting money into the state general fund," *id.* at 55:5-6, at the purported expense of the political subdivisions,

is a political question—and a State level one at that—wholly unsuited for an Article III court. Because the District Court has allowed a desire to resolve the underlying litigation to prevail over Ohio's sovereign interests, it repeats its earlier error, meriting a writ.

### C. Because Ohio cannot be forced to join or intervene in the federal cases, mandamus is the appropriate remedy.

Ohio has made the informed choice to pursue its claims in state court—and it did so before either of the two bellwether counties filed suit. Because Ohio is a sovereign, neither the plaintiffs nor defendants in this action can force it to become a party to the federal cases. *See, e.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 506 (8th Cir. 1995).

Ohio's choice to pursue remedies in state court has both a structural and a practical component. Structurally, of course, only state courts can make "authoritative" interpretations of state law. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 395 (1988). Practically, federal judges are "'outsiders'" to state law and lack the "common exposure to local law which comes from sitting in the jurisdiction." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (citation omitted). Ohio has a valid interest in preferring that Ohio judges decide questions of Ohio law. For reasons of autonomy and efficiency, Ohio has chosen to litigate these claims in its own courts.

It is no answer to Ohio's mandamus petition to say that it should just inter-vene in the federal case.  Ohio has no "claim or defense" to plead in the federal cases.  Fed. R. Civ. P. 24(c).  More fundamentally, Ohio has no desire to assert any claims in federal court, and its sovereign right to litigate in its own courts means that it cannot be forced to participate in federal court merely to protect its rights.  *See Seminole Tribe v. Florida*, 517 U.S. at 54; *Thomas,* 50 F.3d at 506; *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934).  Mandamus is the appropriate avenue for the State to pursue relief.

### D.    This petition raises important questions about state sovereignty and state resources.

For the same reasons that the planned bellwether trial prejudices Ohio, the planned trial meets this Court's requirement that a mandamus petition raise an "important" legal issue.  *In re Bendectin*, 749 F.2d at 304.  The threat to state sovereignty ranks above the threats to private interests in class-action cases.  Political subdivisions are not stand-ins for the State.  A city law director or county prose-cutor is no substitute for the Ohio Attorney General.  The fact that the political subdivisions have begun extracting settlements indicates that other settlements may soon follow, and shows that the harm to Ohio's sovereignty is real and needs an immediate remedy.  *See* Emily Mills, *Summit, Cuyahoga counties settle with drug-makers ahead of October opioid trial*, Columbus Dispatch (online) (Aug. 20, 2019),

*available at* https://www.dispatch.com/news/20190820/summit-cuyahoga-counties-settle-with-drugmakers-ahead-of-october-opioid-trial/1.

This Court has already recognized the "importance" of this litigation's subject matter, pointing both to the presidential declaration of a "national emergency" and quoting the District Court that the underlying facts "affect the health and safety of the entire country." *HD Media*, 2019 U.S. App. LEXIS 18502, at \*3, 43.

The mandamus writ is a powerful tool that should remain little used. But this court should not let forays by political subdivisions into federal courts erode state sovereignty. The relative power of political subdivisions within the various States is committed to the "'absolute discretion'" of each State, *Ours Garage*, 536 U.S. at 437 (citation omitted), and is a question ill-suited for Article III resolution. This extraordinary situation calls for an extraordinary writ.

### E. The scheduled bellwether trial involves the type of error this Court has corrected through mandamus.

This Court's writ cases also consider whether the District Court's error is a repeat one. This factor and the importance factor "are somewhat contradictory, and the district judge's order typically will not satisfy both guidelines." *In re Am. Med. Sys.*, 75 F.3d at 1088. Even so, the factor supports Ohio here.

Applying the repetition factor, this Court looks both backward and forward. Looking back, the Court sometimes invokes the "larger context" of the issue under

29

review, not merely the particular judge's own rulings. *Id.* at 1089. Looking forward, the Court has issued a writ despite no "manifest disregard" of the law, because the writ would offer "guidance" that "may be applied with some frequency in the future." *In re NLO*, 5 F.3d at 159. These same considerations support a writ here.

The "larger context" of the District Court's bellwether-trial plan is a sprawling MDL, where settlement pressure threatens to override the rule of law. The judge overseeing it has called it "perhaps the most complex constellation of cases that have ever been filed." R.1732, June 25, 2019 Transcript, pt. 1, 4:12-13 (PageID not yet available). In the MDL, political subdivisions have moved to certify a "negotiating class" to negotiate with defendants. *See* R.1820 Amended Motion for Certification of Negotiation Class, PageID#56631, etc. But the Supreme Court has warned that a desire to settle large civil actions cannot override restraints on federal-court authority. *See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) and *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). The bellwether trial is yet another tool to catalyze settlement. In context, the error of allowing the bellwether trial is the kind of error that justifies a writ.

The need for forward-looking guidance also supports issuing a writ. Most immediately, guidance is needed for the many other suits in the MDL. The very

purpose of a bellwether trial is to guide those other cases.  This is not just about the relationship between Ohio and its subdivisions.  It is about every State and political subdivision.  *See* R.1951, 38 Attorneys General Letter.  Issuing a writ that prevents subdivisions from getting ahead of their respective States in litigating state-wide issues will guide the way as the litigation unfolds even after the bellwether trial is over.

The District Court faces a Herculean task—dealing with political subdivisions, but not their parent States; herding dozens of defendants that played distinct roles in the opioid crisis; and witnessing the ongoing need to resolve the cases—all while the opioid epidemic continues to rage.  Even so, this Court can easily "sympath[ize]" with the District Court's efforts, "when faced with [a] complicated, multi-party civil action[] … to impose some degree of manageability through innovative use of the federal rules," yet still recognize the need to issue a writ to prevent an action that might advance settlement, but that breaks fidelity with the law.  *See In re NLO*, 5 F.3d at 159.  This is particularly so where there is easy relief for Hercules.

Paradoxically, the District Court has recognized the available relief:  "Now it's easy to set -- establish a team of 50 AGs.  It's 50 men and women. That kind of team has been put together in lots of other lawsuits very effectively. They were

here from the beginning.  It's not so easy with 2000 litigating cities and counties and potentially 20 or 30,000 others." R. __, Aug. 6, 2019 Transcript, 48:9-14. The solution to this conundrum is simple and profound: Allow the State Attorneys General to do their jobs as they have heretofore done—unimpeded by a cities-and-counties MDL.

*    *    *

Federal courts should "pause" before "intrud[ing] into the proper sphere of the States." *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring). The proper sphere of the State is clear: as a sovereign, it alone speaks for all of its citizens.  This Court should issue a writ to protect Ohio's interests.

## III.  Remedy

The vast bulk of the subdivisions' claims and relief can be pursued only by Ohio.  Any remaining claims cannot be quantified and awarded until after the State's overriding interest in protecting its citizens as a whole is seen to fruition.

As demonstrated by the recent settlements, allowing the bellwether trial to proceed will elevate the interests of Cuyahoga and Summit counties above those of the State of Ohio as a whole.  It will render 86 Ohio counties, and countless communities, subservient to the desires of a select few.  And it will be an affront to the principals of sovereignty and primacy that form the foundation of state govern-

ment.

Plaintiffs cannot seek advertising and marketing limitations; impose a regulatory regime; pursue claims stemming from general harm to the public, general economic harm, reduced tax base, and reduced property values; or pursue claims stemming from redirected public expenditures, or hard dollars expended by Ohio passed through the political subdivisions. These remedies are available only to the State.

Ohio respectfully requests that a writ be issued that commands the District Court to dismiss and/or limit the claims that seek these categories of relief. Moreover, the District Court should be instructed to stay any trial of any remaining claims brought by any Ohio political subdivision while Ohio's claims against the opioid manufacturers and distributors are pending.

In a recent appeal from this MDL, this court recognized "the paramount importance of the litigation's subject matter." *HD Media Co., LLC*, 2019 U.S. App. LEXIS 18502, at *43. Ohio submits the issues presented in this original action—state sovereignty, and the State's relationship both with its own political subdivisions and its place in the federal system—are even weightier than those presented in that discovery dispute, and cry out for this court's attention.

## CONCLUSION

The Court should grant a writ compelling the District Court to dismiss or limit all claims that seek to remedy societal harms and to delay the bellwether trial until after Ohio's state-court actions conclude.

Respectfully submitted,

DAVE YOST
Ohio Attorney General (0056290)

*/s/ Jonathan Blanton*
JONATHAN BLANTON* (0070035)
Deputy Attorney General for
Major Litigation
  *\*Counsel of Record*

CHARLES MILLER (0073844)
Office Counsel
MICHAEL HENDERSHOT (0081842)
Chief Deputy Solicitor General
SAMUEL PETERSON (0081432)
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-728-1171
Jonathan.Blanton@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements for a writ and contains 7,619 words, and was prepared in Microsoft Word with 14-point Equity font. *See* Fed. R. App. P. 21(d)(1).


*/s/ Jonathan Blanton*
JONATHAN BLANTON

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019 the foregoing was filed electronically with the Clerk of Court via email.

I further certify that on August 30, 2019 a copy of the foregoing was served via electronic mail and United States First Class Mail upon the following:

Hon. Dan Aaron Polster
Carl B. Stokes Court House
801 West Superior Avenue,
Courtroom 18B
Cleveland, OH 44113-1837
Email: Polster_Chambers@
  ohnd.uscourts.gov

Elisa P. McEnroe
Morgan, Lewis & Bockius - Philadelphia
1701 Market Street
Philadelphia, PA 19103
Email: elisa.mcenroe@morganlewis.com

Sarah Carroll
Attorney, Appellate Staff
Civil Division, Room 7511
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington D.C. 20530
Email: sarah.w.carroll@usdoj.gov

Tara A. Fumerton
Jones Day - Chicago
Ste. 3500
77 West Wacker
Chicago, IL 60601
Email: tfumerton@jonesday.com

Adam D. Fuller
Brennan, Manna & Diamond - Akron
75 East Market Street
Akron, OH 44308
Email: adfuller@bmdllc.com

Tina M. Tabacchi
Jones Day - Chicago
Ste. 3500
77 West Wacker
Chicago, IL 60601
Email: tmtabacchi@jonesday.com

Donald W. Davis , Jr.
Brennan, Manna & Diamond - Akron
75 East Market Street
Akron, OH 44308
Email: dwdavis@bmdllc.com

Elizabeth Shively Boatwright
Brennan, Manna & Diamond - Akron
75 East Market Street
Akron, OH 44308
Email: esboatwright@bmdllc.com

Linda J. Singer
Motley Rice - Washington
Ste. 1001
401 Ninth Street NW
Washington, DC 20004
Email: lsinger@motleyrice.com

Mark S. Cheffo
Dechert - New York
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Email: mark.cheffo@dechert.com

Steven A. Reed
Morgan, Lewis & Bockius - Philadel-
phia
1701 Market Street
Philadelphia, PA 19103
Email: steven.reed@
  morganlewis.com

Dean T. Barnhard
Barnes & Thornburg - Indianapolis
11 South Meridian Street
Indianapolis, IN 46204
Email: dean.barnhard@btlaw.com

Kathleen L. Matsoukas
Barnes & Thornburg - Indianapolis
11 South Meridian Street
Indianapolis, IN 46204
Email: kathleen.matsoukas@btlaw.com

William E. Padgett
Barnes & Thornburg - Indianapolis
11 South Meridian Street
Indianapolis, IN 46204
Email: william.padgett@btlaw.com

Gregory N. Heinen
Foley & Lardner - Milwaukee
777 East Wisconsin Avenue
Milwaukee, WI 53202
Email: gheinen@foley.com

Jaclyn V. Piltch
Foley & Lardner - Boston
Ste. 2600
111 Huntington Avenue
Boston, MA 02199
Email: jpiltch@foley.com

Charles C. Lifland
O'Melveny & Myers - Los Angeles
Ste. 1500
400 South Hope Street
Los Angeles, CA 90071
Email: clifland@omm.com

Jonathan L. Stern
Arnold & Porter Kaye Scholer -
Washington
601 Massachusetts Avenue, NW
Washington, DC 20001
Email: jonathan.stern@apks.com

Geoffrey E. Hobart
Covington & Burling - Washington
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Email: ghobart@cov.com

Robert A. Nicholas
Reed Smith - Philadelphia
Ste. 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Email: rnicholas@reedsmith.com

Jenny A. Hergenrother
Alston & Bird - Atlanta
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Email: jenny.mendelsohn@
  alston.com

James W. Matthews
Foley & Lardner - Boston
Ste. 2600
111 Huntington Avenue
Boston, MA 02199
Email: JMatthews@foley.com

Katy E. Koski
Foley & Lardner - Boston
Ste. 2600
111 Huntington Avenue
Boston, MA 02199
Email: kkoski@foley.com

Kristina J. Matic
Foley & Lardner - Boston
Ste. 2600
111 Huntington Avenue
Boston, MA 02199
Email: kmatic@foley.com

Redi Kasollja
Foley & Lardner - Boston
Ste. 2600
111 Huntington Avenue
Boston, MA 02199
Email: rkasollja@foley.com (Inactive)

Timothy D. Johnson
Cavitch Familo & Durkin
20th Floor
1300 East Ninth Street
Cleveland, OH 44114
Email: tjohnson@cavitch.com

Brandan J. Montminy
Locke Lord - Dallas
Ste. 2800
2200 Ross Avenue
Dallas, TX 75201
Email: bran-
dan.montminy@lockelord.com

C. Scott Jones
Locke Lord - Dallas
Ste. 2800
2200 Ross Avenue
Dallas, TX 75201
Email: sjones@lockelord.com

John P. McDonald
Locke Lord - Dallas
Ste. 2800
2200 Ross Avenue
Dallas, TX 75201
Email: jpmcdonald@lockelord.com

Lauren M. Fincher
Locke Lord - Austin
Ste. 2200
600 Congress Avenue
Austin, TX 78701
Email: lfincher@lockelord.com

Erin G. Allen
Marcus & Shapira
35th Floor
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Email: allen@marcus-shapira.com

George M. Moscarino
Moscarino & Treu
Ste. 630
1422 Euclid Avenue
Cleveland, OH 44115
Email: gmoscarino@mosctreu.com

Robert M. Barnes
Marcus & Shapira
35th Floor
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Email: rbarnes@marcus-shapira.com

Scott D. Livingston
Marcus & Shapira
35th Floor
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Email: livingston@marcus-shapira.com

Laurie K. Miller
Jackson Kelly - Charleston
Ste. 1600
500 Lee Street
P.O. Box 553
Charleston, WV 25322
Email: lmiller@jacksonkelly.com

David G. Lambert
Office of the Prosecuting Attorney -
Cuyahoga County
8th Floor
Courts Tower, Justice Center
1200 Ontario Street
Cleveland, OH 44113
Email: dlambert@
  prosecutor.cuyahogacounty.us

Aelish Marie Baig
Robbins Geller Rudman & Dowd -
San Francisco
Ste. 1800
Post Montgomery Center
One Montgomery Street
San Francisco, CA 94104
Email: aelishb@rgrdlaw.com

Frank L. Gallucci , III
Plevin & Gallucci
2222 Illuminating Bldg.
55 Public Square
Cleveland, OH 44113
Email: fgallucci@pglawyer.com

William H. Falin
Moscarino & Treu
Ste. 630
1422 Euclid Avenue
Cleveland, OH 44115
Email: wfalin@mosctreu.com

John J. Haggerty
Fox Rothschild - Warrington
Ste. 300
2700 Kelly Road
Warrington, PA 18976
Email: jhaggerty@foxrothschild.com

Kaspar J. Stoffelmayr
Bartlit Beck - Chicago
Ste. 300
54 West Hubbard Street
Chicago, IL 60654
Email: kaspar.stoffelmayr@
  bartlit-beck.com

Wendy West Feinstein
Morgan, Lewis & Bockius - Pittsburgh
32nd Floor
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Email: wendy.feinstein@
  morganlewis.com

Hunter J. Shkolnik
Napoli Shkolnik
Ste. 305
400 Broadhollow Road
Melville, NY 11747
Email: hunter@napolilaw.com

Joseph W. Boatwright , IV
Cuyahoga County Department of
Law
7th Floor
2079 East Ninth Street
Cleveland, OH 44115
Email: jboatwright@
   cuyahogacounty.us

Joseph L. Ciaccio
Napoli Shkolnik - Melville
Ste. 305
400 Broadhollow Road
Melville, NY 11747
Email: jciaccio@napolilaw.com

Leo M. Spellacy , Jr.
Porter, Wright, Morris & Arthur -
Cleveland
Ste. 500
950 Main Avenue
Cleveland, OH 44113
Email: lspellacy@tddlaw.com

Tera N. Coleman
Baker & Hostetler - Cleveland
Ste. 2000
127 Public Square
Cleveland, OH 44114
Email: tcoleman@bakerlaw.com

Carole S. Rendon
Baker & Hostetler - Cleveland
Ste. 2000
127 Public Square
Cleveland, OH 44114
Email: crendon@bakerlaw.com

Alana V. Tanoury
Steptoe & Johnson - Columbus
Ste. 2200
41 South High Street
Columbus, OH 43215
Email: alana.tanoury@steptoe-
johnson.com

Brian J. Laliberte
Steptoe & Johnson - Columbus
Ste. 2200
41 South High Street
Columbus, OH 43215
Email: Brian.Laliberte@labertellc.com

Paul B. Maslo
Ogletree Deakins Nash Smoak &
Stewart - Dallas
Ste. 500
8117 Preston Road
Dallas, TX 75225
Email: paul.maslo@ogletree.com

Paul J. Napoli
Napoli Shkolnik
11th Floor
360 Lexington Avenue
New York, NY 10017
Email: PNapoli@napolilaw.com

Robin M. Wilson
Kaufman & Company
Ste. 1710
1001 Lakeside Avenue
Cleveland, OH 44114
Email: robin.wilson@
  kaufman-company.com

Salvatore C. Badala
Napoli Shkolnik - Melville
Ste. 305
400 Broadhollow Road
Melville, NY 11747
Email: sbadala@napolilaw.com

Scott Elliot Smith
Law Office of Smith & Phillips
Ste. 3F
6660 North High Street
Worthington, OH 43085
Email: ses@sestriallaw.com

Mark H. Lynch
Covington & Burling - Washington
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Email: mlynch@cov.com

Vincent I. Holzhall
Steptoe & Johnson - Columbus
Ste. 2200
41 South High Street
Columbus, OH 43215
Email: vince.holzhall@
  steptoe-johnson.com

Ashley W. Hardin
Williams & Connolly
725 Twelfth Street, NW
Washington, DC 20005
Email: ahardin@wc.com

Joseph F. Murray
Murray, Murphy, Moul & Basil
1114 Dublin Road
Columbus, OH 43215
Email: murray@mmmb.com

Steven M. Pyser
Williams & Connolly
725 Twelfth Street, NW
Washington, DC 20005
Email: spyser@wc.com

Shayna Erin Sacks
Napoli Shkolnik - Melville
Ste. 305
400 Broadhollow Road
Melville, NY 11747
Email: ssacks@napolilaw.com

Daniel J. Buckley
Vorys, Sater, Seymour & Pease - Cin-
cinnati
3500 Great American Tower
301 East Fourth Street
Cincinnati, OH 45202
Email: djbuckley@vorys.com

Donna M. Welch
Kirkland & Ellis - Chicago
300 North LaSalle Street
Chicago, IL 60654
Email: dwelch@kirkland.com

Andrea B. Daloia
Thompson Hine - Cleveland
3900 Key Tower
127 Public Square
Cleveland, OH 44114
Email: Andrea.Daloia@
    ThompsonHine.com

Aaron E. McQueen
Jackson Kelly - Akron
Ste. 201
50 South Main Street
Akron, OH 44308
Email: aa-
ron.mcqueen@jacksonkelly.com

Andrew N. Schock
Jackson Kelly - Akron
Ste. 201
50 South Main Street
Akron, OH 44308
Email: anschock@jacksonkelly.com

Mark W. Bernlohr
Jackson Kelly - Akron
Ste. 201
50 South Main Street
Akron, OH 44308
Email: mwbernlohr@jacksonkelly.com

Sandra K. Zerrusen
Jackson Kelly - Akron
Ste. 201
50 South Main Street
Akron, OH 44308
Email: skzerrusen@jacksonkelly.com

John R. Mitchell
Thompson Hine - Cleveland
3900 Key Tower
127 Public Square
Cleveland, OH 44114
Email: john.mitchell@
  thompsonhine.com

Stacey A. Greenwell
Thompson Hine - Cleveland
3900 Key Tower
127 Public Square
Cleveland, OH 44114
Email: stacey.greenwell@
  thompsonhine.com

Andrew J. O'Connor
Ropes & Gray - Boston
800 Boylston Street
Boston, MA 02199
Email: Andrew.O'Connor@
  ropesgray.com

Brien T. O'Connor
Ropes & Gray - Boston
800 Boylston Street
Boston, MA 02199
Email: Brien.O'Connor@
  ropesgray.com

Eric R. Delinsky
Zuckerman Spaeder - Washington
Ste. 1000
1800 M Street, NW
Washington, DC 20036
Email: edelinsky@zuckerman.com

Jordan D. Rauch
Dickinson Wright - Columbus
24th Floor
150 East Gay Street
Columbus, OH 43215
Email: jrauch@dickinsonwright.com

O. Judson Scheaf , III
Hahn, Loeser & Parks - Columbus
Ste. 1400
65 East State Street
Columbus, OH 43215
Email: JScheaf@hahnlaw.com

Daniel J. Hyzak
Gordon & Rees - Columbus
Ste. 2495
41 South High Street
Columbus, OH 43215
Email: dhyzak@grsm.com

Tyler G. Tarney
Gordon & Rees - Columbus
Ste. 2495
41 South High Street
Columbus, OH 43215
Email: ttarney@grsm.com

I further certify that on August 30, 2019 a copy of the foregoing was served via electronic mail to Multi-District Litigation Case No. 1:17-md-02084 Plaintiffs' counsel (mdl2804discovery@motleyrice.com) and Defendants' counsel (xALLDEFENDANTS-MDL2804-Service@arnoldporter.com).

*/s/ Jonathan Blanton*
JONATHAN BLANTON

# APPENDIX

**IN THE COMMON PLEAS COURT OF
ROSS COUNTY, OHIO
CIVIL DIVISION**

COURT OF COMMON PLEAS
2017 MAY 31  AM 8: 08

FILED
ROSS COUNTY COMMON PLEAS
CLERK OF COURTS
TY D. HINTON

| | |
|---|---|
| STATE OF OHIO *ex rel.* MIKE DeWINE, Ohio Attorney General, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.;  ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; AND DOES 1 THROUGH 100, INCLUSIVE, | **JURY TRIAL DEMANDED AND ENDORSED HEREON** |
| Defendants. | |

010396-17 959286 V1

# TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ................................................................................1

II.    JURISDICTION AND VENUE ..........................................................8

III.   PARTIES ............................................................................................8

     A.    Plaintiff ...................................................................................8

     B.    Defendants .............................................................................9

IV.   FACTUAL ALLEGATIONS ............................................................14

     A.    Defendants Used Multiple Avenues To Disseminate Their False And Deceptive Statements About Opioids. ...................................14

          1.    Defendants spread and continue to spread their false and deceptive statements through direct marketing of their branded opioids. .....................................................................15

          2.    Defendants used a diverse group of seemingly independent third parties to spread false and deceptive statements about the risks and benefits of opioids. ...............................17

               a.    Key Opinion Leaders ("KOLs") .................................19

                    (1)    Russell Portenoy .........................................20

                    (2)    Lynn Webster ...............................................21

               b.    Front Groups .............................................................23

                    (1)    American Pain Foundation ("APF") ..............24

                    (2)    American Academy of Pain Medicine ("AAPM") ...........26

     B.    Defendants' Marketing Scheme Misrepresented The Risks And Benefits Of Opioids. .........................................................29

          1.    Defendants falsely trivialized or failed to disclose the known risks of long-term opioid use. .......................................30

          2.    Defendants grossly overstated the benefits of chronic opioid therapy. .......................................................40

3.      Defendants also engaged in other unlawful, unfair,
and fraudulent misconduct. ........................................................45

C.      Defendants Targeted Susceptible Prescribers And Vulnerable
Patient Populations.................................................................47

D.      Although Defendants Knew That Their Marketing Of Opioids
Was False And Deceptive, They Fraudulently Concealed
Their Misconduct. ...................................................................48

E.      By Increasing Opioid Prescriptions And Use, Defendants'
Deceptive Marketing Scheme Has Fueled The Opioid Epidemic
And Devastated Ohio Communities. ........................................50

F.      The Defendants' Unlawful Opioid Promotion And Scheme
Has Caused Substantial Economic Injury To State Agencies ..............64

1.      Excessive opioid prescriptions paid for by the Department
of Medicaid and the Bureau of Workers' Compensation .........64

2.      Associated treatment costs paid for by the Department
of Medicaid and the Bureau of Workers' Compensation .........65

G.      Defendants' Fraudulent Marketing Has Led To Record Profits. .........66

V.      CAUSES OF ACTION ...............................................................66

FIRST CAUSE OF ACTION  PUBLIC NUISANCE OHIO PRODUCT LIABILITY
ACT ("PLA"), R.C. 2307.71, *ET SEQ.* ...........................................66

SECOND CAUSE OF ACTION  PUBLIC NUISANCE OHIO COMMON LAW ..................69

THIRD CAUSE OF ACTION  OHIO CONSUMER SALES PRACTICES
ACT ("CSPA")  R.C. 1345.02 AND 1345.03 ...................................72

FOURTH CAUSE OF ACTION  MEDICAID FRAUD R.C. 2307.60
(FOR VIOLATION OF R.C. 2913.40)...............................................81

FIFTH CAUSE OF ACTION  COMMON LAW FRAUD ...........................................83

SIXTH CAUSE OF ACTION  OHIO CORRUPT PRACTICES ACT
("OCPA")  R.C. 2923.31, *ET SEQ.* (AGAINST PURDUE, JANSSEN,
CEPHALON AND ENDO) ...............................................................89

A.      The Opioids Marketing Enterprise......................................90

B.      Conduct of the Opioids Marketing Enterprise .....................94

C.      Pattern of Racketeering Activity.........................................96

D.      Damages Caused by Defendants' Fraud ................................................99

PRAYER FOR RELIEF ...........................................................................100

JURY DEMAND ENDORSEMENT ............................................................101

PAGES 1 THROUGH 65 OMITTED

158.    Nationally, claims involving workers who take opioids are almost four times more likely to reach costs of over $100,000 than claims involving workers without opioids because opioid patients suffer greater side effects and are slower to return to work.[57]   Even adjusting for injury severity and self-reported pain score, receiving an opioid for more than seven days and receiving more than one opioid prescription increased the risk that a patient will be on work disability one year later.[58]   A prescription for opioids as the first treatment for a workplace injury doubled the average length of the claim.[59]

## G.    Defendants' Fraudulent Marketing Has Led To Record Profits.

159.    While the use of opioids has taken an enormous toll on the State of Ohio and its residents, Defendants have realized blockbuster profits.  In 2014 alone, opioids generated $11 billion in revenue for drug companies like Defendants.  Indeed, financial information indicates that each Defendant experienced a material increase in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct described above.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### PUBLIC NUISANCE
### OHIO PRODUCT LIABILITY ACT ("PLA"), R.C. 2307.71, *ET SEQ.*

160.    The State realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

---

[57] Jeffrey A. White, *et al.*, *The Effect of Opioid Use on Workers' Compensation Claim Cost in the State of Michigan*, 54(8) J. of Occupational & Environ. Med. 948-953 (2012).

[58] Gary M. Franklin, *et al.*, *Early Opioid Prescription and Subsequent Disability Among Workers with Back Injuries: The Disability Risk Identification Study Cohort*, 33(2) *Spine* 199-204 (2008).

[59] Dongchun Wang, *et al.*, *Longer-Term Use of Opioids*, Workers Comp. Res. Inst. (Oct. 2012).

161.    This action is brought by the State under the PLA to seek compensatory damages from Defendants for death, physical injury to person, emotional distress or physical damage to property.  Both the Department of Medicaid and BWC paid such costs for addiction treatment, MATs and other services necessary for the treatment of people addicted to prescription opioids, including the treatment of babies born afflicted with Neonatal Abstinence Syndrome.

162.    Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Ohioans or interferes with the comfortable enjoyment of life in violation of Ohio law.

163.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.  The staggering rates of opioid use resulting from Defendants' marketing efforts have caused harm to the community that includes, but is not limited to:

    a.    Upwards of 30% of all adults have used them.  These high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

    b.    Children too have been harmed by opioids.  They have been exposed to medications prescribed to family members or others, resulting in injury, addiction, and death.  Easy access to prescription opioids has made opioids a recreational drug of choice among Ohio teenagers; opioid use among teenagers is only outpaced by marijuana use.  Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

    c.    Ohioans who have never taken opioids also have suffered the costs of Defendants' public nuisance.  Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

    d.    More broadly, opioid use and misuse have driven Ohioans' health care costs higher.

e.     Employers have lost the value of productive and healthy employees who suffered from adverse consequences from opioid use.

f.     Defendants' success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendants' scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them.

g.     This demand also has created additional illicit markets in other opiates, particularly heroin.  The low cost of heroin has led some of those who initially become addicted to prescription opioids to migrate to cheaper heroin, fueling a new heroin epidemic in the process.

h.     The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on emergency services and law enforcement in the State.

i.     All of this has caused significant harm to the community – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken families and homes.

j.     These harms have taxed the human, medical, public health, law enforcement, and financial resources of the State.

k.     Defendants' interference with the comfortable enjoyment of life of a substantial number of people is entirely unreasonable because there is little social utility to opioid use and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

164.     Defendants knew or should have known that their promotion of opioid use would create a public nuisance.

a.     Defendants have engaged in massive production, promotion, and distribution of opioids for use by the citizens of the State.

b.     Defendants' actions created and expanded the market for opioids, promoting its wide use for pain management.

c.     Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs.

  d. Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

165. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used.  Defendants' actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain.  Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

166. The health and safety of the citizens of the State, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the State's citizens and residents.

167. Defendants' conduct has affected and continues to affect a considerable number of people within the State and is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

## <u>SECOND CAUSE OF ACTION</u>

### PUBLIC NUISANCE
### OHIO COMMON LAW

168. The State realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

169. This action is brought by the State under Ohio common law to seek damages and abate the public nuisance created by the Defendants.  This Cause of Action does not seek compensatory damages for death, physical injury to person, emotional distress, or physical damage to property.

PAGES 70 THROUGH 103 OMITTED



FILED
In The Court of Common Pleas
Madison County, Ohio

FEB 28 2018

Rosie J. Gardill
Clerk of Courts

## IN THE COURT OF COMMON PLEAS
## MADISON COUNTY, OHIO

| | |
|---|---|
| **STATE OF OHIO,**<br>ex rel. Mike DeWine, in his capacity as<br>Attorney General of the State of Ohio,<br><br>                 **PLAINTIFF,**<br><br>    v. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. CVH20180055

(Judge Costello )

**COMPLAINT**

**JURY TRIAL DEMANDED AND
ENDORSED HEREON**

**MCKESSON CORPORATION**
<u>Agent</u>:  **Corporation Service Company
50 West Broad Street
Suite 1330
Columbus, OH 43215**

**CARDINAL HEALTH, INC.**
<u>Agent</u>:  **CT Corporation System
4400 Easton Commons Way
Suite 125
Columbus, OH 43219**

**AMERISOURCEBERGEN DRUG
CORPORATION**
 <u>Agent</u>:  **CT Corporation System
4400 Easton Commons Way
Suite 125
Columbus, OH 43219**

**AND**

**MIAMI-LUKEN, INC.**                                )
<u>Agent</u>:    **William Powers**                     )
            **265 Pioneer Blvd.**                       )
            **Springboro, OH 45066**                )
                                                        )
                                                        )
            **DEFENDANTS.**                           )

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

PARTIES ...........................................................................................................4

I.      Plaintiff...............................................................................................4

II.     Defendants .........................................................................................5

JURISDICTION AND VENUE .........................................................................6

FACTUAL BACKGROUND AND ALLEGATIONS ..........................................6

I.      The Opioid Epidemic .........................................................................6

        A.      Prescription Opioids Are Highly Dangerous, and Their Use Has Led
                to a National Opioid Crisis ......................................................6

        B.      The Opioid Epidemic in Ohio Has Been Catastrophic....................10

        C.      The Consequences of the Opioid Epidemic Are Far-Reaching ......11

II.     The Distribution of Opioids Is Highly Regulated .............................15

        A.      Distributors Have A Duty Under Federal and State Law to Guard
                Against and Report Unlawful Diversion..........................................17

        B.      The DEA Has Provided Wholesale Distributors, Including
                Defendants, With Specific Guidance Regarding Their Duties ........19

III.    Defendants Breached Their Duties to Prevent Opioid Diversion............23

        A.      McKesson ..............................................................................23

        B.      Cardinal ................................................................................26

        C.      AmerisourceBergen ...............................................................28

        D.      Miami-Luken .........................................................................29

        E.      Despite Prior Regulatory Actions, Defendants Violated Their Duties
                In Ohio ..................................................................................30

IV.     Defendants' Misconduct Has Injured and Continues to Injure the State and
        Its Citizens .........................................................................................32

**CAUSES OF ACTION** ...................................................................................**34**

**COUNT I – ABSOLUTE PUBLIC NUISANCE**...............................................**34**

**COUNT II – QUALIFIED PUBLIC NUISANCE** .............................................**37**

**COUNT III – NEGLIGENCE** ..........................................................................**40**

PAGES 1 THROUGH 10 OMITTED

34.    Much of the data regarding opioid distribution, sales, and consumption is in the hands of Defendants or others. But even the publicly available data shows that Ohio as a whole and certain parts in particular consume an amount of opioids that can be explained only by the diversion of opioids for non-medical purposes.

35.    In 2016 alone, 2.3 million Ohio patients - roughly 20% of the State's population - were prescribed an opioid drug.[32] According to public data from the DEA, over 18.8 billion milligrams - over 20 tons - of prescription opioids were distributed in Ohio from 2013-2016.[33] These conclusions about the extent of opioid diversion are further supported by data from the Ohio Automated RX Reporting System ("OARRS") showing that in 2016, the "average" county in Ohio received saw distributions of approximately 65 pills per person per year (including children) and several Ohio counties have seen annual distributions exceeding 100 opioid pills for every man, woman and child and 1,000 pills per user. [34]

C.    **The Consequence of the Opioid Epidemic Are Far-Reaching**

36.    Overdose deaths are only one consequence of the opioid epidemic. Opioid addiction and misuse has also resulted in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of naloxone - the antidote to opioid overdose. In Ohio, administrations of naloxone (or Narcan) by Ohio EMS personnel rose from 7,139 in 2006 to 40,837 in 2017 (through November 20, 2017).[35] This means that, on average, Ohio EMS personnel administered over 111 doses of naloxone every day in 2017 alone.

---

[32] Ohio Automated RX Reporting System, 2016 Annual Report, *available at* https://www.ohiopmp.gov/documents/Annual%20Report%20(2016).pdf.
[33] DEA, ARCOS Retail Drug Summary Reports, https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/.
[34] Ohio Automated RX Reporting System, https://www.ohiopmp.gov/Default.aspx.
[35] Ohio Emergency Medical Services, Administration of Naloxone By Emergency Medical Services In Ohio – 2014, *available at* http://www.ems.ohio.gov/links/ems_NaloxoneFlyer.pdf; Ohio Department of Public Safety, Division of Emergency Medical Services, Naloxone Administration by Ohio EMS Providers, 2008-2017, *available at* http://www.ems.ohio.gov/links/emsNaloxone2008-2017.pdf.

37.     Rising opioid use and abuse also have negative social and economic consequences far beyond overdoses. According to a 2016 study by a Princeton economist, unemployment is increasingly correlated with prescription painkiller use.[36] Nearly half of surveyed men not in the labor force said they took painkillers daily, and two-thirds of them were on prescription medications - compared to just 20% of employed men who reported taking painkillers.[37]

38.     The abuse of opioids has caused additional medical conditions that have injured Ohio residents and required care often paid for by the State. For example, the number of cases of chronic Hepatitis C in Ohio nearly tripled from 2011-2015.[38] The increase is largely a result of intravenous drug use stemming from the opioid epidemic, including intravenous use of prescription OxyContin and other prescription painkillers.[39]

39.     Even infants have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS").[40] These infants painfully withdraw from the drug once they are born, cry and wail nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms.[41] Research has indicated that these children are likely to suffer from continued, serious neurologic and cognitive

---

[36] Alan B. Krueger, *Where Have All the Workers Gone? An inquiry into the decline of the U.S. labor force participation rate*, Brookings Papers on Economic Activity, Conference Draft (Aug. 26, 2017).
[37] *Id.*
[38] CDC, 2015 Ohio – State Health Profile, https://www.cdc.gov/nchhstp/stateprofiles/pdf/ohio_profile.pdf.
[39] Jon E. Zibbell, et al., *Increase in Hepatitis C Virus Infection Related to Injection Drug Use Among Persons Aged <30 Years – Kentucky, Tennessee, Virginia and West Virginia, 2006-2012*, 64 Morbidity and Mortality Weekly Report (2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6417a2.htm?s_cid=mm6417a2_w.
[40] Ohio Department of Health, Neonatal Abstinence Syndrome (NAS) in Ohio, 2006-2015 Report, *available at* https://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/health/injury-prevention/NAS-Summary-Report.pdf?la=en.
[41] *See* Intermountain Healthcare, Fact Sheet for Patients and Families, *available at* https://intermountainhealthcare.org/ext/Dcmnt?ncid=522597150.

impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life threatening. Babies with NAS typically require extensive hospital stays as they withdraw from opioids.

40.     In Ohio, the incidence of NAS related to opioids and other illegal narcotics increased 816% between 2006 and 2015, with opioids and other illegal narcotics being the most commonly implicated drugs since 2009.[42]

41.     In 2013, the average inpatient stay and bill for NAS infants in Ohio was four times longer and four times higher than for other infants.[43] Newborns with NAS spent approximately 26,000 days in Ohio hospitals in 2014, with health care costs totaling $105 million.[44] In 2014, 1,875 babies with NAS were admitted to inpatient settings in Ohio, an average of more than five per day. In April 2016, it was reported by the Ohio Perinatal Quality Collaborative that 4,000 babies had been treated for NAS at Ohio hospitals during the preceding 18-month period.[45] These figures continue to worsen with new data.[46]

42.     Multiple State agencies and State programs have borne many of the costs associated with the medical treatment required by children suffering from NAS.

43.     Children have also been injured by the dislocation caused by opioid abuse and addiction. In 2015, 28% of Ohio children taken into custody were removed from their homes

---

[42] Ohio Department of Health, Neonatal Abstinence Syndrome (NAS) in Ohio, 2006-2015 Report, *available at* https://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/health/injury-prevention/NAS-Summary-Report.pdf?la=en.
[43] Ohio Department of Health, Neonatal Abstinence Syndrome and Drug Use Among Pregnant Women in Ohio 2004-2011, *available at* http://mha.ohio.gov/Portals/0/assets/Research/Reports/2013-no1-nas-2004-11-epidemiological-report.pdf.
[44] Ohio Maternal Opiate Medical Supports Project, 2016 Infant Mortality Summit, *available at* http://www.odh.ohio.gov/~/media/ODH/ASSETS/Files/cfhs/octpim/imsummit2016/MOMS---Maternal-Opiate-Medical-Support.pdf.
[45] Christopher Evans, *Addiction City: Ohio's Opiate Addicts Would Make the Fifth Largest City in the State* Cleveland.com (Apr. 23, 2016), http://www.cleveland.com/metro/index.ssf/2016/04/--the_heroin_crisis_in_ohio.html.
[46] *See., e.g.,* Neontal Abstinence Sybdrome (NAS) in Ohio 2006-15 Report, *available at* https://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/health/injury-prevention/NAS-Summary-Report.pdf.

due to their parents' use of opioids.[47] Seventy percent of infants placed in Ohio's foster care system are children of parents with opioid addictions.[48] Between 2011 and 2015, Ohio's child protection agencies experienced a 9% increase in the number of children - nearly 1,100 - in foster care driven by parental drug addiction.[49] The State spends an estimated $45 million per year for placement costs of children in custody due to parental use of opioids or heroin.[50]

44.     Opioid addiction is now the primary reason that Ohioans seek substance abuse treatment.  In 2014, 37% of admissions for drug abuse were associated with a primary diagnosis of opioid abuse or dependence.[51]

45.     Since 2014, the State has repeatedly increased spending on Medication Assisted Treatments ("MATs") to address opioid addiction.  Expenditures on MATs have more than doubled, from $40 million in 2014 to over $110 million in 2016.  This expense is in addition to treatment and counseling services which costs Ohio another $462 million between 2014 and 2016.[52]  Courts, jails, and prisons received at least $16 million more in Ohio grants to cover the costs of MATs, treatment, and case management for the uninsured.[53]

46.     Law enforcement agencies have increasingly associated opioid abuse with both violent crimes and property crimes.  For example, the opioid epidemic has prompted a growing

---

[47] Public Children Services Association of Ohio, Testimony of Angela Sausser (Executive Director) on Sub. H.B. 49 (May 17, 2017), *available at* http://advocatesforohio.org/perch/resources/PCSAO-Subcommittee-Testimony.pdf.
[48] Public Children Services Associate of Ohio, Child Welfare Opiate Engagement Project, *available at* http://www.pcsao.org/perch/resources/downloads/cw-opiate-white-paper-final-9-18-14.pdf.
[49] Public Children Services Association of Ohio, Ohio's Opiate Epidemic and Child Protection (2016), *available at* http://www.pcsao.org/pdf/advocacy/PCSAOOpiateEpidemicChildProtectionBrief2016.pdf.
[50] Public Children Services Association of Ohio, Opiate Epidemic, http://www.pcsao.org/programs/opiate-epidemic.
[51] Ohio Mental Health & Addiction Services, Unduplicated Admissions for Opiate Abuse and Dependence, *available at* http://mha.ohio.gov/Portals/0/assets/Research/Maps/Ohio_MACSIS_2014_v6.pdf.
[52] Rachel Dissell, *Ohio's spending on opioid addiction treatment drugs Vivitrol and Suboxone spikes, spurs debate on what treatments work*, Cleveland.com (Apr. 30, 2017), http://www.cleveland.com/metro/index.ssf/2017/04/ohios_spending_on_opioid_addiction_treatment_drugs_like_vivitrol_and_suboxone_spikes_spurs_debate_what_treatments_work.html.
[53] *Id.*

14

trend of crimes against pharmacies, including robbery and burglary. The number of criminal possession charges for opioids has also significantly increased since 2012.

47.    A study by the Ohio Substance Abuse Monitoring Network reported on the connection between oxycodone use and heroin addiction, finding that "young new heroin abusers seeking treatment reported OxyContin abuse prior to becoming addicted to heroin," often after OxyContin became too expensive or difficult to obtain.[54] In 2014 and 2015, Ohio recorded the largest number of heroin-related fatal overdoses of any state, with one in every nine deaths in the United States occurring in Ohio.[55] In 2015, heroin was involved in 46.7% of all overdose deaths in Ohio.[56]

## II.    The Distribution of Opioids Is Highly Regulated

48.    Given the extreme risks posed by prescription opioids, these drugs are heavily regulated under both federal and state law. Under the federal Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, many opioids are classified as Schedule II controlled substances. This is due to their "high potential for abuse which may lead to severe psychological or physical dependence."[57] Opioids are likewise a controlled substance under Ohio law and are categorized as "dangerous drugs." R.C. 4729.01(F).

49.    To prevent the diversion of pharmaceutical drugs (including opioids) for illicit use, federal and state laws create a closed system of distribution for all controlled substances. This closed system imposes very specific duties upon anyone involved in the supply

---

[54] Ohio Substance Abuse Monitoring Network, OSAM Rapid Response Investigation Reveals Connection Between OxyContin Abuse and Heroin Addiction in Some Individuals, *available at* http://mha.ohio.gov/Portals/0/assets/Learning/OSAM/Jan02ConnxtsOxy.pdf.

[55] The Henry J. Kaiser Family Foundation, Opioid Overdose Deaths (2014 and 2015), https://www.kff.org/other/state-indicator/opioid-overdose-deaths-by-type-of-opioid/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[56] Ohio Department of Health, 2015 Ohio Drug Overdose Data General Findings, *available at* https://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/health/injury-prevention/2015-Overdose-Data/2015-Ohio-Drug-Overdose-Data-Report-FINAL.pdf.

[57] DEA, Controlled Substance Schedules, https://www.deadiversion.usdoj.gov/schedules/.

PAGES 16 THROUGH 33 OMITTED

119.    If Defendants had adhered to effective controls to guard against diversion, the State and its citizens would have avoided significant injury and loss.

120.    Defendants made substantial profits based on their failure to prevent illegal diversion of opioids into illegitimate channels in Ohio. Defendants' wrongdoing has foreseeably caused injuries to Ohio's citizens and financial damages to the State. Defendants knew full well that the State would be unjustly forced to bear the costs of these injuries and damages.

121.    At all relevant times, Defendants engaged in wrongful conduct, and continue to do so, knowing that the State, in its role of providing protection and care for its citizens, would have to provide or pay for additional costs to the healthcare, criminal justice, social services, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

122.    Defendants' distribution of excessive amounts of prescription opioids resulted in opioid diversion and contributed to an illegal opioid market in Ohio, while showing a reckless disregard for the safety of the State and its citizens. Defendants' conduct poses a continuing threat to the health, safety, and welfare of the State and its citizens.

123.    It was reasonably foreseeable to Defendants that the State would be forced to bear substantial expenses as a result of Defendants' acts in failing to prevent opioid diversion and contributing to an illegal opioid market and improper opioid use in Ohio.

## CAUSES OF ACTION UNDER OHIO LAW

## COUNT I

### ABSOLUTE PUBLIC NUISANCE

124.    Paragraphs 1 through 123 of the Complaint are hereby repeated and re-alleged as if fully set forth herein.

34

125.    The Attorney General is authorized to bring suit on behalf of the State and its citizens to address an absolute public nuisance.

126.    Defendants, through the actions described in the Complaint, have created - or were a substantial factor in creating - an absolute public nuisance by unreasonably and intentionally or unlawfully interfering with a right common to the general public.

127.    Defendants have caused an absolute public nuisance, in that they have committed offenses against the public order and economy of the State by unlawfully and/or intentionally

      a.     facilitating the distribution and sale of prescription opioids from premises in and around Ohio to Ohio citizens who should not be receiving them - including children, people at risk of overdose or suicide, and criminals;

      b.     failing to implement effective controls and procedures in their supply chains to guard against the diversion of controlled substances; and

      c.     failing to design and operate an adequate system to detect, halt, and report suspicious orders of controlled substances.

128.    The State and its citizens have a public right to be free from the substantial injury to public health, safety, peace, comfort, and convenience that has resulted from Defendants' illegal conduct related to the diversion of opioids.

129.    Defendants' misconduct has unreasonably interfered with the common rights of the public, including, but not limited to, the right to be free from the nuisance alleged herein.

130.    Defendants' interference with these public rights is unreasonable because it

      a.     has harmed and will continue to harm the public health and public peace of Ohio;

      b.     has harmed and will continue to harm Ohio neighborhoods and communities by increasing the levels of vagrancy and property crime, and thereby interfering with the rights of the community at large;

      c.     violates Federal and State statutes and regulations;

      d.     is of a continuing nature, and has produced long-lasting effects; and

e.    is, or should be, known to Defendants that their conduct has a significant effect upon the public rights of Ohio citizens and the State.

131.    The nuisance undermines Ohio citizens' public health, quality of life, and safety. It has resulted in increased crime and property damage and in higher rates of addiction, overdoses, and dysfunction within Ohio's families and communities.

132.    Public resources are being consumed in efforts to address the opioid epidemic, thereby reducing available resources that could be used to benefit the Ohio public at large.

133.    At all times, all Defendants had the obligation and ability to control the nuisance-causing distribution of opioids in Ohio.

134.    As a direct and proximate result of the nuisance, Ohio citizens have suffered in their ability to enjoy rights of the public.

135.    As a direct and proximate result of the nuisance, the State has sustained significant economic harm by spending substantial sums trying to fix the societal harms caused by Defendants' nuisance-causing activity, including costs to the State's healthcare, criminal, justice, social services, and education systems. The State has also incurred costs relating to lost productivity and lower tax revenue.

136.    The State has also suffered unique harms of a kind that are different from Ohio citizens at large, namely, that the State has been harmed in its proprietary interests.

137.    The State asserts this cause of action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in R.C. 2307.71. The State seeks recovery of its economic damages and not any compensatory damages for death, physical injury to person, emotional distress, or physical damage to property.

138.    Pursuant to Ohio Rule 8(A), the State avers that it seeks damages in excess of twenty-five thousand dollars.

139.    The State respectfully requests that this Court enter judgment in its favor jointly and severally against Defendants and seeks:

    a.    an order to abate the nuisance and prevent the further occurrence of such harm and inconvenience by enjoining Defendants from failing to fulfill their obligations to prevent opioid diversion, including, but not limited to,

        i)    requiring each Defendant to provide quarterly shipment data in ARCOS format to the Attorney General for three (3) years with substantial penalties for failure to do so;

        ii)    requiring each Defendant to provide copies of all suspicious order reports filed with the DEA to the Ohio Board of Pharmacy and to the Attorney General simultaneously when filed with the DEA with substantial penalties for failure to do so; and

        iii)    requiring each Defendant to provide a written explanation and report as to how any suspicions of diversion were resolved to both the Ohio Board of Pharmacy and the Attorney General prior to filling any order reported to the DEA as "suspicious";

    b.    compensatory damages for increased costs and expenses for the State, including, but not limited to, damages relating to Ohio's healthcare, criminal, justice, social services, and education systems;

    c.    punitive damages;

    d.    attorney's fees and costs; and

    e.    such further relief as justice and equity may require.

## COUNT II

### QUALIFIED PUBLIC NUISANCE

140.    Paragraphs 1 through 139 of the Complaint are hereby repeated and re-alleged as if fully set forth herein.

141.    The Attorney General is authorized to bring suit on behalf of the State and its citizens to address a qualified public nuisance.

142.    Defendants, through the actions described in the Complaint, have created - or were a substantial factor in creating - a qualified public nuisance by unreasonably, negligently, and/or carelessly interfering with a right common to the general public.

143.    Defendants have caused a qualified public nuisance, in that they have committed offenses against the public order and economy of the State, by, among other things, unlawfully and/or negligently

a.    facilitating the distribution and sale of prescription opioids from premises in and around Ohio to Ohio citizens who should not be receiving them - including children, people at risk of overdose or suicide, and criminals;

b.    failing to implement effective controls and procedures in their supply chains to guard against theft, diversion, and misuse of controlled substances; and

c.    failing to design and operate an adequate system to detect, halt, and report suspicious orders of controlled substances.

144.    The State and its citizens have a public right to be free from the substantial injury to public health, safety, peace, comfort, and convenience that has resulted from Defendants' illegal conduct related to the diversion of opioids.

145.    Defendants' activities unreasonably interfere with the common rights of the public, including, but not limited to, the right to be free from the nuisance alleged herein.

146.    Defendants' interference with these public rights is unreasonable because it

a.    has harmed and will continue to harm the public health and public peace of Ohio;

b.    has harmed and will continue to harm Ohio neighborhoods and communities by increasing the levels of vagrancy and property crime, and thereby interfering with the rights of the community at large;

c.    violates Federal and State statutes and regulations;

d.    is of a continuing nature, and has produced long-lasting effects; and

e.    is, or should be, known to Defendants that their conduct has a significant effect upon the public rights of Ohio citizens and the State.

38

147. Defendants' actions are in violation of the standard of care set by Ohio and Federal law and regulations.

148. The nuisance undermines Ohio citizens' public health, quality of life, and safety. It has resulted in increased crime and property damage and in higher rates of addiction, overdoses, and dysfunction within Ohio's families and communities.

149. Public resources are being consumed in efforts to address the opioid epidemic, thereby reducing available resources that could be used to benefit the Ohio public at large.

150. At all times, all Defendants have had the obligation and ability to control the nuisance-causing distribution of opioids in Ohio.

151. As a direct and proximate result of the nuisance, Ohio citizens have suffered in their ability to enjoy rights of the public.

152. As a direct and proximate result of the nuisance, the State has sustained significant economic harm by spending substantial sums trying to fix the societal harms caused by Defendants' nuisance-causing activity, including costs to the State's healthcare, criminal, justice, social services, and education systems.

153. The State has also suffered unique harms of a kind that are different from Ohio citizens at large, namely, that the State has been harmed in its proprietary interests.

154. The State asserts this cause of action as a common law tort claim for qualified public nuisance and not as a "product liability claim" as defined in R.C. 2307.71. The State seeks recovery of its economic damages and not any compensatory damages for death, physical injury to person, emotional distress, or physical damage to property.

155. Pursuant to Ohio Rule 8(A), the State avers that it seeks damages in excess of twenty-five thousand dollars.

156.    The State respectfully requests that this Court enter judgment in its favor jointly and severally against Defendants and seeks:

    a.    an order to abate the nuisance and prevent the further occurrence of such harm and inconvenience by enjoining Defendants from failing to fulfill their obligations to prevent opioid diversion, including, but not limited to,

        i)    requiring each Defendant to provide quarterly shipment data in ARCOS format to the Attorney General for three (3) years with substantial penalties for failure to do so;

        ii)    requiring each Defendant to provide copies of all suspicious order reports filed with the DEA to the Ohio Board of Pharmacy and to the Attorney General simultaneously when filed with the DEA with substantial penalties for failure to do so; and

        iii)    requiring each Defendant to provide a written explanation and report as to how any suspicions of diversion were resolved to both the Ohio Board of Pharmacy and the Attorney General prior to filling any order reported to the DEA as "suspicious";

    b.    compensatory damages for increased costs and expenses for the State, including, but not limited to, damages relating to Ohio's healthcare, criminal, justice, social services, and education systems;

    c.    punitive damages;

    d.    attorney's fees and costs; and

    e.    such further relief as justice and equity may require.

## COUNT III

### NEGLIGENCE

157.    Paragraphs 1 through 156 of the Complaint are hereby repeated and re-alleged as if fully set forth herein.

158.    Defendants owed a duty of reasonable care under the circumstances to the State and its citizens.

159.    Defendants' conduct fell below this standard of reasonable care. Defendants' negligent acts include, but are not limited to,

PAGES 41 THROUGH 43 OMITTED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: Case No. 18-op-45090 | Judge Dan Aaron Polster |
| THE COUNTY OF SUMMIT, OHIO; SUMMIT COUNTY PUBLIC HEALTH; THE CITY OF AKRON; THE CITY OF BARBERTON; THE VILLAGE OF BOSTON HEIGHTS; BOSTON TOWNSHIP; THE VILLAGE OF CLINTON; COPLEY TOWNSHIP; COVENTRY TOWNSHIP; THE CITY OF CUYAHOGA FALLS; THE CITY OF FAIRLAWN; THE CITY OF GREEN; THE VILLAGE OF LAKEMORE; THE VILLAGE OF MOGADORE; THE CITY OF MUNROE FALLS; THE CITY OF NEW FRANKLIN; THE CITY OF NORTON; THE VILLAGE OF PENINSULA; THE VILLAGE OF RICHFIELD; THE VILLAGE OF SILVER LAKE; SPRINGFIELD TOWNSHIP; THE CITY OF STOW; THE CITY OF TALLMADGE; VALLEY FIRE DISTRICT; STATE OF OHIO EX REL., PROSECUTING ATTORNEY FOR SUMMIT COUNTY, SHERRI BEVAN WALSH, THE DIRECTOR OF LAW FOR THE CITY OF AKRON, EVE BELFANCE, THE DIRECTOR OF LAW FOR THE CITY OF BARBERTON, LISA MILLER, THE DIRECTOR OF LAW FOR THE CITY OF TALLMADGE, MEGAN RABER; THE LAW DIRECTOR FOR THE CITY OF CUYAHOGA FALLS, RUSS BALTHIS, THE LAW DIRECTOR FOR THE CITY OF FAIRLAWN, BRYAN NACE, THE LAW DIRECTOR FOR THE CITY OF GREEN, INTERIM LAW DIRECTOR BILL CHRIS, THE LAW DIRECTOR FOR THE CITY OF MOGADORE, MARSHAL M. PITCHFORD, THE LAW DIRECTOR FOR THE CITY OF MUNROE FALLS, TOM | **CORRECTED SECOND AMENDED COMPLAINT AND JURY DEMAND** |

KOSTOFF, THE LAW DIRECTOR FOR
THE CITY OF NEW FRANKLIN, THOMAS
MUSARRA, THE LAW DIRECTOR FOR
THE CITY OF NORTON, JUSTIN
MARKEY; THE LAW DIRECTOR FOR THE
CITY OF STOW, AMBER ZIBRITOSKY;
THE VILLAGE SOLICITOR FOR THE
VILLAGE OF BOSTON HEIGHTS,
MARSHAL PITCHFORD), THE SOLICITOR
FOR BOSTON TOWNSHIP, ED
PULLEKINS), SOLICITOR FOR THE
VILLAGE OF CLINTON, MARSHAL
PITCHFORD, THE LAW SOLICITOR FOR
COPLEY TOWNSHIP, IRV SUGARMAN,
THE LAW SOLICITOR FOR COVENTRY
TOWNSHIP, IRV SUGARMAN, THE LAW
SOLICITOR FOR THE VILLAGE OF
LAKEMORE, IRV SUGARMAN, THE
SOLICITOR FOR THE VILLAGE OF
PENINSULA, BRAD BRYAN, THE LAW
SOLICITOR FOR THE VILLAGE OF
RICHFIELD, WILLIAM HANNA, THE
SOLICITOR THE VILLAGE OF SILVER
LAKE, BOB HEYDORN, AND THE
ADMINISTRATOR & LEGAL COUNSEL
FOR SPRINGFIELD TOWNSHIP, WARREN
PRICE,

                                    Plaintiffs,


         vs.

PURDUE PHARMA, L.P.; PURDUE
PHARMA, INC.; THE PURDUE
FREDERICK COMPANY, INC.; ENDO
HEALTH SOLUTIONS INC.; ENDO
PHARMACEUTICALS, INC.; PAR
PHARMACEUTICAL, INC.; PAR
PHARMACEUTICAL COMPANIES, INC.
F/K/A PAR PHARMACEUTICAL
HOLDINGS, INC.; JANSSEN
PHARMACEUTICALS, INC.; ORTHO-
MCNEIL-JANSSEN PHARMACEUTICALS,
INC. N/K/A JANSSEN
PHARMACEUTICALS, INC.; / JANSSEN
PHARMACEUTICA, INC. N/K/A JANSSEN

PHARMACEUTICALS, INC.; JOHNSON &
JOHNSON; NORAMCO, INC.; TEVA
PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.; ALLERGAN PLC F/K/A
ACTAVIS PLC; ALLERGAN FINANCE
LLC, F/K/A/ ACTAVIS, INC., F/K/A
WATSON PHARMACEUTICALS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; ACTAVIS PHARMA, INC.
F/K/A WATSON PHARMA, INC; INSYS
THERAPEUTICS, INC., MALLINCKRODT
PLC; MALLINCKRODT LLC; SPECGX
LLC, AMERISOURCEBERGEN DRUG
CORPORATION; ANDA, INC.; CARDINAL
HEALTH, INC.; CVS HEALTH
CORPORATION; DISCOUNT DRUG
MART, INC.; HBC SERVICE COMPANY;
HENRY SCHEIN, INC.; HENRY SCHEIN
MEDICAL SYSTEMS, INC.; MCKESSON
CORPORATION; MIAMI-LUKEN, INC.;
PRESCRIPTION SUPPLY, INC.; RITE AID
CORPORATION.; RITE AID OF
MARYLAND, INC.; D/B/A RITE-AID MID-
ATLANTIC CUSTOMER SUPPORT
CENTER, INC; WALGREENS BOOTS
ALLIANCE, INC. A/K/A WALGREEN CO.,
AND WALMART INC. F/K/A WAL-MART
STORES, INC.,

Defendants.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 3

JURISDICTION AND VENUE .......................................................................................... 8

PARTIES ............................................................................................................................... 9

I.      PLAINTIFFS ............................................................................................................ 9

II.    DEFENDANTS ........................................................................................................ 15

       A.      Marketing Defendants ................................................................................ 15

            1.      Purdue Entities ................................................................................ 15

            2.      Actavis Entities ............................................................................... 17

            3.      Cephalon Entities ............................................................................ 18

            4.      Janssen Entities ............................................................................... 19

            5.      Endo Entities .................................................................................... 22

            6.      Insys Therapeutics, Inc. .................................................................. 23

            7.      Mallinckrodt Entities ...................................................................... 24

       B.      Distributor Defendants .............................................................................. 26

            1.      AmerisourceBergen Drug Corporation .......................................... 27

            2.      Anda, Inc. ......................................................................................... 27

            3.      Cardinal Health, Inc. ...................................................................... 27

            4.      CVS Health Corporation ................................................................. 28

            5.      Discount Drug Mart, Inc. ................................................................ 28

            6.      HBC Service Company .................................................................... 28

            7.      Henry Schein Entities ..................................................................... 28

            8.      McKesson Corporation .................................................................... 30

            9.      Miami-Luken, Inc. .......................................................................... 30

            10.    Prescription Supply, Inc. ................................................................. 31

            11.    Rite Aid Corporation ...................................................................... 31

            12.    Walgreens Boots Alliance, Inc. ...................................................... 31

            13.    Walmart Inc. .................................................................................... 32

       C.      Agency and Authority ................................................................................ 32

FACTUAL ALLEGATIONS ............................................................................................. 33

I.      Facts Common to All Claims .............................................................................. 33

<u>**TABLE OF CONTENTS**</u>
(continued)

<u>**Page**</u>

A. Opioids and Their Effects ................................................................. 33

B. The Resurgence of Opioid Use in the United States ............................................. 37

    1. The Sackler Family Integrated Advertising and Medicine ..................... 37

    2. Purdue Developed and Aggressively Promoted OxyContin.................. 38

    3. Other Marketing Defendants Leapt at the Opioid Opportunity .............. 43

C. Defendants' Conduct Created an Abatable Public Nuisance ............................... 45

D. The Marketing Defendants' Multi-Pronged Scheme to Change Prescriber Habits and Public Perception and Increase Demand for Opioids ...................... 46

    1. The Marketing Defendants Promoted Multiple Falsehoods About Opioids ................................................................. 47

        a. Falsehood #1: The risk of addiction from chronic opioid therapy is low ................................................................. 48

            i. Purdue's misrepresentations regarding addiction risk ................................................................. 49

            ii. Endo's misrepresentations regarding addiction risk ........ 56

            iii. Janssen's misrepresentations regarding addiction risk ................................................................. 58

            iv. Cephalon's misrepresentations regarding addiction risk ................................................................. 60

            v. Actavis's misrepresentations regarding addiction risk ................................................................. 61

            vi. Mallinckrodt's misrepresentations regarding addiction risk ................................................................. 62

        b. Falsehood #2: To the extent there is a risk of addiction, it can be easily identified and managed ........................................... 64

        c. Falsehood #3: Signs of addictive behavior are "pseudoaddiction," requiring more opioids ................................. 67

        d. Falsehood #4: Opioid withdrawal can be avoided by tapering ................................................................. 70

        e. Falsehood #5: Opioid doses can be increased without limit or greater risks ................................................................. 71

        f. Falsehood #6: Long-term opioid use improves functioning ....... 74

        g. Falsehood #7: Alternative forms of pain relief pose greater risks than opioids ................................................................. 80

Case: 1:17-md-02804-DAP Doc #: 513-1 Filed: 05/29/18 6 of 343. PageID #: 10561

**TABLE OF CONTENTS**
(continued)

Page

h.    Falsehood #8: OxyContin provides twelve hours of pain relief .................................................................................. 83

i.    Falsehood #9: New formulations of certain opioids successfully deter abuse ............................................... 88

     i.    Purdue's deceptive marketing of reformulated OxyContin and Hysingla ER ........................................... 89

     ii.    Endo's deceptive marketing of reformulated Opana ER ................................................................................ 92

     iii.    Other Marketing Defendants' misrepresentations regarding abuse deterrence ................................. 98

2.    The Marketing Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Channels ........................ 100

a.    The Marketing Defendants Directed Front Groups to Deceptively Promote Opioid Use ............................................. 100

     i.    American Pain Foundation ........................................... 102

     ii.    American Academy of Pain Medicine and the American Pain Society ................................................. 105

     iii.    Federation of State Medical Boards ............................. 108

     iv.    The Alliance for Patient Access .................................... 109

     v.    The U.S. Pain Foundation ............................................. 113

     vi.    American Geriatrics Society .......................................... 114

b.    The Marketing Defendants Paid Key Opinion Leaders to Deceptively Promote Opioid Use ............................................. 115

     i.    Dr. Russell Portenoy ..................................................... 117

     ii.    Dr. Lynn Webster ......................................................... 120

     iii.    Dr. Perry Fine ................................................................ 122

     iv.    Dr. Scott Fishman ......................................................... 124

c.    The Marketing Defendants Disseminated Their Misrepresentations Through Continuing Medical Education Programs .................................................................................... 126

d.    The Marketing Defendants Used "Branded" Advertising to Promote their Products to Doctors and Consumers ................... 129

## <u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

|  |  |  |  |  |
|--|--|--|--|--|
| | | e. | The Marketing Defendants Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain Without FDA Review | 130 |
| | | f. | The Marketing Defendants Funded, Edited and Distributed Publications That Supported Their Misrepresentations | 131 |
| | | g. | The Marketing Defendants Used Detailing to Directly Disseminate Their Misrepresentations to Prescribers | 133 |
| | | h. | Marketing Defendants Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages | 136 |
| | 3. | | The Marketing Defendants Targeted Vulnerable Populations | 137 |
| | 4. | | Insys Employed Fraudulent, Illegal, and Misleading Marketing Schemes to Promote Subsys | 139 |
| | 5. | | The Marketing Defendants' Scheme Succeeded, Creating a Public Health Epidemic | 144 |
| | | a. | Marketing Defendants Dramatically Expanded Opioid Prescribing and Use | 144 |
| | | b. | Marketing Defendants' Deception in Expanding Their Market Created and Fueled the Opioid Epidemic | 147 |
| E. | | | Defendants Throughout the Supply Chain Deliberately Disregarded Their Duties to Maintain Effective Controls and to Identify, Report, and Take Steps to Halt Suspicious Orders | 148 |
| | 1. | | All Defendants Have a Duty to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions | 150 |
| | 2. | | Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders | 155 |
| | 3. | | Defendants Worked Together to Inflate the Quotas of Opioids They Could Distribute | 158 |
| | 4. | | Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers | 167 |
| | 5. | | Defendants Failed to Report Suspicious Orders or Otherwise Act to Prevent Diversion | 175 |
| | 6. | | Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement | 179 |

<u>**TABLE OF CONTENTS**</u>
(continued)

<u>**Page**</u>

7.    The National Retail Pharmacies Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids ..................... 184

    a.    The National Retail Pharmacies Have a Duty to Prevent Diversion .................................................................. 185

    b.    Multiple Enforcement Actions against the National Retail Pharmacies Confirms their Compliance Failures ..................... 188

        i.    CVS .................................................................. 189

        ii.    Walgreens ........................................................ 191

        iii.    Rite Aid ............................................................ 193

F.    The Opioids the Defendants Sold Migrated into Other Jurisdictions ............... 195

G.    Ohio-Specific Facts ................................................................. 199

    1.    The Devastating Effects of the Opioid Crisis in Ohio and Plaintiffs' Communities ........................................... 199

        a.    Marketing Defendants' Implementation of Their Scheme in Summit County ............................................ 199

        b.    Defendants Breached Their Duties in Ohio ............................ 202

        c.    By Dramatically Increasing Prescription Opioid Prescribing and Use, Defendants Have Created a Public Health Crisis in Summit County ................................................. 214

H.    The Defendants Conspired To Engage In The Wrongful Conduct Complained Of Herein and Intended To Benefit Both Independently and Jointly From Their Conspiracy ......................................... 226

    1.    Conspiracy Among Marketing Defendants ........................... 226

    2.    Conspiracy Among All Defendants .................................... 229

I.    Statutes Of Limitations Are Tolled and Defendants Are Estopped From Asserting Statutes Of Limitations As Defenses ................................. 231

    1.    Continuing Conduct ..................................................... 231

    2.    Equitable Estoppel and Fraudulent Concealment ................... 231

J.    Facts Pertaining to Punitive Damages ........................................ 234

    1.    The Marketing Defendants Persisted in Their Fraudulent Scheme Despite Repeated Admonitions, Warnings, and Even Prosecutions ..... 235

        a.    FDA Warnings to Janssen Failed to Deter Janssen's Misleading Promotion of Duragesic ........................... 235

# TABLE OF CONTENTS
(continued)

b. Governmental Action, Including Large Monetary Fines, Failed to Stop Cephalon from Falsely Marketing Actiq for Off-Label Uses ........................................................................ 236

c. FDA Warnings Did Not Prevent Cephalon from Continuing False and Off-Label Marketing of Fentora ................................ 237

d. A Guilty Plea and a Large Fine Did Not Deter Purdue from Continuing Its Fraudulent Marketing of OxyContin ................ 238

2. Repeated Admonishments and Fines Did Not Stop Defendants from Ignoring Their Obligations to Control the Supply Chain and Prevent Diversion ........................................................................ 239

II. Facts Pertaining to Claims Under Racketeer-Influenced and Corrupt Organizations ("RICO") AcT ...................................................................... 246

A. The Opioid Marketing Enterprise ...................................................................... 246

1. The Common Purpose and Scheme of the Opioid Marketing Enterprise ...................................................................... 246

2. The Conduct of the Opioid Marketing Enterprise violated Civil RICO ...................................................................... 251

3. The RICO Marketing Defendants Controlled and Paid Front Groups and KOLs to Promote and Maximize Opioid Use .................. 255

4. Pattern of Racketeering Activity ...................................................................... 255

B. The Opioid Supply Chain Enterprise ...................................................................... 259

CLAIMS FOR RELIEF ...................................................................... 270

FIRST CLAIM FOR RELIEF Violation of RICO, 18 U.S.C. § 1961 et seq.—Opioid Marketing Enterprise (Against Purdue, Cephalon, Janssen, Endo, and Mallinckrodt (the "RICO Marketing Defendants")) ...................................................................... 270

SECOND CLAIM FOR RELIEF Violation of RICO, 18 U.S.C. § 1961 *et seq.*—Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen—"RICO Supply Chain Defendants") ...................................................................... 279

THIRD CLAIM FOR RELIEF Violation Of The Ohio Corrupt Practices Act Ohio Revised Code §§ 2923.31, *et seq.* (Against Purdue, Cephalon, Janssen, Endo, and Mallinckrodt (the "Opioid Marketing Enterprise")) ...................................................................... 289

A. The Opioid Marketing Enterprise and Pattern of Corrupt Activity .................. 289

B. Injury Caused and Relief Sought ...................................................................... 290

**TABLE OF CONTENTS**
(continued)

FOURTH CLAIM FOR RELIEF Violation Of The Ohio Corrupt Practices Act Ohio Revised Code §§ 2923.31, *et seq.* Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis,  McKesson, Cardinal, and AmerisourceBergen) (The "Opioid Supply Chain Enterprise") ................................................................... 293

    A.    The Opioid Supply Chain Enterprise and Pattern of Corrupt Activity ............. 293

    B.    Impact of The Opioid Supply Chain Enterprise ................................ 298

    C.    Injury Caused and Relief Sought ................................ 298

FIFTH CLAIM FOR RELIEF Statutory Public Nuisance  (Against All Defendants) ............. 300

SIXTH CLAIM FOR RELIEF Common Law Absolute Public Nuisance (Against All Defendants) ............................................................................ 305

SEVENTH CLAIM FOR RELIEF Negligence (Against All Defendants) .............................. 312

EIGHTH CLAIM FOR RELIEF Common Law Fraud (Against the Marketing Defendants) ............................................................................ 319

NINTH CLAIM FOR RELIEF Injury Through Criminal Acts (R.C. 2307.60) (Against All Defendants) ............................................................................ 324

TENTH CLAIM FOR RELIEF Unjust Enrichment  (Against All Defendants) ..................... 327

ELEVENTH CLAIM FOR RELIEF Civil Conspiracy (Against All Defendants) ................... 329

PRAYER FOR RELIEF ............................................................................ 331

PAGES 11 (PageID#10566) THROUGH 18 (PageID#10573) OMITTED

towards Ohio and/or have the requisite minimum contacts with Ohio to satisfy any statutory or constitutional requirements for personal jurisdiction.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Ohio.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact their affairs in this district.

## PARTIES

### I.      PLAINTIFFS

28.     The County of Summit, Ohio ("the County") is a charter County organized under the laws of the State of Ohio and its Charter, and is the fourth most populous county in Ohio. The County has its seat of government at 175 S. Main Street, Akron, Ohio 44308.  The County provides many services for its residents, including public assistance, law enforcement services, criminal justice services, and services for families and children.  The County brings this action by and through its County Executive Ilene Shapiro and County Prosecutor Sherri Bevan Walsh.

29.     The Summit County Combined General Health District ("Summit County Public Health") is a combined general health district organized under the laws of the State of Ohio.  The mission of Summit County Public Health is to protect and promote the health of the community through programs and activities designed to address the safety, health and well-being of the people who live in Summit County.  Summit County Public Health provides a variety of programs for residents of Summit County, including programs for alcohol and drug counseling, birth and death records, care coordination, maternal and child health, and services related to the prevention and control of infectious disease.  Summit County Public Health has its primary location at 1867 West Market Street, Akron, Ohio 44313.  Summit County Public Health brings this action by and through County Prosecutor Sherri Bevan Walsh.

30.     The City of Akron is a chartered municipality within Summit County, organized under the laws of the State of Ohio and its charter, with its seat of government located at 166 South High Street, Suite 130, Akron, Ohio 44308.  The City of Akron brings this action by and through Eve Belfance, its Director of Law and Assistant to the Mayor.

31.     The City of Barberton is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 576 W Park Avenue, Barberton, Ohio 44203.  The City of Barberton brings this action by and through its Director of Law, Lisa Miller.

32.     The Village of Boston Heights is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 45 E. Boston Mills Road, Boston Heights, Ohio 44264.  The Village of Boston Heights brings this action by and through its Village Solicitor, Marshal Pitchford.

33.     Boston Township is a duly organized and existing township located in Summit County, Ohio, with its headquarters located at 1775 Main Street, Peninsula, Ohio 44216, and brings this action by and through its duly elected Board of Trustees and its Solicitor Ed Pullekins.

34.     The Village of Clinton is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 7871 Main Street, Clinton, Ohio 44216.  The Village of Clinton brings this action by and through its Solicitor, Marshal Pitchford.

35.     Copley Township is a duly organized and existing township located in Summit County, Ohio, with its seat of government located at 1540 South Cleveland-Massillon Road, Copley, Ohio 44321, and brings this action by and through its duly elected Board of Trustees and its Law Solicitor Irv Sugarman.

10

36.     Coventry Township is a duly organized and existing township located in Summit County, Ohio, with its seat of government located at 68 Portage Lakes Drive, Akron, Ohio 44319, and brings this action by and through its duly elected Board of Trustees and its Law Solicitor Irv Sugarman.

37.     The City of Cuyahoga Falls is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 2310 Second Street, Cuyahoga Falls, Ohio 44221.  The City of Cuyahoga Falls brings this action by and through its Law Director Russ Balthis.

38.     The City of Fairlawn is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 3487 South Smith Road, Fairlawn, Ohio 44333.  The City of Fairlawn brings this action by and through its Law Director Bryan Nace.

39.     The City of Green is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 1755 Town Park Boulevard, Uniontown, Ohio 44685.  The City of Green brings this action by and through its Interim Law Director Bill Chris.

40.     The Village of Lakemore is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 1400 Main Street, Lakemore, Ohio 44250.  The Village of Lakemore brings this action by and through its Law Solicitor Irv Sugarman.

41.     The Village of Mogadore is a municipality within Summit and Portage Counties, organized under the laws of the State of Ohio, with its seat of government located at 135 South Cleveland Avenue, Mogadore, Ohio 44260. The Village of Mogadore brings this action by and through its Law Director Marshal M. Pitchford.

42. The City of Munroe Falls is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 43 Munroe Falls Avenue, Munroe Falls, OH 44262.  The City of Munroe Falls brings this action by and through its Law Director Tom Kostoff.

43. The City of New Franklin is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 5611 Manchester Road, New Franklin, OH 44319.  The City of New Franklin brings this action by and through its Law Director Thomas Musarra.

44. The City of Norton is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 4060 Columbia Woods Drive, Norton, Ohio 44203.  The City of Norton brings this action by and through its Law Director Justin Markey.

45. The Village of Peninsula is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 1582 Main Street, Peninsula, Ohio  44264.  The Village of Peninsula brings this action by and through its Solicitor Brad Bryan.

46. The Village of Richfield is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 4410 West Streetsboro Road, Richfield, OH 44286.  The Village of Richfield brings this action by and through its Law Solicitor William Hanna.

47. The Village of Silver Lake is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 2961 Kent Road, Silver Lake, Ohio 44224.  The Village of Silver Lake brings this action by and through its Solicitor Bob Heydorn.

48. Springfield Township is a duly organized and existing township located in Summit County, Ohio, which its seat of government located at 2459 Canfield Road Akron, Ohio 44312, and brings this action by and through its duly elected Board of Trustees and its Township Administrator & Legal Counsel Warren Price.

49. The City of Stow is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 3760 Darrow Road, Stow, Ohio 44224. The City of Stow brings this action by and through its Law Director Amber Zibritosky.

50. The City of Tallmadge is a municipality within Summit County, organized under the laws of the State of Ohio, with its seat of government located at 46 North Avenue, Tallmadge, Ohio 44278. The City of Tallmadge brings this action by and through its Director of Law, Megan Raber.

51. The City of Akron, the City of Barberton, the Village of Boston Heights, Boston Township, the Village of Clinton, Copley Township, Coventry Township, the City of Cuyahoga Falls, the City of Fairlawn, the City of Green, the Village of Lakemore, the Village of Mogadore, the City of Munroe Falls, the City of New Franklin, the City of Norton, the Village of Peninsula, the Village of Richfield, the Village of Silver Lake, Springfield Township, the City of Stow, and the City of Tallmadge provide a variety of law-enforcement and other services for their residents, including providing and/or paying for police, fire and emergency services.

52. Valley Fire District is a joint fire district organized under the laws of the State of Ohio, and is located within Summit County at 5287 Dogwood Drive, Peninsula OH 44264. Valley Fire District provides fire and emergency medical services ("EMS") for 3,529 residents of the Village of Peninsula, Boston Township and Village of Boston Heights. Valley Fire District brings this action by and through its Fire Chief, Chief Criedel.

53.     This action is also brought on behalf of the State of Ohio, by and through the prosecuting attorney for Summit County; the Directors of Law for the Cities of Akron, Barberton, and Tallmadge; the law directors for the Cities of Cuyahoga Falls, Fairlawn, Green, Mogadore, Munroe Falls, New Franklin, Norton, and Stow; the Village Solicitor for the Village of Boston Heights, and the chief legal officers for Boston Township, the Village of Clinton, Copley Township, Coventry Township, the Village of Lakemore, the Village of Peninsula, the Village of Richfield, the Village of Silver Lake, and Springfield Township.

54.     This action and the undersigned counsel have been duly authorized by the prosecuting authority and the Summit County Court of Common Pleas.

55.     The County, Summit County Public Health, the City of Akron, the City of Barberton, the Village of Boston Heights, Boston Township, the Village of Clinton, Copley Township, Coventry Township, the City of Cuyahoga Falls, the City of Fairlawn, the City of Green, the Village of Lakemore, the Village of Mogadore, the City of Munroe Falls, the City of New Franklin, the City of Norton, the Village of Peninsula, the Village of Richfield, the Village of Silver Lake, Springfield Township, the City of Stow, the City of Tallmadge, and Valley Fire District are collectively referred to herein as "Plaintiffs."

56.     Plaintiffs are responsible for the public health, safety and welfare of their citizens.

57.     Summit County has declared, *inter alia*, that a state of emergency exists in the County as a result of the opioid epidemic.

58.     The distribution and diversion of opioids into Ohio and into Summit County and surrounding areas (collectively, "Plaintiffs' communities"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiffs here seek relief.

59.     Plaintiffs directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiffs seek relief.  These damages have been suffered, and continue to be suffered directly, by the Plaintiffs.

60.     Plaintiffs also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

61.     Plaintiffs have standing to bring an action for the opioid epidemic nuisance created by Defendants.

62.     Plaintiffs have standing to recover damages incurred as a result of Defendants' actions and omissions.  Plaintiffs have standing to bring all claims pled herein, including, *inter alia*, to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

## II.     <u>DEFENDANTS</u>

### A.     <u>Marketing Defendants</u>

63.     At all relevant times, the Marketing Defendants, each of whom is defined below, have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.  The Marketing Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

#### 1.     <u>Purdue Entities</u>

64.     Defendant Purdue Pharma L.P. ("PPL") is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut.  None of the PPL's partners have citizenship in the State of Ohio.

PAGES 26 (PageID#10581) THROUGH 279 (PageID#10834) OMITTED

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of RICO, 18 U.S.C. § 1961 et seq.—Opioid Marketing Enterprise
### (Against Purdue, Cephalon, Janssen, Endo, and Mallinckrodt (the "RICO Marketing Defendants"))

878.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

879.    The RICO Marketing Defendants—through the use of "Front Groups" that appeared to be independent of the RICO Marketing Defendants; through the dissemination of publications that supported the RICO Marketing Defendants' scheme; through continuing medical education ("CME") programs controlled and/or funded by the RICO Marketing Defendants; by the hiring and deployment of so-called "key opinion leaders," ("KOLs") who were paid by the RICO Marketing Defendants to promote their message; and through the "detailing" activities of the RICO Marketing Defendants' sales forces—conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out  the common purpose of the Opioid Marketing Enterprise, *i.e.*, to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.  Through the racketeering activities of the Opioid Marketing Enterprise sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use by convincing them that each of the nine false propositions alleged earlier were true. In so doing, each of the RICO Marketing Defendants knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

880.    The Opioid Marketing Enterprise alleged above,  is an association-in-fact enterprise that consists of the RICO Marketing Defendants (Purdue, Cephalon, Janssen, Endo, and

Mallinckrodt); the Front Groups (APF, AAPM, APS, FSMB, USPF, and AGS); and the KOLs (Dr. Portenoy, Dr. Webster, Dr. Fine, and Dr. Fishman).

881. Each of the RICO Marketing Defendants and the other members of the Opioid Marketing Enterprise conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order increase the market for prescription opioids by changing prescriber habits and public perceptions and increase the market for opioids.

882. Specifically, the RICO Marketing Defendants each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; (iii) funding, editing and distributing CME programs to advance their false messages; and (iv) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians and, in particular, at physicians lacking the expertise of pain care specialists (a practice known as sales detailing).

883. Each of the Front Groups helped disguise the role of RICO Marketing Defendants by purporting to be unbiased, independent patient-advocacy and professional organizations in order to disseminate patient education materials, a body of biased and unsupported scientific "literature," and "treatment guidelines" that promoted the RICO Marketing Defendants false messages.

884. Each of the KOLs were physicians chosen and paid by each of the RICO Marketing Defendants to influence their peers' medical practice by promoting the Marketing Defendant's false message through, among other things, writing favorable journal articles and delivering supportive CMEs as if they were independent medical professionals, thereby further obscuring the RICO Marketing Defendants' role in the enterprise and the enterprise's existence.

885. Further, each of the RICO Marketing Defendants, KOLs and Front Groups that made-up the Opioid Marketing Enterprise had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the RICO Marketing Defendants coordinated their efforts through the same KOLs and Front Groups, based on their agreement and understanding that the Front Groups and KOLs were industry friendly and would work together with the RICO Marketing Defendants to advance the common purpose of the Opioid Marketing Enterprise; each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

886. At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the RICO Marketing Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO Marketing Defendants; (d) was characterized by interpersonal

relationships between and among each member of the Opioid Marketing Enterprise, including between the RICO Marketing Defendants and each of the Front Groups and KOLs; (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

887. The persons and entities engaged in the Opioid Marketing Enterprise are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities, as spearheaded by the RICO Marketing Defendants.

888. The RICO Marketing Defendants conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

889. The RICO Marketing Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.* violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Marketing Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Marketing Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail and interstate wire facilities. The RICO Marketing Defendants participated in the scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

890. The RICO Marketing Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a. Mail Fraud: The RICO Marketing Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

    b. Wire Fraud: The RICO Marketing Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

891.    Indeed, as summarized herein, the RICO Marketing Defendants used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry-out the Opioid Marketing Enterprise's fraudulent scheme.

892.    Because the RICO Marketing Defendants disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the RICO Marketing Defendants, Front Groups, and KOLs.  Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  However, Plaintiffs have described the occasions on which the RICO Marketing Defendants, Front Groups, and KOLs disseminated misrepresentations and false statements to Ohio consumers, prescribers, regulators and Plaintiffs, and how those acts were in furtherance of the scheme.

893.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including Ohio consumers, prescribers, regulators and Plaintiffs. The RICO Marketing Defendants, Front Groups and KOLs calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high.  In designing and implementing the scheme, the RICO Marketing Defendants understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the RICO Marketing Defendants' products.

894.    The RICO Marketing Defendants' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other.  Likewise, the RICO Marketing Defendants are distinct from the Opioid Marketing Enterprise.

895.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

896.    The racketeering activities conducted by the RICO Marketing Defendants, Front Groups and KOLs amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Ohio consumers, prescribers, regulators and the Plaintiffs.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Ohio consumers, prescribers, regulators and the Plaintiffs.  The RICO Marketing Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

897.     Each of the RICO Marketing Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

898.     As described herein, the RICO Marketing Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

899.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.  The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

900.     The RICO Marketing Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property.   The RICO Marketing Defendants' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic.  Plaintiffs' injuries, as described below, were not unexpected, unforeseen or independent.[215]   Rather, as Plaintiffs allege, the RICO Marketing Defendants knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.[216]  Nevertheless, the RICO Marketing Defendants

---

[215] *Travelers Prop. Cas. Co. of Am.* v. *Actavis, Inc.*, 16 Cal. App. 5th 1026, 1030 (2017).
[216] *Id.* at 1041.

engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

901.    It was foreseeable and expected that the RICO Marketing Defendants creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.[217]

902.    Specifically, the RICO Marketing Defendants' creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic.  Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

    a.  Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

    b.  Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    c.  Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

    d.  Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

    e.  Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

---

[217] *Id.*

f.   Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g.   Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

h.   Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

i.   Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j.   Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

k.   Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

l.   ~~Costs associated with extensive clean-up of public parks, spaces, and facilities of needles and other debris and detritus of opioid addiction;~~

m.   Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

n.   Losses caused by diminished property values in the form of decreased business investment and tax revenue.

903.   Plaintiffs' injuries were directly and thus proximately caused by these Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries.  But for the opioid-addiction epidemic the RICO Marketing Defendants created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property.

904.   Plaintiffs are the most directly harmed entity and there is no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

905.    Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia,* actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest.

## SECOND CLAIM FOR RELIEF

**Violation of RICO, 18 U.S.C. § 1961 *et seq.*—Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen—"RICO Supply Chain Defendants")**

906.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

907.    At all relevant times, the RICO Supply Chain Defendants were and are "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

908.    The RICO Supply Chain Defendants together formed an association-in-fact enterprise, the Opioid Supply Chain Enterprise, for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States.  The Opioid Supply Chain Enterprise is an association-in-fact enterprise within the meaning of § 1961.  The Opioid Supply Chain Enterprise consists of the RICO Supply Chain Defendants.

909.    The RICO Supply Chain Defendants were members of the Healthcare Distribution Alliance (the "HDA").[218] Each of the RICO Supply Chain Defendants is a member, participant, and/or sponsor of the HDA, and has been since at least 2006, and utilized the HDA to form the

---

[218] *History*, Health Distribution Alliance, https://www.healthcaredistribution.org/about/hda-history (last accessed Sept. 15, 2017).

PAGES 290 (PageID#10845) THROUGH 294 (PageID#10849) OMITTED

to abuse.[219]  Nevertheless, the RICO Supply Chain Defendants engaged in a scheme of deception, that utilized the mail and wires as part of their fraud, in order to increase sales of their opioid products by refusing to identify, report suspicious orders of prescription opioids that they knew were highly addictive, subject to abuse, and were actually being diverted into the illegal market.[220]

933.  The RICO Supply Chain Defendants' predicate acts and pattern of racketeering activity were a cause of the opioid epidemic which has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic.

934.  Specifically, Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

   a. Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

   b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

   c. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

   d. Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

   e. Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

   f. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

---

[219] *Travelers Prop. Cas. Co. of Am.* v. *Actavis, Inc.*, 16 Cal. App. 5th 1026, 1030 (2017).
[220] *City of Everett v. Purdue Pharma L.P.*, Case No. 17-cv-00209, 2017 WL 4236062, *2 (W.D. Wash. Sept. 25, 2017).

g. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

h. Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

i. Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

k. Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

l. Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

m. Losses caused by diminished property values in the form of decreased business investment and tax revenue.

935. Plaintiffs' injuries were proximately caused by Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the opioid-addiction epidemic created by Defendants' conduct, Plaintiffs would not have lost money or property.

936. Plaintiffs' injuries were directly caused by the RICO Supply Chain Defendants' pattern of racketeering activities.

937. Plaintiffs are most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

938. Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia,* actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised

corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*:

    a. Actual damages and treble damages, including pre-suit and post-judgment interest;

    b. An order enjoining any further violations of RICO;

    c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

    d. An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

    e. An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

    f. An order enjoining any future marketing of opioids through non-branded marketing including through the Front Groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

    g. An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

    h. An order compelling the Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court, but not less than print advertisements in national and regional newspapers and medical journals, televised broadcast on major television networks, and displayed on their websites, concerning: (1) the risk of addiction among patients taking opioids for pain; (2) the ability to manage the risk of addiction; (3) pseudoaddiction is really addiction, not a sign of undertreated addiction; (4) withdrawal from opioids is not easily managed; (5) increasing opioid dosing presents significant risks, including addiction and overdose; (6) long term use of opioids has no demonstrated improvement of function; (8) use of time-released opioids does not prevent addiction; (9) abuse-deterrent formulations do not prevent opioid abuse; and (10) that manufacturers and distributors have duties under the CSA to monitor, identify, investigate, report and halt suspicious orders and diversion but failed to do so;

    i. An order enjoining any future lobbying or legislative efforts regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

j.  An order requiring all Defendants to publicly disclose all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

k.  An order prohibiting all Defendants from entering into any new payment or sponsorship agreement with, or related to, any: Front Group, trade association, doctor, speaker, CME, or any other person, entity, or association, regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

l.  An order establishing a National Foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the Defendants in an amount to be determined by the Court;

m.  An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious orders or diversion of opioids;

n.  An order requiring all Defendants to publicly disclose all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding suspicious orders for or the diversion of opioids;

o.  An order divesting each Defendant of any interest in, and the proceeds of any interest in, the Marketing and Supply Chain Enterprises, including any interest in property associated with the Marketing and Supply Chain Enterprises;

p.  Dissolution and/or reorganization of any trade industry organization, Front Group, or any other entity or association associated with the Marketing and Supply Chain Enterprises identified in this Complaint, as the Court sees fit;

q.  Dissolution and/or reorganization of any Defendant named in this Complaint as the Court sees fit;

r.  Suspension and/or revocation of the license, registration, permit, or prior approval granted to any Defendant, entity, association or enterprise named in the Complaint regarding the manufacture or distribution of opioids;

s.  Forfeiture as deemed appropriate by the Court; and

t.  Attorney's fees and all costs and expenses of suit.

PAGES 299 (PageID#10854) THROUGH 309 (PageID#10864) OMITTED

      m.  Losses caused by diminished property values in the form of decreased business investment and tax revenue.

973.    Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages,; treble damages;, equitable and/or injunctive relief, including corrective statements, information and education, under Ohio Rev. Code § 2923.34(B)(1)-(2), requiring divestiture by, and reasonable restrictions upon, the future activities of the Defendants;, forfeiture as deemed proper by the Court; attorney's fees and all costs; and expenses of suit; and pre- and post-judgment interest.

### FIFTH CLAIM FOR RELIEF

### Statutory Public Nuisance
### (Against All Defendants)

974.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

975.    The prosecuting attorney for Summit County; the Directors of Law for the Cities of Akron, Barberton, and Tallmadge; the law directors for the Cities of Cuyahoga Falls, Fairlawn, Green, Mogadore, Munroe Falls, New Franklin, Norton, and Stow; the Village Solicitor for the Village of Boston Heights, and the chief legal officers for Boston Township, the Village of Clinton, Village of Lakemore, the Village of Peninsula, the Village of Richfield, and the Village of Silver Lake bring this claim in the name of the State of Ohio pursuant to the statutory authority granted under R.C. § 3767.03, to abate a public nuisance and to enjoin further maintenance of the nuisance. R.C. § 3767.03 provides: "Whenever a nuisance exists the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation in which the nuisance exists; the prosecuting attorney of the county in which the nuisance exists; the law director of a township that has adopted a limited home rule government under Chapter 504 of the Revised Code; or any person who is a citizen of the county in which the nuisance exists may bring

an action in equity in the name of the state, upon the relation of the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation; the prosecuting attorney; the township law director; or the person, to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it."

976.    The prosecuting attorney for Summit County also brings this claim in the name of the State of Ohio pursuant to the statutory authority granted under O.R.C. § 4729.35 to enjoin a violation of that statute.

977.    The Cities of Akron, Barberton, Cuyahoga Falls, Fairlawn, Green, Munroe Falls, New Franklin, Norton, Stow, and Tallmadge, and the Villages of Boston Heights, Clinton, Copley Township, Coventry Township, the Village of Lakemore, Mogadore, Peninsula, Richfield, Silver Lake  by and through their solicitor, city director of law or chief legal officer, law director, or similar legal officer, in the name of the State of Ohio and/or on behalf of the municipal corporations and their residents, also bring this claim pursuant to their statutory authority under R.C. § 715.44 to:  (A) [a]bate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist; [and] (C) [p]revent injury and annoyance from any nuisance . . . ."

978.    Ohio statutory law provides that "[a]s used in all sections of the Revised Code relating to nuisances . . . (C) "Nuisance" means any of the following: . . . (1) [t]hat which is defined and declared by statutes to be a nuisance . . . ." R.C. § 3767.01.

979.    Ohio statutory law "declare[s] to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance" "[t]he violation by a pharmacist or other person of any laws of Ohio or of the United States of America or of any rule of the board

of pharmacy controlling the distribution of a drug of abuse as defined in section 3719.011 of the Revised Code . . . ." R.C. § 4729.35.

980.    Opioids are "a drug of abuse" as defined in R.C. § 3719.011.

981.    Under R.C. § 3767.02, "Any person, who uses, occupies, establishes, or conducts a nuisance, or aids or abets in the use, occupancy, establishment, or conduct of a nuisance; the owner, agent, or lessee of an interest in any such nuisance; any person who is employed in that nuisance by that owner, agent, or lessee; and any person who is in control of that nuisance is guilty of maintaining a nuisance and shall be enjoined as provided in sections 3767.03 to 3767.11 of the Revised Code."

982.    Defendants are persons who have established or conducted a nuisance, who have aided or abetted in the establishment or conduct or a nuisance, and/or who are in control of a nuisance and guilty of maintaining a nuisance, as defined in R.C. §3767.02.

983.    Defendants are persons who have violated, and/or who have aided and abetted the violation of the laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in R.C. § 3719.011.

984.    In the distribution and sale of opioids in Plaintiffs' communities, Defendants violated and/or aided and abetted the violation of Ohio law, including, but not limited to, R.C. § 4729.01(F̶)̶,̶ ̶R̶.̶C̶.̶ ̶§̶§̶ ̶4̶7̶2̶9̶.̶5̶1̶-̶4̶7̶2̶9̶.̶5̶3̶,̶ and Ohio Admin. Code ("O.A.C.") §§ 4729-9-12, 4729-9-16, 4729-9-28, and federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 CFR § 1301.74.

985.    Defendants' unlawful conduct includes violating and/or aiding and abetting the violation of federal and Ohio statutes and regulations, including the controlled substances laws, by, *inter alia*:

a. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

b. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids without maintaining effective controls against the diversion of opioids;

c. Choosing not to stop or suspend shipments of suspicious orders; and

d. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

986. In the distribution and sale of opioids in Ohio and Plaintiffs' communities, Defendants violated and/or aided and abetted violations of R.C. § 2925.02(A), which states:

"No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

987. The exemption in R.C. § 2925.02 only applies to drug manufacturers and wholesalers when their "conduct is in accordance with Chapters RC 3719., 4715., 4723., 4729., 4730., 4731., and 4741." R.C. § 2925.02(B). Defendants are not in compliance with said Chapters and have thereby forfeited the protection provided by the exception.

988. Defendants' conduct entails a pervasive pattern and practice of violating the statutes and regulations set forth above. Defendants' systemic failure to adhere to Ohio and federal controlled substances statutes and regulations has created an ongoing, significant, unlawful, and unreasonable interference with the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs and Plaintiffs' communities.

989. Defendants had control over their conduct in Plaintiffs' communities and that conduct has had an adverse effect on the public right. Marketing Defendants controlled their

deceptive advertising and efforts to mislead the public, including their acts and omissions in detailing by their sales representatives, online communications, publications, Continuing Medical Education programs and other speaking events, and other means described in this Complaint. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Each of the Defendants controlled the systems they developed to prevent diversion, including whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

990. The nuisance created by Defendants' conduct is abatable.

991. Defendants' misconduct alleged in this case is ongoing and persistent.

992. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

993. Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

994. The unlawful conduct of each Defendant was a substantial factor in producing harm to Plaintiffs.

995. Plaintiffs seek abatement, recovery of abatement costs, injunctive relief, and to prevent injury and annoyance from any nuisance.

996. Plaintiffs seek all other legal and equitable relief as allowed by law.

## SIXTH CLAIM FOR RELIEF

### Common Law Absolute Public Nuisance
### (Against All Defendants)

997.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further alleges:

998.    Defendants created and maintained a public nuisance which proximately caused injury to Plaintiffs.

999.    A public nuisance is an unreasonable interference with a right common to the general public.

1000.    Defendants have created and maintained a public nuisance by marketing, distributing, and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiffs' communities, and Plaintiffs and the residents of Plaintiffs' communities have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

1001.    The public nuisance is an *absolute* public nuisance because Defendants' nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

1002.    Defendants have created and maintained an absolute public nuisance through their ongoing conduct of marketing, distributing, and selling opioids, which are dangerously addictive drugs, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiffs' communities, flooded Plaintiffs' communities with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiffs and the residents of Plaintiffs' communities.

1003.  Defendants know, and have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs and Plaintiffs' communities.

1004.  Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs and Plaintiffs' communities. *See* Restatement (Second) of Torts § 821B.

1005.  The interference is unreasonable because Defendants' nuisance-creating conduct:

   a.  Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

   b.  At all relevant times was and is proscribed by state and federal laws and regulations; and/or

   c.  Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

1006.  The significant interference with rights common to the general public is described in detail throughout this Complaint and includes:

   a.  The creation and fostering of an illegal, secondary market for prescription opioids;

   b.  Easy access to prescription opioids by children and teenagers;

   c.  A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

   d.  Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

   e.  Employers have lost the value of productive and healthy employees; and

    f.   Increased costs and expenses for Plaintiffs relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

1007.  Defendants intentionally and unreasonably and/or unlawfully deceptively marketed and pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiffs' communities, a higher level of fear, discomfort and inconvenience to the residents of Plaintiffs' communities, and direct costs to Plaintiffs and Plaintiffs' communities.

1008.  Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Plaintiffs.

1009.  A violation of any rule or law controlling the sale and/or distribution of a drug of abuse in Plaintiffs' communities constitutes an absolute public nuisance. *See e.g.* R.C. § 4729.35 ("The violation by a . . . person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . . constitute[s] a public nuisance[.]").

1010.  In the sale and distribution of opioids in Ohio and Plaintiffs' communities, Defendants violated federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74, and Ohio law, including, but not limited to, R.C. § 4729.01(F), R.C. §§ 4729.51–4729.53, and O.A.C. §§ 4729-9-12, 4729-9-16, and 4729-9-28.

1011.  Defendants' unlawful nuisance-creating conduct includes violating federal and Ohio statutes and regulations, including the controlled substances laws, by:

    a.   Distributing by distributors and selling by manufacturers of opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

b. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids without maintaining effective controls against the diversion of opioids;

c. Choosing not to effectively monitor for suspicious orders;

d. Choosing not to investigate suspicious orders;

e. Choosing not to report suspicious orders;

f. Choosing not to stop or suspend shipments of suspicious orders;

g. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills;"

h. Defendants' intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes:

i. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

j. Distributing ~~by distributors and selling by manufacturers of~~ opioids without maintaining effective controls against the diversion of opioids;

k. Choosing not to effectively monitor for suspicious orders;

l. Choosing not to investigate suspicious orders;

m. Choosing not to report suspicious orders;

n. Choosing not to stop or suspend shipments of suspicious orders; and

o. Distributing ~~by distributors~~ and selling ~~by manufacturers of~~ opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

1012. Defendants intentionally and unreasonably distributed and sold opioids that Defendants knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

1013. The Marketing Defendants intentionally and unreasonably engaged in a deceptive marketing scheme that was designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket in Plaintiffs' communities.

1014. The Marketing Defendants intentionally and unreasonably misled Plaintiffs, healthcare providers, and the public about the risks and benefits of opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

1015. The Marketing Defendants violated Ohio and federal statutes and regulations, including the controlled substances laws, by engaging in the deceptive marketing of opioids, as described in this Complaint.

1016. In the distribution and sale of opioids in Ohio and Plaintiffs' communities, Defendants violated and/or aided and abetted violations of R.C. § 2925.02(A), which states:

> "No person shall knowingly do any of the following:
>
> (1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or
>
> (3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

1017. ~~Defendants are in the business of manufacturing, marketing, selling and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.~~ Defendants are in the business of manufacturing, marketing, and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

1018. Indeed, opioids are akin to medical-grade heroin. Defendants' wrongful conduct of deceptively marketing and pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiffs—exactly as would be expected when medical-grade heroin

in the form of prescription opioids are deceptively marketed, flood the community, and are diverted into an illegal, secondary market.

1019.  Defendants had control over their conduct in Plaintiffs' communities and that conduct has had an adverse effect on rights common to the general public.  Marketing Defendants controlled their deceptive advertising and efforts to mislead the public, including their acts and omissions in detailing by their sales representatives, online communications, publications, Continuing Medical Education programs and other speaking events, and other means described in this Complaint.  Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders.  Each of the Defendants controlled the systems they developed to prevent diversion, whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

1020.  It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiffs described herein.

1021.  Because of the Marketing Defendants' deceptive marketing of opioids and Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

1022.  The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiffs' communities and the harm inflicted outweighs any offsetting benefit.

1023.  The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

1024. As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiffs have suffered and will continue to suffer economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services.

1025. As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiffs have suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

1026. The nuisance created by Defendants' conduct is abatable.

1027. Defendants' misconduct alleged in this case is ongoing and persistent.

1028. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

1029. Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

1030. Plaintiffs seek to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

1031. Plaintiffs have suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than Ohio citizens at large. These are harms that can only be suffered by Plaintiffs.

1032. Plaintiffs are asserting their own rights and interests and Plaintiffs' claims are not based upon or derivative of the rights of others.

1033.   The tortious conduct of each Defendant was a substantial factor in creating the absolute public nuisance.

1034.   The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiffs.

1035.   Plaintiffs have suffered an indivisible injury as a result of the tortious conduct of Defendants.

1036.   Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

1037.   Plaintiffs assert this Cause of Action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in R.C. § 2307.71.  In this Count, Plaintiffs do not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act.

1038.   Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre and post-judgment interest.

## SEVENTH CLAIM FOR RELIEF

### Negligence
### (Against All Defendants)

1039.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

1040.   Defendants owed Plaintiffs a duty to not expose Plaintiffs to an unreasonable risk of harm.

PAGES 323 (PageID#10878) THROUGH 336 (PageID#10891) OMITTED

part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

1105.  Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

1106.  Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

1107.  Plaintiffs seek all legal relief to which they may be entitled pursuant to R.C. § 2307.60(A)(1), including *inter alia* compensatory damages, punitive and/or exemplary damages, attorney's fees, and the costs and expenses of suit, including pre- and post-judgment interest.

### TENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against All Defendants)

1108.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

1109.  As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of opioids within Plaintiffs' communities, including from opioids foreseeably and deliberately diverted within and into Plaintiffs' communities.

1110.  Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

1111.  Plaintiffs have expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

1112.   These expenditures include the provision of healthcare services and treatment services to people who use opioids.

1113.   These expenditures have helped sustain Defendants' businesses.

1114.   Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities:  the cost of the harms caused by Defendants' improper distribution practices.

1115.   Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

1116.   Plaintiffs have paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products.  Because of their deceptive marketing of prescription opioids, Marketing Defendants obtained enrichment they would not otherwise have obtained.  Because of their conscious failure to exercise due diligence in preventing diversion, Defendants obtained enrichment they would not otherwise have obtained.  The enrichment was without justification and Plaintiffs lack a remedy provided by law.

1117.   Defendants have unjustly retained benefits to the detriment of Plaintiffs, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

1118.   Defendants' misconduct alleged in this case is ongoing and persistent.

1119.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

1120.  Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

1121.  Plaintiffs seek an order compelling Defendants to disgorge all unjust enrichment to Plaintiffs; and awarding such other, further, and different relief as this Honorable Court may deem just.

## ELEVENTH CLAIM FOR RELIEF

### Civil Conspiracy
### (Against All Defendants)

1122.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

1123.  Defendants engaged in a civil conspiracy in their unlawful marketing of opioids and/or distribution of opioids into Ohio and Plaintiffs' communities.

1124.  Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful marketing of opioids and/or distribution of opioids into Ohio and Plaintiffs' communities.

1125.  Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

1126.  The Marketing Defendants further unlawfully marketed opioids in the Ohio and Plaintiffs' communities in furtherance of that conspiracy.

1127.  Defendants' conspiracy and acts in furtherance thereof are alleged in detail in this Complaint, including, without limitation, in Plaintiffs' Counts for violations of RICO and the Ohio Criminal Practices Act. Such allegations are specifically incorporated herein.

PAGE 340 (PageID#10895) OMITTED

1135.   Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

1136.   Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre-and post-judgment interest.

## **PRAYER FOR RELIEF**

1137.   Plaintiffs respectfully request that this Court enter an order of judgment granting all relief requested in this complaint, and/or allowed at law or in equity, including:

     a.   abatement of the nuisance;

     b.   actual damages;

     c.   treble or multiple damages and civil penalties as allowed by statute;

     d.   punitive damages;

     e.   exemplary damages;

     f.   disgorgement of unjust enrichment;

     g.   equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

     h.   forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

     i.   attorneys' fees;

     j.   costs and expenses of suit;

     k.   pre- and post-judgment interest; and

     l.   such other and further relief as this Court deems appropriate.

PAGES 342 (PageID#10897) THROUGH 343 (PageID#10898) OMITTED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) **MDL 2804** |
| | ) |
| THIS DOCUMENT RELATES TO: | ) **Case No. 1:17-md-2804** |
| | ) |
| *The County of Summit, Ohio, et al. v.* | ) **Judge Dan Aaron Polster** |
| *Purdue Pharma L.P., et al.,* | ) |
| Case No. 18-op-45090 | ) **OPINION AND ORDER** |

This matter is before the Court upon the Report and Recommendation ("R&R") of the United States Magistrate Judge. **Doc. #: 1025** (hereinafter cited as "R&R"). On November 2, 2018 Manufacturer,[1] Distributor, and Retail Pharmacy Defendants and Plaintiffs all filed Objections to various portions of the R&R. Doc. ##: 1082, 1079, 1078, and 1080. On November 12, 2018 Plaintiffs and Defendants filed Responses to the Objections. Doc. ##: 1115 and 1116. Upon a *de novo* review of the record, and for the reasons set forth below, the Court **ADOPTS IN PART** and **REJECTS IN PART** the Report and Recommendation.

## I.

The District Court reviews proper objections pursuant to its duty under Federal Rule of Civil Procedure 72(b). Fed. R. Civ. P. 72(b) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.") In a footnote, Manufacturer Defendants purport to object to "the entirety of the R&R." Doc #: 1082 at n.1. This

---

[1] Defendant Noramco, Inc. states that it joined in Manufacturers' Motion to Dismiss "to the extent applicable," Doc. #: 499-1 at 1 n.2, and requests clarification that it is included among the moving Manufacturer Defendants and is entitled to all applicable relief. Doc. #: 1082 at 1 n.1. The Court clarifies that Noramco is included among the moving Manufacturer Defendants and is entitled to all applicable relief.

objection is not proper insofar as it does not include any bases in or support from legal authority. Therefore, as there are no proper objections to the facts or procedural history, the Court adopts the facts and procedural history as stated in the R&R. Further, there are no objections to the R&R with respect to the following sections:

- Section III.B. Preemption

- Section III.H. Count Eight: Fraud

- Section III.L. Statewide Concern Doctrine

- Section III.M. Article III Standing[2]

The Court presumes the parties are satisfied with these determinations and adopts the R&R with respect to these sections. "Any further review by this Court would be a duplicative and inefficient use of the Court's limited resources." *Graziano v. Nesco Serv. Co.*, No. 1:09 CV 2661, 2011 WL 1131557, at *1 (N.D. Ohio Mar. 29, 2011) (citing *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health and Human Services*, 932 F.2d 505 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981)).

## II.

As an initial matter, Retail Pharmacy Defendants have asked the Court to clarify that the claims brought against them are only brought in their capacity as distributors, not as dispensers. *See* Doc. #: 1078 at 2. The Court understands that Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids, *see* Doc. #: 654 at 75 n.47, and thus considers the parties' arguments while keeping in mind that the Retail Pharmacies may only be held liable as distributors.

---

[2] Pharmacy Defendants, in their objections, mention Article III standing only briefly in a section dedicated to the RICO claims. *See* Doc. #: 1078 at 2-3. They mischaracterize the R&R's analysis of the Article III standing directness requirement, rehash arguments already made in their motion to dismiss, and then move on to address their RICO analysis concerns. The Court finds this objection without merit, and therefore it is overruled.

### A. Tolling of the Statute of Limitations

The R&R concluded that Plaintiffs have alleged sufficient facts "to raise a plausible inference that the applicable limitations periods are subject to tolling." R&R at 55-56. Manufacturer Defendants object, stating that Plaintiffs' Complaint indicates that they knew or should have known of both the Manufacturers' marketing practices and the costs Plaintiffs were incurring. Defendants argue that it follows that Plaintiffs, by their own allegations, did not act with sufficient diligence to support a fraudulent concealment theory. In addition to tolling under a fraudulent concealment theory, Plaintiffs also assert that the continuing violations doctrine should be applied to save their claims from the relevant statute of limitations.

### 1. Fraudulent Concealment

The R&R correctly states that "resolving a motion to dismiss based on statute-of-limitations grounds is appropriate when the undisputed facts 'conclusively establish' the defense as a matter of law." R&R at 54 (citing *Estate of Barney v. PNC Bank*, 714 F.3d 920, 926 (6th Cir. 2013); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012), *cert. denied*, 568 U.S. 1157 (2013)). "In order for Plaintiff's delay in filing to be excused due to Defendants' fraudulent concealment, Plaintiff must affirmatively plead with particularity: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Reid v. Baker*, 499 F. App'x 520, 527 (6th Cir. 2012) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975)). However, as the R&R also points out, "courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) (citing as examples of disputed factual questions, "claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff

3

from learning of its injury . . . and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim").

Defendants' assertions that Plaintiffs were aware, at least since 2007, of their marketing practices and knew about the effects of the opioid crisis, effectively admitted in the Complaint,[3] are insufficient to *conclusively establish* that any of Plaintiffs' claims are time-barred by the statute of limitations. If Plaintiffs relied solely on Defendants' concealment of their marketing practices, Plaintiffs' assertion that the statutes of limitation were tolled due to fraudulent concealment would fail. However, Plaintiffs' allegations of fraudulent concealment do not rely solely on Defendants' alleged concealment of their marketing practices. Plaintiffs also allege that Defendants concealed their lack of cooperation with law enforcement and that they affirmatively misrepresented that they had satisfied their duty to report suspicious orders, concealing the fact that they had not done so. *See* Doc. #: 514 at 232-33 (hereinafter cited as "SAC").

Plaintiffs additionally point out that they could not have discovered "the nature, scope, and magnitude of Defendants' misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence," because until this Court ordered production of the ARCOS database in this litigation, Plaintiffs did not have access to that information. *Id.* at 233 (citing Doc. #: 233 at 6-7). Without access to the ARCOS data, Plaintiffs were forced to take Defendants at their word that they were complying with their obligations under consent decrees, statutes, and regulations. Plaintiffs inarguably knew about Defendants' marketing practices, but whether they had sufficient information, in the absence of

---

[3] *See, e.g.*, Doc. #: 514 at 238 ("In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risks of addiction."); *see also Id.* at 212 ("the increase in fatal overdoses from prescription opioids has been widely publicized for years.").

the ARCOS data, to identify Defendants' alleged concealment and thus the scope or magnitude of Defendants' alleged misconduct is a disputed factual question.

### 2. Continuing Violations

Plaintiffs also assert that the applicable statute of limitations should be tolled under the continuing violations doctrine. *Id.* at 231. In the Sixth Circuit, a "'continuous violation' exists if: (1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009) (citing *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 521 (6th Cir.1997)). Although Ohio courts are generally reluctant to apply the doctrine outside the Title VII context, "this doctrine is rooted in general principles of common law and is independent of any specific action." *Id.* Further, the Sixth Circuit has noted that "no opinion has articulated a principled reason why the continuing-violation doctrine should be limited to claims for deprivations of civil rights and employment discrimination." *Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 416–17 (6th Cir. 2007). "Courts have allowed the statute of limitations to be tolled [under the continuing violations framework] when . . . there is a 'longstanding and demonstrable policy' of the forbidden activity." *Ohio Midland, Inc. v. Ohio Dep't of Transp*, 286 F. App'x 905, 912 (6th Cir. 2008) (citing *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 857 (6th Cir.2003).).

Here, taking the factual allegations in the Complaint as true, Plaintiffs have alleged a longstanding and demonstrable policy of misrepresentations and omissions on the part of Defendants sufficient to demonstrate their engagement in continuing wrongful conduct. In addition, whether further injury could have been avoided had Defendants ceased this conduct is another disputed factual question. Therefore, the Court finds that Plaintiffs have alleged facts sufficient to raise a plausible inference that the applicable limitations periods are subject to

tolling—under either a fraudulent concealment theory or a continuing violation theory—and that

no claims should be dismissed on statute of limitations grounds at this early stage in the litigation.

### B. RICO

After a lengthy discussion of RICO, the R&R concluded that Plaintiffs' RICO claims

should survive Defendants' motions to dismiss. R&R at 11-44. "RICO was an aggressive initiative

to supplement old remedies and develop new methods for fighting crime." *Sedima, SPRL v. Imrex*

*Co., Inc.*, 473 U.S. 479, 498 (1985) (citing *Russello v. United States*, 464 U.S. 16, 26-29 (1983)).

In *Sedima*, the Supreme Court acknowledged the Second Circuit's distress over the "extraordinary,

if not outrageous," uses to which civil RICO claims had been applied. *Id.* at 499. "Instead of being

used against mobsters and organized criminals, it had become a tool for everyday fraud cases

brought against respected and legitimate enterprises." *Id.* However, in reversing the 2nd Circuit,

the *Sedima* Court observed:

> . . . Congress wanted to reach both "legitimate" and "illegitimate" enterprises.
> *United States v. Turkette*, [452 U.S. 576 (1981)]. The former enjoy neither an
> inherent incapacity for criminal activity nor immunity from its consequences. The
> fact that § 1964(c) is used against respected businesses allegedly engaged in a
> pattern of specifically identified criminal conduct is hardly a sufficient reason for
> assuming that the provision is being misconstrued. Nor does it reveal the
> "ambiguity" discovered by the court below. "[T]he fact that RICO has been applied
> in situations not expressly anticipated by Congress does not demonstrate ambiguity.
> It demonstrates breadth." *Haroco, Inc. v. American National Bank & Trust Co. of*
> *Chicago*, [747 F.2d 384, 398 (1984)].

*Id.*

The RICO analysis is complicated because, "RICO's civil-suit provision imposes two

distinct but overlapping limitations on claimants—standing and proximate cause . . . [a]nd as a

matter of RICO law, the two concepts overlap." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602,

613 (6th Cir. 2004). Defendants object to the R&R's conclusions regarding both "overlapping"

limitations. Regarding standing, Defendants argue that Plaintiffs' injuries are 1) not to Plaintiffs'

"business or property" as required by the statute, and 2) derivative of a third-party's injuries (i.e. not direct). Regarding proximate cause, Defendants argue that Plaintiffs' injuries are too remote to hold Defendants liable under RICO (i.e. not direct). Manufacturing Defendants succinctly summarize the way "directness" applies to RICO analysis.

> For standing to exist, an injury must be "direct" in the sense of being both (1) non-derivative of some third party's injury (***the standing analysis***), *see Trollinger*, 370 F.3d at 614; and (2) having an uninterrupted, direct, and not overly attenuated causal chain from conduct to injury (***the proximate cause analysis***), *see Anza*, 547 U.S. at 457.

Doc. #: 1082 at 3 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)) (emphasis in original). "Because Congress modeled [the RICO] provision on similar language in the antitrust laws (§ 4 of the Clayton Act and § 7 the Sherman Act) and because the antitrust laws have been interpreted to require that a private plaintiff show proximate cause in order to have standing to sue, RICO civil claims also require proximate cause. *Trollinger*, 370 F.3d at 612 (citing *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 267-68 (1992); *Sedima*, 473 U.S. at 496). Thus, although standing is a threshold issue, because proximate cause analysis is necessarily incorporated within the standing analysis, the Court begins with proximate cause.

### 1. Proximate Cause

In *Holmes*, the Supreme Court described proximate cause as "the judicial tools used to limit a person's responsibility for the consequences of that person's own act," and further stated "the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" 503 U.S. at 268 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). In a RICO claim, "[t]he proximate-cause inquiry . . . requires careful consideration of the 'relation between the injury asserted and the injurious conduct alleged.'" *Anza*, 547 U.S. at 462 (quoting *Holmes*, 503 U.S. at 268). "Though foreseeability is an element of the proximate cause analysis, it is distinct from the

requirement of a direct injury." *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) (citing *Holmes*, 503 U.S. at 268-69.). Additionally, the *Holmes* Court provided several reasons why "some direct relation between the injury asserted and the injurious conduct alleged" is so important to the proximate cause analysis. *Holmes*, 503 U.S. at 268. The Court stated:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269–70 (internal citations omitted). Thus, it is important to first carefully consider the relationship between the injury asserted by Plaintiffs and the alleged injurious conduct of Defendants and then further consider whether that relationship implicates any of the concerns highlighted by the *Holmes* Court.

Plaintiffs allege that "RICO Marketing Defendants . . . conducted an association-in-fact enterprise . . . to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain" thereby creating the opioid epidemic.[4] SAC at 270. Plaintiffs further allege that RICO Supply Chain Defendants . . . formed an association-in-fact enterprise . . . for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States" thereby creating the opioid epidemic.[5] It is important to note that Plaintiffs never expressly define what they mean by the term "opioid epidemic." The term

---

[4] According to the Complaint, the RICO Marketing Defendants are "Purdue, Cephalon, Janssen, Endo, and Mallinckrodt." *See* Doc. #: 514 at 270.
[5] According to the Complaint, the RICO Supply Chain Defendants are "Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen" *See* Doc. #:514 at 279.

may reasonably refer to the massive rate of addiction, overdose, and death associated with taking opioids. *See, e.g.*, *id.* at 214-15 ("Ohio is among the states hardest hit by the opioid epidemic. . . . Overdose deaths have become the leading cause of death for Ohioans under the age of 55.").

However, the term "opioid epidemic" may just as reasonably include black markets for diverted opioids. *See, e.g.*, *id.* at 284 ("[Defendants' violations] allowed the widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market—causing the opioid epidemic."); *see also id.* at 7 ("The increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose and death [and] black markets for diverted prescription opioids.). Regarding their asserted injuries, however, Plaintiffs are more explicit. Plaintiffs expressly assert thirteen categories of damages. *See id.* at 285-86. Among these is, for example, the "costs associated with . . . attempts to stop the flow of opioids into local communities." *Id.*

Manufacturer Defendants argue that the chain of causation from conduct to injury is as follows:

> (i) a Manufacturer made deceptive claims in promoting its opioids (***the conduct***); (ii) some physicians were exposed to that Manufacturer's claims; (iii) which caused some of those physicians to write medically inappropriate opioid prescriptions they would not have otherwise written; (iv) which caused some of their patients to decide to take opioids; (v) which caused some of those individuals to become addicted to opioids; (vi) which caused some of those addicted individuals to need additional medical treatment, to neglect or abuse their families, to lose their jobs, and/or to commit crimes; (vii) which caused Plaintiffs to expend additional resources on emergency services, and to lose revenue from a decreased working population and/or diminished property values (***the injury***).

Doc. #: 1082 at 9-10 (emphasis in original). However, Plaintiffs have alleged sufficient facts to support a far more direct chain of causation: (i) RICO Marketing Defendants made deceptive claims in promoting their opioids in order to sell more opioids than the legitimate medical market could support (***the conduct***); (ii) the excess opioids marketed by the RICO Marketing Defendants

and distributed by the RICO Supply Chain Defendants were then diverted into an illicit, black market; (iii) Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up. Under this potential chain of causation, the relationship between Plaintiffs' injury and Defendants' alleged conduct is less remote than prior Sixth Circuit precedent finding proximate cause, and is not too remote to support a finding of proximate cause here. *See, e.g.*, *Trollinger*, 370 F.3d at 619 (finding proximate cause where Tyson "hired sufficient numbers of illegal aliens to impact the legal employees' wages," having an "impact on the bargained-for wage-scale," which "allowed Tyson not to compete with other businesses for unskilled labor," and finally where "Tyson's legal workers did not 'choose' to remain at Tyson for less money than other businesses offered").

Thus, it is incumbent upon the Court to consider whether any of the *Holmes* Court's reasons for requiring directness are implicated. Here, Plaintiffs' alleged damages are not speculative, but concrete and ascertainable. No other party can vindicate the law and deter Defendants' alleged conduct because Plaintiffs' asserted damages are not recoverable by any other party. Finally, there is no potential for—and thus no reason for the Court to have to adopt complicated rules to prevent—duplicative recoveries. As none of the *Holmes* concerns are implicated in this case, the Court finds that Plaintiffs have sufficiently alleged proximate cause for their RICO claims.

### 2. Standing

Having determined that Plaintiffs have alleged sufficient facts to find that they do not stand at too remote a distance to recover, the Court now turns to standing. Title 18 of the U.S. Code, section 1964(c), has been deemed the standing provision of RICO. It provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains and the cost of the suit, including

reasonable attorney's fee." 18 U.S.C. § 1964(c). The two operative portions of this section are the "business or property" limitation and the "by reason of" limitation.

"The 'by reason of' limitation . . . bundles together a variety of 'judicial tools,' some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions." *Trollinger*, 370 F.3d at 613 (citing *Holmes*, 503 U.S. at 268.). As it pertains to standing, the "by reason of" limitation is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was "derivative or passed-on" to the plaintiff by some intermediate party. *See id.* at 614.

### a. The "by reason of" Limitation (Direct Versus Passed-On Injury)

Defendants claim that Plaintiffs' asserted injuries are "necessarily derivative of harms to individual opioid users." Doc. #: 1082 at 4. They state that "it is the opioid user who (if anyone) was directly harmed, and it is only as a result of this harm—in the aggregate—that Plaintiffs can claim to have experienced additional public expenditures, lost tax revenue, and diminished property values." *Id.* Defendants cite *Perry* as a paradigmatic example from the Sixth Circuit of the distinction between derivative and non-derivative injuries. Defendants characterize *Perry* as follows: "Plaintiffs [in *Perry*] were individual insurance plan subscribers who alleged that because of the tobacco manufacturers' conduct, they paid increased premiums to account for medical care provided to smokers in the same insurance pool." *Id.* at 4-5 (citing *Perry*, 324 F.3d at 847) (internal citations omitted).

Defendants' characterization of *Perry* is correct, but *Perry* is factually distinct from this case. In *Perry*, tobacco users suffered smoking-related injuries which increased healthcare costs. That is where the similarities with the present case end. In *Perry*, the increased healthcare costs were borne by insurance companies who then passed-on those costs to individual insurance plan subscribers in the form of higher insurance premiums. The non-smoking individual subscribers

then sued the tobacco companies for the costs passed-on to them by the insurance companies. *See Perry*, 324 F.3d at 847. Thus, *Perry* represents a classic case of "passed-on" economic injury. Here, as described above, Plaintiffs have alleged a plausible claim that their injuries are the direct result of Defendants' creation of an illicit opioid market within their communities.[6] Plaintiffs' asserted economic injuries are borne by them and not passed-on by any intermediate party standing less removed from Defendants' actions.

The tobacco cases, in general, are factually distinct from the present case for an additional reason. In the tobacco cases, no one asserted, nor could they have, that tobacco defendants created an "illicit cigarette market" the attendant consequences of which might have caused the government plaintiffs to expend their limited financial resources to mitigate. This "opioid epidemic as an illicit market" concept is an important distinction underlying many of Plaintiffs' allegations. *See, e.g.*, SAC at 150-51. Therefore, assuming as it must that Plaintiffs can prove their allegations, the Court finds it plausible that Plaintiffs' asserted injuries were directly caused "by reason of" Defendants' injurious conduct.

### b. The "business or property" Limitation

Even if Plaintiffs' asserted injuries were proximately and directly caused "by reason of" Defendants' alleged injurious conduct, Plaintiffs still may not bring a RICO claim if the injuries asserted were not to their "business or property." 18 U.S.C. § 1964(c). As a general principal, "money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). It is also true that, "[a] person whose property is diminished by a payment of money wrongfully

---

[6] Plaintiffs allege that "Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.. . . All registrants—which includes all manufacturers and distributors of controlled substances—must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion." Doc. #: 514 at 150-51 (citing 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74).

induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) (quoting *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906)). Plaintiffs assert thirteen categories of expenditures that they contend represent a substantial monetary loss, and are therefore an injury to their property. *See* SAC at 285. Defendants contend that none of the monetary costs asserted by Plaintiffs are the type of property injury anticipated (and thus permitted) by the RICO statute.

### (i) Personal Injuries

The Sixth Circuit has held that "personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c)." *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013). "Courts interpreting RICO have remained faithful to this distinction [between non-redressable personal injury and redressable injury to property] by excluding damages '*arising directly out of*' a personal injury, even though personal injuries often lead to monetary damages that would be sufficient to establish standing if the plaintiff alleged a non-personal injury." *Id.* (emphasis added).

The *Jackson* court's holding that RICO claims that allege damages "arising directly out of a personal injury" are not redressable adds another layer to the "directness" requirement summarized by Defendants above. As stated previously, Defendants explained two ways in which RICO allegations must be sufficiently direct to maintain a RICO claim. First, the relationship between the asserted injury and the alleged injurious conduct must have a *direct* causal connection. (the proximate cause analysis). And second, the asserted injury must also be borne *directly* by Plaintiffs and not passed-on to them by intermediate parties (the standing "by reason of" analysis). Under *Jackson*, there is an additional element of *directness* to consider—whether Plaintiffs' alleged injury arises *directly* out of a personal injury. While the first two analyses require closeness

of the relationship between injury and injurious conduct, the *Jackson* analysis requires separation between personal injury and pecuniary losses that arise therefrom.

To determine what type of pecuniary losses arise directly out of personal injury, the Court first looks to the facts of *Jackson* itself. In *Jackson*, former employees who suffered personal injuries at work sued their employer for a RICO violation. They alleged that their employer's workers' compensation administrator and physician engaged in a fraudulent scheme to avoid paying workers' compensation benefits to them, causing them to suffer monetary losses (i.e. receiving less money from their personal injury claim than they felt they were entitled to). *See id.* at 561-62. The *Jackson* court rejected the plaintiffs' theory that their workers' compensation benefits created an intervening legal entitlement to money, which is property under RICO. *See id.* at 566. The *Jackson* court also cites several examples where other circuits have considered when a pecuniary harm arises directly out of a personal injury. *See, e.g.*, *id.* at 564 n.4. Reviewing these cases, the Court determines that their unifying character is that pecuniary losses "arise directly out of" a personal injury when the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself.[7]

In other words, damages that result from a personal injury to a plaintiff (such as attorney fees, lost wages, lost workers' compensation benefits, or medical expenses), that are recoverable

_____

[7] Footnote 4 of the *Jackson* opinion cites the following exemplary cases: *Evans v. City of Chicago*, 434 F.3d 916 (7th Cir.2006) (false imprisonment causing loss of income not an injury to "business or property"); *Diaz v. Gates*, 420 F.3d 897 (9th Cir.2005) (*en banc*) (false imprisonment causing loss of employment and employment opportunity *is* an injury to "business or property"); *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417 (5th Cir.2001) (assault claim against tobacco company causing wrongful death of smoker not an injury to "business or property"); *Hamm v. Rhone–Poulenc Rorer Pharm., Inc.*, 187 F.3d 941 (8th Cir.1999) (retaliatory firing causing damage to reputation not an injury to "business or property"); *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir.1995) (surreptitiously recorded phone calls causing mental anguish not an injury to "business or property"); *Doe v. Roe*, 958 F.2d 763 (7th Cir.1992) (coercion into sexual relationship by attorney causing emotional harm not an injury to "business or property"); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir.1986) (exposure to toxic chemicals during employment with defendant causing personal injuries not an injury to "business or property").

in a typical tort action are not recoverable in RICO, even if caused by a defendant's racketeering activity. These are costs that arise directly out of the plaintiff's personal injury, and are not injuries to plaintiff's "business or property" under the statute.

Defendants contend that Plaintiffs are attempting to recover the pecuniary losses resulting directly from their addicted residents' physical injuries, citing *Jackson*. Plaintiffs respond that their economic losses are not pecuniary losses resulting from their addicted residents' personal injuries; rather, they are concrete economic losses to the cities and counties resulting directly from Defendants' relinquishment of their responsibility to maintain effective controls against diversion of Schedule II narcotics. *See, e.g.*, 21 U.S.C. § 823(a)-(b).

Plaintiffs have the better argument. None of Plaintiffs' thirteen categories of costs arise directly out of a personal injury to Plaintiffs themselves. *See* Doc. #: 654 at 36-37 ("Plaintiffs' damages claims are not for personal injuries, but police and fire services, lost taxes, revenue and funding."). Even if *Jackson* can be read to preclude a RICO claim by a plaintiff who is tasked to protect the well-being of a third-party where the asserted economic harm is created by a personal injury to that third-party, it still does not follow that all thirteen categories of damages asserted by Plaintiffs arise directly out of such personal injuries. In that scenario, it would still be crucial to determine whether Plaintiffs' alleged injuries result directly from the personal injuries sustained by their citizens.

Plaintiffs assert the following injuries:

a. Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

15

c. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

d. Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e. Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

f. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

h. Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

i. Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

k. Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

l. Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

m. Losses caused by diminished property values in the form of decreased business investment and tax revenue.

SAC at 285-286. Perhaps it can be said that items b and e above (the provision of medical treatment and emergency response services) arise directly out of the personal injury of the citizens because they are effectively claims to recoup the costs of medical expenses. However, there are other categories of costs, for example item h (the costs associated with "attempts to stop the flow of

16

opioids into [Plaintiffs'] communities . . . [and] prevent the current opioid epidemic from spreading and worsening"), that cannot be said to arise directly out of Plaintiffs' residents' personal injuries. *Id.* Thus, under no reading of *Jackson* can it be maintained that *all* of Plaintiffs' asserted injuries arise directly out of a personal injury, and it is more likely, in this Court's opinion, that most do not.

### (ii) Sovereign Capacity

Finally, Defendants argue that regardless of the above, Plaintiffs cannot recover injury to their property to the extent they seek to recover costs associated with services provided in Plaintiffs' sovereign or quasi-sovereign capacities, which Defendants argue, accounts for the entirety of Plaintiffs' claimed injuries. Doc. #: 1082 at 6-7. Defendants implore the Court to follow the Ninth Circuit's holding in *Canyon County v. Syngenta Seeds, Inc*., 519 F.3d 969 (9th Cir. 2008). Defendants claim that *Canyon County's* holding that "money 'expended on public health care and law enforcement services' by a city or county does not constitute injury to 'business or property' under RICO" is applicable to the present case. *See* Doc. #: 1079 at 6 (quoting *Canyon County*, 519 F.3d at 971). Defendants point out that the Sixth Circuit has previously relied on *Canyon County* (albeit for its analysis of the proximate cause requirement of RICO and not for its "business or property" analysis) in *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010). The R&R declined to follow *Canyon County*, however, stating that, "Defendants . . . have not identified any Supreme Court or Sixth Circuit case directly on point with the facts of this case."

The R&R is correct because there has never been a case with facts analogous to those alleged by Plaintiffs here. It cannot be stressed strongly enough that the prescription opiates at

issue in this case **are Schedule II controlled substances**.[8] Plaintiffs have alleged a wanton disregard for public health and safety exhibited by Defendants with respect to their legal duty to try to prevent the diversion of prescription opioids. With the privilege of lawfully manufacturing and distributing Schedule II narcotics—and thus enjoying the profits therefrom—comes the obligation to monitor, report, and prevent downstream diversion of those drugs. *See* 21 U.S.C. § 823(a)-(b). Plaintiffs allege that Defendants have intentionally turned a blind eye to orders of opiates they knew were suspicious, thereby flooding the legitimate medical market and creating a secondary "black" market at great profit to Defendants and at great cost to Plaintiffs.[9] Plaintiffs must shoulder the responsibility for attempting to clean up the mess allegedly created by Defendants' misconduct.

In *Canyon County*, the County brought a RICO claim against four defendant companies for "knowingly employ[ing] and/or harbor[ing] large numbers of illegal immigrants within Canyon County, in an 'Illegal Immigrant Hiring Scheme.'" *Canyon County*, 519 F.3d at 972. The County claimed that it "paid millions of dollars for health care services and criminal justice services for the illegal immigrants who [were] employed by the defendants in violation of federal law." *Id.* Based on these facts, the Ninth Circuit concluded that "when a governmental body acts in its sovereign or quasi-sovereign capacity, seeking to enforce the laws or promote the public well-

---

[8] "Since passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* ("CSA" or "Controlled Substances Act"), opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs; hydrocodone and tapentadol were recently reclassified from Schedule III to Schedule II. Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence." SAC at 16 n.5.

[9] For example, Plaintiffs allege that "between 2012 and 2016, Summit County estimates that it spent roughly $66 million on costs tied to the opioid crisis. Those costs are projected to add up to another $89 million over the next five years, representing a total cost to the County of $155 million over the ten year period "simply trying to keep up with the epidemic.'" Doc. #: 514 at 226.

being, it cannot claim to have been 'injured in [its] . . . property' for RICO purposes based *solely* on the fact that it has spent money in order to act governmentally." *Canyon County*, 519 F.3d at 976 (emphasis added). As stated above, neither the Sixth Circuit nor the Supreme Court have adopted the holding in *Canyon County*, and certainly not for the broad proposition that governmental entities are *barred* from seeking RICO claims for services provided in their sovereign or quasi-sovereign capacities. Not even *Canyon County* established such a bright-line rule. The *Canyon County* court held that governmental entities are not injured in their property based *solely* on the expenditure of money to act governmentally. Use of the word "solely" implies that governmental entities might be able to assert an injury to their property based on the expenditure of money plus something else, perhaps, for example, the assumption of a statutory burden relinquished by a defendant.

In this case, the scope and magnitude of the opioid crisis—the illicit drug market and attendant human suffering—allegedly created by Defendants have forced Plaintiffs to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws or promote the general welfare. Plaintiffs have been forced to expend vast sums of money far exceeding their budgets to attempt to combat the opioid epidemic. The Court thus concludes that while Cities and Counties cannot recover ordinary costs of services provided in their capacity as a sovereign, Cities and Counties should be able to recover costs greatly in excess of the norm, so long as they can prove the costs were incurred due to Defendants' alleged RICO violations.

Additionally, the Ninth Circuit held in *Canyon County* that governmental entities can, in fact, recover in RICO for the costs associated with doing business in the marketplace. *See, e.g.*, *id.* ("government entities that have been overcharged in commercial transactions and thus deprived of their money can claim injury to their property.").

19

It is Defendants' position that *all* of Plaintiffs' costs responding to Defendants' alleged misconduct are sovereign or quasi-sovereign public services derivative of their residents' opioid problems, for which they cannot recover. *See* Doc. #: 1082 at 7. The Court disagrees. Certainly, some of Plaintiffs' alleged costs are costs associated with the ordinary provision of services to their constituents in their capacity as sovereigns. *See, e.g.*, SAC at 285 (asserting injury due to the provision of emergency first responder services). These costs cannot be recovered unless Plaintiffs can prove they go beyond the ordinary provision of those services. However, some of Plaintiffs' alleged costs are clearly associated with Plaintiffs' *participation in the marketplace*, and for those costs, Plaintiffs can undoubtedly recover. *See, e.g.*, *id.* (asserting injury due to the costs associated with purchasing naloxone to prevent future fatal overdoses).

Therefore, under the broadest reading of Sixth Circuit precedent, the Court finds that Plaintiffs may recover damages based on the provision of governmental services in their capacity as a sovereign to the extent they can prove the asserted costs go beyond the ordinary cost of providing those services and are attributable to the alleged injurious conduct of Defendants. Under a more restrictive reading of *Jackson*, Plaintiffs still may recover those costs associated with preventing the flood of these narcotics into their communities, which do not directly arise from the personal injuries of their citizens (e.g. providing medical care, addiction treatment, etc.). Lastly, Plaintiffs have sufficiently alleged that at least some of their claimed injuries are recoverable under RICO due to Plaintiffs' participation in the marketplace. Thus, the Court concludes that it is not appropriate to dismiss the RICO claims at this early stage in the litigation.

### C. Civil Conspiracy

The R&R concluded that Plaintiffs sufficiently pled a claim for civil conspiracy. R&R at 95-98. Distributor Defendants object, stating that the Complaint "alleges no facts to support the assertion that Distributors participated in the marketing of opioids [or] . . . in applying or lobbying

for increased opioid production quotas from DEA, . . . [and] no facts to support the claim that Distributors conspired not to report the unlawful distribution practices of their competitors to the authorities." Doc. #: 1079 at 2-3 (emphasis removed). Pharmacy Defendants also object, arguing that to the extent a civil conspiracy is alleged through Defendants' participation in industry groups, the Complaint is deficient with respect to the Retail Pharmacies, because it does not allege their participation in those groups.

The R&R correctly identifies the elements of a cognizable conspiracy claim as: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy") *Hale v. Enerco Grp., Inc.*, 2011 WL 49545, at *5 (N.D. Ohio Jan. 5, 2011) (citation and internal quotation marks omitted). Distributor Defendants take exception to the R&R's finding of independent unlawful acts. Pharmacy Defendants object to the R&R's finding of a malicious combination. Defendants miss the forest for the trees.

Distributor Defendants characterize the R&R's finding of unlawful acts as "(1) fraudulently marketing opioids; (2) fraudulently increasing the supply of opioids by seeking increased quotas; and (3) failing to report suspicious orders." Doc #: 1079 at 2. This mischaracterizes the R&R's actual finding that "the statutory public nuisance, Ohio RICO, and injury through criminal acts claims" would all suffice to "fulfill the underlying unlawful act element." R&R at 96. The Court agrees that any of these claims is sufficient to satisfy the underlying unlawful act element.

Pharmacy Defendants assert that, because the Complaint fails to expressly allege their participation in industry groups such as the Healthcare Distribution Alliance and Pain Care Forum, that Plaintiffs failed to adequately plead a civil conspiracy claim, at least regarding them. However,

the R&R did not rely on industry group participation to find a malicious combination. The R&R concluded that:

> Pleading the existence of a malicious conspiracy requires "only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 687 N.E.2d 481, 496-98 (Ohio Ct. App. 1996). "All that must be shown is that . . . the alleged coconspirator shared in the general conspiratorial objective." *Aetna Cas. & Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519, 538 (6th Cir. 2000) (citation and internal quotation marks omitted).

*Id.* at 97. In other words, the R&R concluded that even absent evidence of participation in industry groups, alleging a "shared conspiratorial objective" is sufficient to demonstrate a "malicious combination" and thus survive Pharmacy Defendants' motion to dismiss. Plaintiffs allege "*all Defendants* took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage." SAC at 229 (emphasis added). Additionally, with respect to Retail Pharmacy Defendants specifically, Plaintiffs assert, "instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it." *Id.* at 184. Thus, the R&R concluded, and this Court agrees, that Plaintiffs adequately pled that Defendants shared a general conspiratorial objective of expanding the opioid market and that there was a common understanding between all Defendants to disregard drug reporting obligations to effectuate that goal. Therefore, the Court adopts the R&R with respect to section III.K.

### D. Abrogation of Common Law Claims Under the Ohio Products Liability Act

The R&R concluded that Plaintiffs' Statutory Public Nuisance and Negligence Claims are not abrogated by the Ohio Product Liability Act ("OPLA").[10] R&R at 58-60, 61-62. As further

---

[10] Pharmacy Defendants argue, without any legal analysis, that Plaintiffs' Unjust Enrichment Claim is abrogated by the OPLA. Doc. #: 1078 at 11. The R&R does not address whether Plaintiffs' Unjust Enrichment Claim is abrogated by the OPLA, likely because the Pharmacies merely made a similarly undeveloped argument in their motion to dismiss, and only rehash them here. Due to the conspicuous lack of legal development in either Pharmacy Defendants' Motion to Dismiss or Objections to the R&R, the Court finds this objection improper. Regardless, per the analysis below, the Court finds that Plaintiffs' Unjust Enrichment Claim is not abrogated by the OPLA.

discussed below, the Court concurs with and adopts the R&R's recommendation and reasoning with respect to these findings. However, the R&R also concluded that Plaintiffs' Common Law Absolute Public Nuisance Claim is abrogated by the OPLA. *Id.* at 62-65. The Court disagrees.

### 1. Abrogation of the Common Law Public Nuisance Claims

The Ohio Product Liability Act, Ohio Rev. Code § 2307.71 *et seq.*, was enacted in 1988. It was amended in 2005 and amended again in 2007. Despite the General Assembly's attempts to clarify the language and intent of the statute's definition of "product liability claim," the Court finds that the definition remains ambiguous, and thus reviews the legislative history pursuant to Ohio Rev. Code § 1.49(C) ("If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters: . . . The legislative history.").

The OPLA, at the time of its enactment, did not explicitly state that it was intended to supersede all common law theories of product liability. It was also ambiguous regarding whether it superseded common law claims seeking only economic loss damages. The Ohio Supreme Court attempted to clarify these ambiguities in two cases, *Carrel v. Allied Prods. Corp.*, 677 N.E.2d 795, 799 (1997) (holding that "the common-law action of negligent design survives the enactment of the Ohio Products Liability Act.") and *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) (holding that "although a cause of action may concern a product, it is not a product liability claim within the purview of Ohio's product liability statutes unless it alleges damages other than economic ones, and that a failure to allege other than economic damages does not destroy the claim, but rather removes it from the purview of those statutes.").

In 2005, the General Assembly added the following provision to the OPLA ("the 2005 Amendment"): "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability causes of action." 2004 Ohio Laws File 144 (Am. Sub. S.B. 80)

23

(codified at Ohio Rev. Code § 2307.71(B)). The associated legislative history of the 2005
Amendment states:

> The General Assembly declares its intent that the amendment made by this act to
> section 2307.71 of the Revised Code is ***intended to supersede the holding of the
> Ohio Supreme Court in Carrel v. Allied Products Corp.*** (1997), 78 Ohio St.3d
> 284, that the common law product liability cause of action of negligent design
> survives the enactment of the Ohio Product Liability Act, sections 2307.71 to
> 2307.80 of the Revised Code, and to abrogate all common law product liability
> causes of action.

*Id.* (emphasis added). Notably, the General Assembly cited the *Carrel* holding while
conspicuously omitting the contemporary *LaPuma* holding. The Court therefore interprets the
General Assembly's inclusion of *Carrel* to imply the intentional exclusion and therefore the tacit
acceptance of the Ohio Supreme Court's holding in *LaPuma*.

In 2007, the Ohio Legislature further amended section 2307.71(A)(13) of the OPLA ("the
2007 Amendment") to add the following to the definition of "product liability claim:"

> "Product liability claim" ***also includes*** any public nuisance claim or cause of action
> at common law in which it is alleged that the design, manufacture, supply,
> marketing, distribution, promotion, advertising, labeling, or sale of a product
> unreasonably interferes with a right common to the general public.

2006 Ohio Laws File 198 (Am. Sub. S.B. 117) (emphasis added). The associated legislative history
of the 2007 Amendment further states:

> The General Assembly declares its intent that the amendments made by this act to
> sections 2307.71 and 2307.73 of the Revised Code are ***not intended to be
> substantive but are intended to clarify the General Assembly's original intent*** in
> enacting the Ohio Product Liability Act, sections 2307.71 to 2307.80 of the Revised
> Code, as initially expressed in Section 3 of Am. Sub. S.B. 80 of the 125th General
> Assembly, to abrogate all common law product liability causes of action ***including***
> common law public nuisance causes of action, regardless of how the claim is
> described, styled, captioned, characterized, or designated, including claims against
> a manufacturer or supplier for a public nuisance allegedly caused by a
> manufacturer's or supplier's product.

*Id.* (emphasis added). Senate Bill 80 of the 125th General Assembly (the 2005 Amendment) was
a "tort reform" bill that was enacted to create limitations on various types of non-economic

damages. *See* 2004 Ohio Laws File 144 (Am. Sub. S.B. 80). Both the 2005 and 2007 Amendments demonstrate the General Assembly's intent to limit non-economic damages on all common law theories of product liability regardless of how the claim was characterized.

Throughout these amendments, however, the overarching substantive definition of a "product liability claim" has not changed much from the original 1988 OPLA definition. To fall within the statute's definition a plaintiff's product liability claim must 1) seek to recover compensatory damages 2) for death, physical injury to a person, emotional distress, or physical damage to property other than the product in question (*i.e.* "harm" as defined by the statute).[11] The subsequent amendments make clear that any civil action concerning liability for a product due to a defect in design, warning, or conformity—including any common law public nuisance or common law negligence claim, regardless of how styled—that 1) seeks to recover compensatory damages 2) for "harm" is abrogated by the OPLA. Conversely, a claim *not* seeking to recover compensatory damages or seeking to recover solely for "economic loss" (*i.e. not* "harm") does not meet the definition of a product liability claim and is not abrogated by the OPLA. The OPLA is explicit that "Harm is not 'economic loss,'" and "Economic Loss is not 'harm.'" Ohio Rev. Code § 2307.71(A)(2) and (7). This reading of § 2307.71(A)(13) is consistent with the legislative intent, the holding in *LaPuma*, and with § 2307.72(C) which states:

> Any recovery of compensatory damages for economic loss based on a claim that is asserted in a civil action, other than a product liability claim, is not subject to sections 2307.71 to 2307.79 of the Revised Code, but may occur under the common law of this state or other applicable sections of the Revised Code.

Ohio Rev. Code § 2307.72(C).

---

[11] Section 2307.71(A)(13) of the OPLA also requires that the claim allegedly arise from any of:
 (a)  The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
 (b)  Any warning or instruction, or lack of warning or instruction, associated with that product;
 (c)  Any failure of that product to conform to any relevant representation or warranty.
Ohio Rev. Code § 2307.71(A)(13).

Further, by defining a "product liability claim" in terms of damages, the OPLA does not provide for any form of equitable remedy.[12] To conclude that all public nuisance claims, including those seeking equitable remedies, are subsumed by the OPLA would effectively be a substantive change in the law in contravention of the General Assembly's express intent that the amendment *not* be substantive. In other words, if all public nuisance claims, including those only seeking equitable relief, were abrogated by the OPLA, a party merely seeking an equitable remedy to stop a public nuisance would be forced instead to sue for compensatory damages under the OPLA, a result that appears completely at odds with the legislative intent to limit non-economic compensatory damages. Therefore, a claim seeking only equitable relief is not abrogated by the OPLA.

The R&R concluded that the 2007 Amendment added public nuisance claims as a second category of actions that fall under the definition of a product liability claim. *See* R&R at 58 n.37. In support of this conclusion, Defendants cite *Mount Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22 (2018). *See* Doc. #: 1116 at 3. In *Mount Lemmon*, the Supreme Court interpreted Congress' addition of a second sentence to the definition of "employer" under the ADEA.[13] The Supreme Court held that the phrase "also means" adds a new category of employers to the ADEA's reach. *Mount Lemmon* is factually inapposite, and the R&R's conclusion is incorrect for two reasons. First, there is a substantive difference between the phrases "also means" and "also includes." The term "means" is definitional, while "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *In re Hartman*, 443 N.E.2d

---

[12] Defendants identify section 2307.72(D)(1) as expressly carving out abatement relief for contamination of the environment as an indication that the OPLA supersedes all other forms of equitable relief. *See* Doc. #: 1116 at 4. However, a far more natural reading of this section is the carving out of all forms of relief for pollution of the environment from preemption by federal environmental protection laws and regulations.

[13] Under the ADEA, "the term 'employer' means a person engaged in an industry affecting commerce who has twenty or more employees . . . . The term *also means* (1) any agent of such a person, and (2) a State or political subdivision of a State . . . ." 29 U.S.C. § 630(b) (emphasis added).

516, 517–18 (Ohio 1983) (quoting *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). In this case, the general principal is that to be a product liability claim, a plaintiff's cause of action must seek compensatory damages for harm. Thus, a public nuisance claim—to be "also include[d]" as a "product liability claim" under the OPLA—must likewise seek compensatory damages for harm. Ohio Rev. Code § 2307.71(A)(13).

Second, as the *Mount Lemmon* opinion points out, "Congress amended the ADEA to cover state and local governments." *Mount Lemmon*, 139 S. Ct. at 23. This amendment to the ADEA certainly amounts to—and was intended to be—an intentional, substantive change in the law. As highlighted above, however, the 2007 Amendment to the OPLA was not intended to be a substantive change.

Therefore, in light of the legislative history, the Court finds it at least plausible, if not likely, that the 2005 and 2007 Amendments to the OPLA intended to clarify the definition of "product liability claim" to mean "a claim or cause of action [*including* any common law negligence or public nuisance theory of product liability . . .] that is asserted in a civil action . . . that seeks to recover compensatory damages . . . for [harm] . . . ." This definition is the most consistent with the statute, the legislative history, and the caselaw. *See LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) ("Failure to allege other than economic damages . . . removes it from the purview of [the OPLA].") (intentionally not overruled by the 125th General Assembly); *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 753 n.4 (Ohio Ct. App. Nov. 16, 2016) ("We recognize that a claim for purely economic loss is not included in the statutory definition of 'product liability claim,' and, consequently, a plaintiff with such a claim may pursue a common-law remedy."); *Ohio v. Purdue Pharma,* Case No. 17 CI 261 (Ohio C.P. Aug. 22, 2018) (finding that the Plaintiff's common law nuisance claim not seeking compensatory damages is not

abrogated under the OPLA.); *see also*, 76 Ohio Jur. 3d Claims Within Scope of Product Liability Act § 1 ("Ohio's products liability statutes, by their plain language, neither cover nor abolish claims for purely economic loss caused by defective products.").

Using this definition, Plaintiffs' absolute public nuisance claim, at least insofar as it does not seek damages for harm,[14] is not abrogated by the OPLA. Section III.E of the R&R is rejected to the extent it held that Plaintiffs' absolute public nuisance claim is abrogated by the OPLA.

### 2. City of Akron's Ability to Bring a Statutory Public Nuisance Claim

The R&R concluded that Plaintiffs' statutory public nuisance claim was not abrogated. R&R at 62. No party objected to this conclusion, therefore the Court adopts the R&R with respect to this finding. The R&R further concluded that the City of Akron lacked standing to bring a statutory public nuisance claim, and that the County of Summit, which had standing, was not limited only to injunctive relief under the statute. The Pharmacy Defendants object to the R&R's conclusion that § 4729.35 of the Ohio Revised Code does not limit the remedy that can be sought under the statute to an injunction, and Plaintiffs object to the R&R's conclusion that § 4729.35 limits who may maintain a nuisance action. The issue then, is whether § 4729.35 is limiting and if so, to what extent.

The operative statutes involved in Plaintiffs' Statutory Public Nuisance Claim are:

Ohio Rev. Code § 715.44(A) (emphasis added):[15]

A municipal corporation may abate ***any nuisance*** and prosecute ***in any court of competent jurisdiction***, any person who creates, continues, contributes to, or suffers such nuisance to exist.

---

[14] "'Harm' means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not 'harm.'" Ohio Rev. Code § 2307.71(A)(2).

[15] Page's Ohio Revised Code Annotated, Title 7: *Municipal Corporations*, Chapter 715: *General Powers*, §§715.37-715.44: Health and Sanitation, §715.44: Power to abate nuisance and prevent injury.

Ohio Rev. Code § 3767.03 (emphasis added):[16]

> ***Whenever a nuisance exists***, the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation ***in which the nuisance exists***; the prosecuting attorney of the county in which the nuisance exists; the law director of a township that has adopted a limited home rule government under Chapter 504. of the Revised Code; or any person who is a citizen of the county in which the nuisance exists may bring an action in equity in the name of the state, upon the relation of the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation; the prosecuting attorney; the township law director; or the person, to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it.

Ohio Rev. Code § 4729.35 (emphasis added):[17]

> The violation . . . of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . . is hereby declared to . . . constitute a public nuisance. The attorney general, the prosecuting attorney of any county in which the offense was committed or in which the person committing the offense resides, or the state board of pharmacy may maintain an action in the name of the state ***to enjoin such person*** from engaging in such violation. Any action under this section shall be brought ***in the common pleas court of the county where the offense occurred or the county where the alleged offender resides***.

If § 4729.35 had ended after the first sentence, there would be no question as among the three statutes that the City of Akron would have the authority to bring an action to abate a nuisance caused by the violation of applicable drug laws. However, the subsequent sentences of § 4729.35 can be read as either limiting or expanding (or both). Section 4729.35 is potentially limiting, for example, in that it does not also list city directors of law, chief legal officers of municipal corporation, or law directors of townships as parties that may maintain a nuisance action. It is also potentially limiting in that it only mentions injunctive relief rather than (or in addition to) relief in the form of abatement (or equitable relief generally). However, as Plaintiffs point out, § 4729.35

---

[16] Page's Ohio Revised Code Annotated, Title 37: Health-Safety-Morals, Chapter 3767: Nuisances, §§3767.01-3767.11: Disorderly houses, §3767.03: Abatement of nuisance; bond.

[17] Page's Ohio Revised Code Annotated, Title 47: Occupations-Professions, Chapter 4729: Pharmacists; Dangerous Drugs, §§4729.27-4729.46: Prohibitions, §4729.35: Violations of drug laws as public nuisance.

might be read as an expansion of § 3767.03 in that it additionally allows the state board of pharmacy and the prosecuting attorney of the county in which the alleged offender resides to maintain a nuisance action.[18] It also provides jurisdiction in either the county where the offense occurred or the county where the alleged offender resides.

The R&R succinctly summarizes the applicable Ohio rule of statutory construction, "a court should construe various statutes in harmony unless their provisions are irreconcilably in conflict." R&R at 65 (citing Ohio Rev. Code § 1.51; *United Tel. Co. v. Limbach*, 643 N.E.2d 1129, 1131 (Ohio 1994)). In the event statutory provisions are irreconcilable, the special or local provision prevails. *See id.* Additionally, as before, the Court interprets the inclusion of certain elements in a statute to imply the intentional exclusion of others.

Here, § 4729.35 is a special or local provision. It is irreconcilable with §§ 715.44(A) and 3767.03 because the plain language of these sections explicitly allows the chief legal officer of **any** municipal corporation, for example a city law director, to bring an action for abatement of **any** nuisance, whereas § 4729.35—at least implicitly—excludes a city law director from bringing a nuisance action for violations of the drug laws. Further, even a statutorily authorized party may only bring an action to enjoin such violations, not one for abatement.

Thus, the Court concludes, as the R&R did, that the General Assembly's inclusion of the attorney general, county prosecuting attorney, and state board of pharmacy in § 4729.35 implies the intentional exclusion of a city law director. Similarly, the Court concludes, though the R&R did not, that the General Assembly's reference to "an action . . . to enjoin such person from engaging in such violation" implies the exclusion of other forms of relief. Ohio Rev. Code § 4729.35.

---

[18] As opposed to only the county prosecuting attorney in which the nuisance exists as allowed by section 3767.03.

While it may not have been the General Assembly's intent to limit the parties who can maintain a nuisance action or to limit the available relief, the Court declines to second guess the unambiguous text of the General Assembly's statute. Further, because § 4729.35 is a special or local provision, irreconcilable with the more general provision, the Court reads § 4729.35 as an exception to the general provision. Therefore, the Court adopts the R&R's conclusion that the City of Akron lacks standing to bring a statutory public nuisance claim but rejects the R&R's conclusion that Ohio Rev. Code § 4729.35 does not expressly limit the categories of relief available for a nuisance claim to an injunction.

### 3. Abrogation of the Negligence Claim

The R&R concluded that the OPLA does not abrogate Plaintiffs' negligence claims. R&R at 60. Distributor Defendants object to that determination. *See* Doc. #: 1079 at 12. As discussed above, the OPLA only abrogates civil actions that seek to recover compensatory damages for death, physical injury, or physical damage to property caused by a product. Distributor Defendants do not meaningfully develop any argument with respect to Plaintiffs' negligence claim other than to cite several cases where courts purportedly dismissed various tort claims as preempted by the OPLA. The cases are all distinguishable.

Defendants cite *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 WL 1326034 (N.D. Ohio Apr. 6, 2011). Regarding the plaintiff's negligence claim, the *Chem. Solvents* court first determined that "the Plaintiff [was] not saying that the product itself was defective." *Id.* at *13. The court then held, "Thus, this is not a 'products liability' claim, but a claim premised upon subsequent negligent actions by Advantage. Accordingly, the Court finds this claim is not preempted by the OPLA." *Id.* (citing *CCB Ohio LLC v. Chemque, Inc.*, 649 F. Supp. 2d 757, 763–64 (S.D. Ohio 2009) ("Similarly, the Court finds actions for fraud and negligent misrepresentation as outside the scope of the OPLA's abrogation, as neither fit neatly into the definition of a

'common law product liability claim.'")). Here, Plaintiffs likewise are not asserting that the opioid products themselves are defective, rather that Defendants negligently permitted (or even encouraged) diversion of those products.

Defendants also cite *McKinney v. Microsoft Corp.*, No. 1:10-CV-354, 2011 WL 13228141 (S.D. Ohio May 12, 2011). *McKinney* is a traditional products liability case where the plaintiff, in addition to his products liability claim under the OPLA, asserted a claim for negligent manufacture (i.e. a defective product claim), the exact type of claim considered by the General Assembly when it overruled *Carrel*. Plaintiffs' negligence claim in this case, again, does not assert that Defendants' opioids were defective.

Finally, Defendants turn to *Leen v. Wright Med. Tech., Inc.*, 2015 WL 5545064, at *2 (S.D. Ohio Sept. 18, 2015). In *Leen*, the plaintiff did not oppose the defendant's abrogation arguments in the motion to dismiss, so the court dismissed the common law negligence claim without considering the merits. *See id.* Therefore, based on this Court's analysis of the OPLA and the cases cited by Defendants, the Court adopts the R&R's conclusion that Plaintiffs' negligence claim is not abrogated.

Defendants also assert that the R&R's reliance on *Cincinnati v. Beretta U.S.A. Corp.* is misplaced because, they claim, it was effectively overruled by the General Assembly's amendments to the OPLA. 768 N.E.2d 1136 (Ohio 2002); *see* Doc. #: 1079 at 14. Whether and to what extent the OPLA abrogates negligence claims is a separate and distinct question from whether there is a common law duty to prevent or attempt to prevent the alleged negligent creation of an illicit secondary market.

As previously stated, the OPLA does not abrogate Plaintiffs' negligence claim, which seeks only relief from economic losses. However, even if the Court had found that Plaintiffs' negligence

32

claim was abrogated, it does not follow that *Beretta's* analysis of what constitutes a legal duty in Ohio is somehow flawed.[19] Thus, *Beretta's* discussion of Ohio common law duty is still relevant to the present case and is analyzed further below.

### E. Negligence

The R&R concluded that Plaintiffs have pled sufficient facts to plausibly support their claims that Defendants owed them a duty of care, that their injuries were proximately and foreseeably caused by Defendants' failure to take reasonable steps to prevent the oversupply of opioids into Plaintiffs' communities, and that their claim is not barred by the economic loss doctrine. R&R at 74-85. Defendants object to the finding that they owed Plaintiffs any duty and the conclusion that the economic loss doctrine does not bar Plaintiffs' claim.

#### 1. Duty of Care

Defendants make several objections to the R&R's analysis regarding the duty of care. "The existence of a duty of care, as an element of a negligence claim under Ohio law, depends on the foreseeability of the injury, and an injury is 'foreseeable' if the defendant knew or should have known that his act was likely to result in harm to someone." 70 Ohio Jur. 3d Negligence § 11 (citing *Bailey v. U.S.*, 115 F. Supp. 3d 882, 893 (N.D. Ohio 2015)). The R&R concluded that "it was reasonably foreseeable that [Plaintiffs] would be forced to bear the public costs of increased harm from the over-prescription and oversupply of opioids in their communities if Defendants failed to implement and/or follow adequate controls in their marketing, distribution, and dispensing of opioids," and therefore, that "Plaintiffs have plausibly pleaded facts sufficient to establish that Defendants owed them a common law duty." R&R at 78-79.

---

[19] The *Beretta* court determined that the defendants' negligent manufacturing, marketing, and distributing, and failure to exercise adequate control over the distribution of their products created an illegal, secondary market resulting in foreseeable injury and that from Defendants' perspective, the City of Cincinnati was a foreseeable plaintiff. *See Beretta*, 768 N.E.2d at 1144.

First, Manufacturer Defendants assert that to the extent they owe a statutory duty, it is owed to the U.S. Drug Enforcement Agency, not to plaintiffs. Doc. #: 1082 at 14. They also assert that they have no legal duty under 21 U.S.C. § 827 or 21 C.F.R. § 1301.74(b) to monitor, report, or prevent downstream diversion. *Id.* These objections are not well-taken. The R&R expressly did not reach whether any Defendant owed a duty to Plaintiffs under the statutes or regulations. R&R at 79. It also did not address whether the statutes or regulations create a common law duty under a negligence *per se* theory. *Id.* at n.49. The R&R instead concluded that the common law duty pled by Plaintiffs was sufficient to support a negligence claim. *See* R&R at 79. This Court agrees.

Distributor Defendants assert that the R&R "refus[ed] to confront a key duty question [(whether a duty, if one exists, flows to the County)] head on." Doc. #:1079 at 14. They assert that "the R&R identified no Ohio case recognizing a common-law duty to *report or halt suspicious orders of controlled substances*," and "even if there were a common-law duty to *report or halt suspicious orders*, no authority suggests that such a duty runs to the cities or counties." *Id.* (emphasis added). The duty that Plaintiffs allege is not so narrow. Plaintiffs allege that Defendants, like all reasonably prudent persons, have a duty "to not expose Plaintiffs to an unreasonable risk of harm." SAC at 312.

In reaching its conclusion on the duty of care, the R&R relies on *Cincinnati v. Beretta*. The R&R provides this summary:

> In *Cincinnati v. Beretta*, the Ohio Supreme Court addressed the question of whether gun manufacturers owed a duty of care to a local government concerning harms caused by negligent manufacturing, marketing and distributing of firearms. *Beretta* involved allegations that the defendants failed to exercise sufficient control over the distribution of their guns, thereby creating an illegal secondary market in the weapons. The *Beretta* court concluded that the harms that resulted from selling these weapons were foreseeable—that Cincinnati was a foreseeable plaintiff. 768 N.E.2d at 1144. Plaintiffs argue that the harm caused by the marketing and distribution of opioids are similarly foreseeable.

34

R&R at 75-76. Here, taking Plaintiffs' allegations as true, by failing to administer responsible distribution practices (many required by law), Defendants not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market. Opioids are Schedule II drugs. Despite Manufacturer Defendants' marketing campaign to the contrary it is well known that opioids are highly addictive. When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, "black" market created for those drugs. It is also foreseeable that local governments will be responsible for combatting the creation of that market and mitigating its effects. Thus, the Court affirms the R&R's conclusion that Defendants owe Plaintiffs a common law duty of care.

### 2. Economic Loss Doctrine

Defendants also object to the R&Rs conclusion that Plaintiffs' negligence claim is not precluded by the economic loss doctrine. Defendants' objections merely rehash arguments already made in their motions to dismiss. The R&R does a thorough analysis of the application of the economic loss rule, and this Court finds no fault with it. The R&R states:

> The economic loss rule recognizes that the risk of consequential economic loss is something that the parties can allocate by agreement when they enter into a contract. This allocation of risk is not possible where, as here, the harm alleged is caused by involuntary interactions between a tortfeasor and a plaintiff. Thus, courts have noted that in cases involving only economic loss, the rule "will bar the tort claim if the duty arose only by contract." *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011). By contrast, "the economic loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise solely from a contract." *Id.*; *see also Corporex*, 835 N.E.2d. at 705 ("When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract."); *Ineos USA LLC v. Furmanite Am., Inc.*, 2014 WL 5803042, at *6 (Ohio Ct. App. Nov. 10, 2014) ("[W]here a tort claim alleges that a duty was breached independent of the contract, the economic loss rule does not apply.").

R&R at 84 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701 (Ohio 2005)). Thus, the Court concurs with and affirms the R&R's analysis of the economic loss rule and its conclusion that it is not applicable to Plaintiffs' tort claims.

### F. The Injury Through Criminal Acts Objections

The R&R concluded that Defendants' motion to dismiss Plaintiffs' Injury Through Criminal Acts Claim should not be dismissed. R&R at 88-90. Defendants' primary objection to this conclusion merely rehashes the argument initially made in their motions to dismiss: that they have not been convicted of a crime. Their objection cites no new facts or case law that were not already presented to and considered by Magistrate Judge Ruiz. Whether Ohio Rev. Code § 2307.60(A)(1) requires an underlying conviction is a question this Court recently certified to the Ohio Supreme Court in *Buddenberg v. Weisdack*, Case No. 1:18-cv-00522, 2018 WL 3159052 (N.D. Ohio June 28, 2018) (Polster, J.); *see also* 10/24/2018 Case Announcements, 2018-Ohio-4288 (available at http://www.supremecourt.ohio.gov/ROD/docs/) (accepting the certified question). In *Buddenberg*, this Court denied the defendants' motion to dismiss and ordered, "Defendants may renew their challenge in the form of a motion for summary judgment after discovery and further research." *Buddenberg*, 2018 WL 3159052 at *6. Nothing in any Defendants' briefing convinces this Court that the same approach is not appropriate here. Therefore, the Court adopts the R&R with respect to Section III.I. Defendants' objections are overruled.[20]

### G. Unjust Enrichment

The R&R concluded that Defendants' motion to dismiss Plaintiffs' Unjust Enrichment Claim should be denied. *See* R&R at 91-95. The issue at the heart of Defendants' objections to the

---

[20] Should the Ohio Supreme Court rule that a criminal conviction is required, this claim will of course be dismissed.

R&R's conclusion is whether Plaintiffs conferred a benefit upon the Defendants. Defendants argue that "the rule in Ohio is that to show that a plaintiff conferred a benefit upon a defendant, an economic transaction must exist between the parties." Doc. #: 1078 at 13 (internal quotations omitted) (citing *Ohio Edison Co. v. Direct Energy Bus.*, LLC, No. 5:17-cv-746, 2017 WL 3174347 (N.D. Ohio July 26, 2017); *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Sons Enters., Inc.*, 50 N.E.3d 955 (Ohio Ct. App. 2015); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942 (N.D. Ohio 2009)).

This is not the rule in Ohio. All the cases cited by Defendants refer back to one sentence in *Johnson v. Microsoft Corp.*: "*The facts in this case* demonstrate that no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit 'to which it is not justly entitled.'" 834 N.E.2d 791, 799 (Ohio 2005) (emphasis added) (citing *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 141 N.E.2d 465 (Ohio 1957)). This holding is expressly limited to the facts of that case. *Johnson* does state the rule in Ohio, however. It provides: "The rule of law is that an *indirect purchaser* cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." *Id.* (emphasis added).

As Defendants are quick to point out, Plaintiffs do not claim to be purchasers of opioids, indirect or otherwise. *See, e.g.*, Doc. #: 1078 at 11 ("Plaintiffs do not allege that *they* purchased opioids from the Pharmacy Defendants."). As such, the R&R rightly concludes that "Plaintiffs' theory of recovery is not based on a financial transaction, therefore the claim is not barred by *Johnson's* limiting indirect purchasers from maintaining unjust enrichment claims against parties other than those with whom they dealt directly." R&R at 92.

Plaintiffs' claim is that "Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution

practices." SAC at 328. According to Plaintiffs, Defendants' conduct allowed the diversion of opioids and thereby created a black market for their drugs. *See id.* at 7. This black market allowed Defendants to continue to ship large volumes of opioids into Plaintiffs' communities at great profit to Defendants and great expense to Plaintiffs. *See id.* at 328. Under Ohio law, "one is unjustly enriched if the retention of a benefit would be unjust, and one should not be allowed to profit or enrich himself or herself inequitably at another's expense." 18 Ohio Jur. 3d Contracts § 279. Therefore, for the reasons stated, Defendants' objections are overruled. The Court adopts Section III.J of the R&R.

III.

Having considered Plaintiffs' Second Amended Complaint, Defendants' Motions to Dismiss, Plaintiffs' Omnibus Response, Defendants' Replies, Magistrate Judge Ruiz's Report and Recommendation, the parties' Objections to the R&R, and their Responses, Defendants' Motions to Dismiss, Doc. ##: 491, 497, 499, are **DENIED** with the following exception: The City of Akron's Statutory Public Nuisance claim is dismissed for lack of standing under Ohio Rev. Code § 4729.35. The County of Summit's Statutory Public Nuisance claim is limited to seeking injunctive relief.

It is accurate to describe the opioid epidemic as a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated. As this Court has previously stated, it is hard to find anyone in Ohio who does not have a family member, a friend, a parent of a friend, or a child of a friend who has not been affected.

Plaintiffs have made very serious accusations, alleging that each of the defendant Manufacturers, Distributors, and Pharmacies bear part of the responsibility for this plague because of their action and inaction in manufacturing and distributing prescription opioids. Plaintiffs allege that Defendants have contributed to the addiction of millions of Americans to these prescription opioids and to the foreseeable result that many of those addicted would turn to street drugs.

While these allegations do not fit neatly into the legal theories chosen by Plaintiffs, they fit nevertheless. Whether Plaintiffs can prove any of these allegations remains to be seen, but this Court holds that they will have that opportunity.

The Court, thus having ruled on all of Defendants' Motions to Dismiss, orders Defendants to file their Answers to Plaintiffs' Corrected Second Amended Complaint, Doc. #: 514, no later than January 15, 2019.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster  *December 19, 2018***
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CUYAHOGA COUNTY, OHIO, et al.,** | ) | **Case No.: 1:17-OP-45004** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **v.** | ) | |
| | ) | <u>**CIVIL JURY TRIAL ORDER**</u> |
| **PURDUE PHARMA LP, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **SUMMIT COUNTY, OHIO, et al.,** | ) | **Case No. 1:18-OP-45090** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **v.** | ) | |
| | ) | <u>**CIVIL JURY TRIAL ORDER**</u> |
| **PURDUE PHARMA LP, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

On April 23, 2019, the Court held a closed conference with Track One trial counsel in the above-captioned consolidated cases scheduled for trial on October 21, 2019. At present, there are 11 claims asserted against approximately 23 Defendant Families[1] in the consolidated cases. Due to the number of claims and Defendants, the primary purpose of the conference was to discuss trial management issues such as the length of the trial, a limitation on the number of pretrial motions that may be filed, and jury selection.

## I.    PRETRIAL MOTIONS

Trial counsel for both sides acknowledged at the April 23rd conference that, in order to hold a manageable trial, the number of claims and Defendants must be substantially reduced

---

[1]For example, the Purdue Family includes Purdue Pharma, LP, Purdue Pharma, Inc. and The Purdue Frederick Company, Inc.

before the beginning of trial–via rulings on pretrial motions, settlements, and/or voluntary dismissals.

To conserve the parties' and the Court's resources, the Court **DIRECTS** trial counsel to meet, confer, attempt to reach agreement, and email to chambers[2] **no later than 12:00 p.m. on Wednesday, May 15, 2019**, a single document proposing reasonable numerical and page limits on each *type* of motion, such as Daubert, summary judgment and in limine.  Trial counsel agreed that they will file, where possible, *consolidated* motions, responses and replies–and will take this into consideration when proposing numerical and page limits on the various types of motions.  If trial counsel cannot reach agreement on *reasonable* limits by that deadline, the Court will impose its own.

The deadline for filing dispositive and Daubert motions is **12:00 p.m. on Friday, June 28, 2019**, and, as will be addressed in Section III.b.4, the deadline for filing motions in limine is **12:00 p.m. on Wednesday, September 25, 2019**.


## II.    FINAL PRETRIAL CONFERENCE

The Court has scheduled a Final Pretrial Conference in the consolidated cases beginning at **12:00 p.m. on Tuesday, October 15, 2019**.  Pursuant to Local Rule 16.3(e), the parties and lead counsel of record must be present and prepared with full authority to discuss all aspects of the case, including any pending motions, witness and exhibit lists, scheduling, and settlement. Counsel must confer with their clients and with each other regarding their final settlement posture no later than two (2) business days before the Final Pretrial Conference.


## III.    TRIAL

The consolidated cases are scheduled for a Jury Trial beginning at **9:00 a.m. on Monday, October 21, 2019,** in the courtroom of the Honorable Dan A. Polster, Courtroom 18B of the Carl B. Stokes United States District Courthouse, 801 W. Superior Ave., Cleveland, Ohio.

---

[2]The chambers' email address is polster_chambers@ohnd.uscourts.gov.

Opening statements and the presentation of evidence will begin at **9:00 a.m. on Monday, October 21, 2019,** and will conclude with closing arguments and final jury instructions **no later than 5:30 p.m. on Friday, December 13, 2019**, with jury deliberations to follow. When the number of parties and claims have been reduced and finally resolved, the Court will determine the number of hours to allot each party with which to conduct its direct and cross examinations, rebuttal, and sur-rebuttal.[3] Counsel are directed to plan their trial strategy accordingly.

Trial days begin at 9:00 a.m. and continue until approximately 5:30 p.m., unless circumstances dictate otherwise, and will include a one (1) hour lunch break and two (2) fifteen minute breaks. Counsel shall be present in the courtroom at 8:30 a.m. on trial days in order to address matters outside the presence of the jury. All parties are to be present in the courtroom at all times when the jury is seated.

     **a.**     **Jury Selection**

          **1.**     **Jury Questionnaire Form**

Approximately (4) four weeks before trial, the Jury Department will email to prospective jurors a Jury Questionnaire prepared by trial counsel that prospective jurors can complete online. (The Jury Department will also mail hard copies to prospective jurors in the event they either have no access to a computer or have difficulty completing the questionnaire online.) The Court **DIRECTS** trial counsel to meet, confer, reach agreement, and email to Special Master Cohen **no later than 12:00 p.m. on Wednesday, August 28, 2019**, a reasonably concise Jury Questionnaire. Special Master Cohen will resolve any issues the parties cannot agree on. Trial counsel shall take into consideration the questions on the Jury Department's form questionnaire, located at https://www.ohnd.uscourts.gov/sites/ohnd/files/CivilRules_AppendixC.pdf.

---

[3]Depending upon the final number of claims and Defendants, the Court may impose time limits such that the trial may conclude well before December 13, 2019.

### 2. Jury Selection Process and Deliberation

The Court expects to conduct jury voir dire the week preceding trial–beginning at **9:00 a.m. on Wednesday, October 16, 2019** and continuing through **no later than 5:30 p.m. on Friday, October 17, 2019**. The Court expects to voir dire approximately 50 prospective jurors each day until such time as the parties agree on 12 jurors. Any juror remaining on the panel at the conclusion of the trial will participate in deliberations.

### b. Trial Documents

### 1. Joint Preliminary Statement

Trial counsel must meet, confer, and prepare a *single* Joint Preliminary Statement (not to exceed 2 pages, double-spaced) describing the cases in an impartial, easily understood, and concise manner for use by the Court at the outset of its voir dire and at the time the jury is impaneled. This statement will set the context of the trial for the jury and must be emailed to chambers **no later than 12:00 p.m. on Wednesday, September 25, 2018**.

### 2. Stipulations of Fact

Given the length and complexities of the trial, trial counsel acknowledged at the April 23rd conference the need to work together to prepare written stipulations as to *all uncontested facts* to be presented at trial. Stipulations must be filed with the Court **no later than 12:00 p.m. on Wednesday, September 25, 2019**. A signed copy of the stipulations must be submitted to the Court at the Final Pretrial Conference.

### 3. Voir Dire

The Court will conduct initial voir dire of the venire and of individual venire members. The Court will thereafter allow one counsel for each party to question the venire *briefly* on issues not addressed by the Court. Plaintiffs collectively and Defendants collectively (2 total documents) shall file proposed questions for the Court's voir dire **no later than 12:00 p.m. on Wednesday, September 25, 2019**. The Court will decide which questions to include in its own voir dire after which it will email its final voir dire questions to trial counsel.

4

### 4. Motions in Limine

The Court reiterates its direction to trial counsel to file, where possible, *consolidated* motions in limine, responses, and replies–and to meet, confer, and email to chambers, **no later than 12:00 p.m. on Wednesday, May 15, 2019**, a single document proposing reasonable numerical and page limits on in limine motions. *Supra*, Section I. Again, if the parties cannot agree on reasonable limits by this deadline, the Court will impose its own limits.

As with all other trial documents, the motions in limine must be filed **no later than 12:00 p.m. on Wednesday, September 25, 2019**. The deadline for filing responses is **12:00 p.m. on Wednesday, October 2, 2019**, and the deadline for filing replies is **12:00 p.m. on Monday, October 7, 2019**.

### 5. Witness Lists and Exhibit Lists

Trial counsel shall exchange witness lists and proposed exhibits **no later than 12:00 p.m. on Wednesday, September 11, 2019**.

Trial counsel must file witness lists and exhibit lists must be filed **no later than 12:00 p.m. on Wednesday, September 25, 2018**.

Witness lists must provide a *brief* description and purpose of each witness.

Regarding exhibit lists, the Court recognizes that, due to the number of exhibits involved in a seven-week trial, the Court's attached exhibit-list form may not be practical. The Court **DIRECTS** trial counsel to meet, confer, and agree upon an exhibit-list form that includes the columns on the attached form (i.e., Exhibit No., Description, I.D., Offered, Obj., Admitted, Not Admitted) and email it to chambers for the Court's review **no later than 12:00 p.m. on Wednesday, September 4, 2019**. **Joint exhibits are strongly encouraged.** Trial counsel shall meet, confer, and agree on a protocol for the marking of exhibits, and mark those exhibits <u>before</u> trial.

### i. Objections to Witnesses or Exhibits

Parties should be mindful that the Court has limited time and resources to address a large number of objections to exhibits and witnesses. Due to the large number of exhibits and

5

witnesses expected to be produced at trial, counsel must make every effort to resolve objections before seeking the Court's assistance. Only those objections to a proposed witness or exhibit that have not been resolved among counsel must be filed **no later than 12:00 p.m. on Monday, October 7, 2019**. Such objections must include a succinct statement setting forth the reasons why the proposed witness or exhibit should not be permitted or admitted, as well as citations to legal authority.

### ii. Continuing Obligation

Each attorney has a continuing obligation to supplement its client's witness and exhibit lists immediately upon learning of any additional witness or exhibit. Absent a showing of good faith, witnesses not included on the witness list or added to the list *well before the trial starts* will not testify at trial, and exhibits not listed on the exhibit list or added to the list *well before the trial starts* will not be introduced at trial. This rule applies to lay and expert witnesses.

### 6. Trial Briefs

Trial counsel must file trial briefs no later than **no later than 12:00 p.m. on Wednesday, September 25, 2018**.

A complete trial brief includes: (a) a statement of the facts; (b) a complete discussion of the controlling law together with citations to statutes and case law; and (c) a discussion of any evidentiary issues likely to arise at trial.

### 7. Jury Instructions, Verdict Forms, and Interrogatories

Counsel must provide jury instructions to the Court *only on the issues of law* that are the subject of the trial. To that end, the Court will email its boilerplate instructions to liaison counsel in short order.

Counsel must exchange proposed jury instructions, verdict forms, and interrogatories **no later than 12:00 p.m. on Wednesday, September 11, 2019**. Counsel must then meet, confer, and make *diligent efforts* to reach agreement on their respective proposals prior to the below September 25th filing deadline.

6

Counsel shall file **no later than 12:00 p.m. on Wednesday, September 25, 2019**, a single joint submission of (1) agreed upon instructions, verdict forms, and interrogatories; (2) instructions and/or interrogatories proposed by plaintiffs but opposed by defendants; and (3) instructions and/or interrogatories proposed by defendants but opposed by plaintiffs. The joint submission must be filed as ***one document***, divided by the above-described sections. All proposed instructions must be supported by citations to legal authority. *Any and all objections* to proposed jury instructions must be accompanied by **a concise statement explaining why the Court should not give the instruction and citing legal authority**. A mere statement of "objection" is not sufficient and will not be considered.

### 8. Deposition Testimony

Whenever depositions (videotape or written) are intended to be used as evidence at trial, counsel proposing to use such deposition testimony must provide opposing counsel with pertinent transcript references **no later than 12:00 p.m. on Wednesday, September 11, 2019**. Counsel must confer with each other in an effort to resolve any objections they may have to planned deposition testimony.

As with objections to witnesses and/or exhibits, the Court has neither the time nor resources to address a large number of objections to deposition testimony. Counsel shall file only those objections that have been raised and not resolved by counsel **no later than 12:00 p.m. on Wednesday, October 2, 2019**. The brief shall contain citations to applicable legal authority.

**No later than 12:00 p.m. on Thursday, October 10, 2019**, counsel is instructed to notify the Courtroom Deputy, in writing, of those deposition transcripts that will be read into the record. The parties are responsible for providing transcripts to the Court.

When videotape depositions will be presented in lieu of live testimony, counsel must file a complete written transcript of the videotape deposition prior to its use and follow Local Civil Rule 32.1.

7

### 9. Emailing Trial Documents to Chambers

The following trial documents must, in addition to being filed, be emailed to Chambers in both WordPerfect *and* Word format **no later than 12:00 p.m. on Wednesday, September 25, 2019**: the joint preliminary statement, stipulations, proposed *voir dire* questions, witness lists, exhibit lists, and the single joint submission of jury instructions, verdict forms, and interrogatories.

**IT IS SO ORDERED.**

    */s/ Dan A. Polster   May 1, 2019*
**Dan Aaron Polster**
**United States District Judge**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CUYAHOGA COUNTY, OHIO, et al., | ) | Case No.:  1:17-OP-45004 |
| | ) | |
| Plaintiffs, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | PLAINTIFFS' TRIAL EXHIBITS |
| | ) | |
| PURDUE PHARMA LP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| SUMMIT COUNTY, OHIO, et al., | ) | Case No. 1:18 OP 45090 |
| | ) | |
| Plaintiffs, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | PLAINTIFF'S TRIAL EXHIBITS |
| | ) | |
| PURDUE PHARMA LP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

| EXHIBIT NO. | DESCRIPTION | I.D. | OFFERED | OBJ | ADMITTED | NOT ADMITTED |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**TIMELINE OF TRIAL DEADLINES**

**12:00 p.m. on Wednesday, May 15, 2019**
> Email to chambers a single document with proposed limitations on number and pages of various types of pretrial motions (i.e., Daubert, summary judgment, in limine)

**12:00 p.m. on Friday, June 28, 2019**
> Dispositive Motions deadline
> Daubert Motions deadline

**12:00 p.m. on Wednesday, August 28, 2019**
> Email to SM Cohen a joint Proposed Jury Questionnaire

**12:00 p.m. on Wednesday, September 4, 2019**
> Email to chambers a proposed Exhibit Chart

**12:00 p.m. on Wednesday, September 11, 2019**
> Exchange jury instructions, verdict forms, jury interrogatories, exhibits, witness lists, and deposition testimony. Meet and confer with goal of resolving differences and filing joint jury instructions, verdict forms and jury interrogatories in a single document. Meet and confer to resolve objections to witnesses, exhibits, and deposition testimony.

**12:00 p.m. on Wednesday, September 25, 2019**
> Email to chambers a Joint Preliminary Statement (no more than 2 pages, double-spaced)
> Deadline to file Stipulations of Fact, Proposed Voir Dire Questions (2 documents), Proposed Jury Instructions, Verdict Forms and Jury Interrogatories (1 document), Motions in Limine, Trial Briefs, Witness Lists, Exhibit Lists
> Email to chambers trial docs, Section III.b.8, in both WordPerfect and Word formats

**12:00 p.m. on Wednesday, October 2, 2019**
> Deadline for filing Opposition briefs to Motions in Limine
> Deadline for filing Objections to deposition testimony

**12:00 p.m. on Monday, October 7, 2019**
> Deadline for filing Objections to exhibits, witnesses
> Deadline for filing Replies to Motions in Limine

**12:00 p.m. on Thursday, October 10, 2019**
> Notify the Courtroom Deputy, in writing, of deposition transcripts that will be read into the record in order that the original transcripts be made available for the Court

**12:00 p.m. on Tuesday, October 15, 2019**
> Final Pretrial Conference
> Bring signed Stipulations to chambers

**9:00 a.m. on Wednesday, October 16, 2019**
> Begin Jury Selection

**9:00 a.m. on Monday, October 21, 2019**
> Trial

  

June 24, 2019

Honorable Dan Aaron Polster
Carl B. Stokes United States Court House
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113-1837
dan_polster@ohnd.uscourts.gov

     Cc:    Helen Norton, Judicial Assistant
             Helen_Norton@ohnd.uscourts.gov
             and
             Katherine King, Deputy Clerk
             Katherine_King@ohnd.uscourts.gov

*Via Electronic Mail*

     Re:    Plaintiffs' Corrected Notice of Motion and Motion for Certification of Rule
             23(b)(3) Cities/Counties Negotiation Class, *In re: Nat'l Prescription Opiate
             Litig.*, MDL No. 2804

Dear Judge Polster:

     The undersigned sincerely appreciate your willingness to meet with representatives of the
Attorneys General during the June 19, 2019 status conference concerning their ongoing efforts to
negotiate prompt settlements of pending litigation that provide maximum resources to abating
the opioid crisis. The unique role and perspective of the Attorneys General in leading efforts to
resolve these claims arises not only from the strength of their legal claims as compared to some
others, but also from the States' central role in managing and funding services addressing opioid
dependency.

     As you review the June 17, 2019 filing of Plaintiffs' Corrected Notice of Motion and
Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, ECF No. 1690
("Mot."), we request that you continue to consider the perspectives of the Attorneys General.
The undersigned 26 Attorneys General respectfully urge the Court to consider the significant
consequences its certification of a "negotiation class," as currently put forth in the motion, will
have.

     As you know, by way of background, the Attorneys General have brought state-law
claims in the courts of their respective States against the various defendants responsible for the
opioid crisis. Each State has chosen which defendants to sue, with the defendants varying

widely among the different State lawsuits, as well as which claims to bring.  Each State is expending significant resources to litigate these lawsuits.

The proposed "negotiation class" threatens to undermine these efforts and interfere with the States' goal of finding a collaborative and effective response to the opioid crisis.  We have identified several issues in our initial review of the motion that cause us concern as to its impact on an expeditious resolution of these cases that provides maximum resources to abating the opioid crisis.[1]

*First*, the proposal treads on the States' sovereign interests in litigating (and resolving) their claims in their State courts by purporting to give a functional veto over any resolution of those cases to out-of-state non-parties that are litigating a separate matter in federal court, at least to the extent any local governmental entities might benefit from such a settlement.  Under the MDL plaintiffs' proposal, "any agreed-to allocation" in a State-court case between a State and the cities or counties in that State "would be treated as a settlement and submitted to the Negotiation Class for its consideration."  Mot. ¶ 8.

Specifically, the MDL plaintiffs seek to establish a team of at least three individuals (Chicago's Corporate Counsel, New York City's Corporation Counsel, and one of San Francisco's outside counsel) who, under the grant of authority of a federal court order, would have a "sole focus" on "the allocation of monies between the States and the cities and counties" in the event that there is not an agreement between a State and its cities and counties.  *Id.*

The Court has previously stated that "it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting."  Order Regarding State Court Coordination 1 (Feb. 27, 2018), ECF No. 146.  The Court further noted that "nobody should construe the AGs' participation in MDL settlement discussions as a limitation on litigation in the sovereign States."  *Id.*; *see also* Order (Jan. 24, 2018), ECF No. 94.  Nevertheless, the MDL plaintiffs' motion appears to seek to impose

---

[1] It is not clear exactly how closely the operation of the settlement class, if approved, would follow the procedures and mechanisms explained in the filing.  The submitted proposed order references "formation of a Negotiation Class with the *essential features* set forth in the Class Action Notice and Frequently Asked Questions."  [Proposed] Prelim. Order Regarding Negotiation Class 1 (June 17, 2019), ECF No. 1690-4 (emphasis added).  There is no definition in the proposed order of what constitutes an "essential" feature versus a *non*-essential feature that apparently will be subject to alteration without approval from the class members or even the Court.  Additionally, the proposed order makes explicit reference only to the class action notice and frequently asked questions, but not to the memorandum in support of certification that provides the most granular detail about many aspects of settlement class's operation.  The filing also refers to a formula to be used as the default for allocating money between counties and their constituent cities (in the absence of a consensual agreement between a county and its cites), but it does not appear that the MDL plaintiffs' counsel currently plan to make the formula available.  *See* Pls.' Corrected Mem. in Supp. of Certification 50 n.20 (June 17, 2019), ECF No. 1690-1 ("Mem.").

obligations on the States in how they interact with political subdivisions, including their own. This implicates potential federalism issues. *Cf. Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities.").

But our "constitutional structure" protects "the 'dignity' to which states are entitled" by preventing them from being involuntarily "'dragged' into any court." *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) (quoting *Alden v. Maine*, 527 U.S. 706, 714, 718 (1999)). This principle is no less applicable where the "dragging" is accomplished by authorizing federal class action litigants – themselves political subdivisions of States – to approve or reject a State's settlement that would stand to benefit them. *Accord Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 217 (2d Cir. 2013) (affirming remand of State opioid litigation to State court and holding that State Attorney General's action was not "similar" to a class action).

If the Court were to grant the unprecedented "negotiation class" certification motion, in the manner currently set out, the only way to avoid this fundamental threat to State sovereignty would be to exclude all local governmental entities from receiving any benefit under a settlement negotiated by a State. This would be a perverse result indeed, especially in light of the States' goal of finding a collaborative and effective response to the opioid crisis.

*Second*, although the MDL plaintiffs are correct that achieving "global peace" is a significant objective of any settlement negotiation, *see* Mot. 4, their proposal cannot achieve that result. The proposed "negotiation class" does not, and cannot, include States that have chosen to litigate state-law claims in their own courts. Some States have already settled their claims with defendants that are also defendants in the MDL. States will continue to litigate – and, where appropriate, to resolve – their cases without seeking approval from a committee or vote of cities and counties around the country. Because it cannot jurisdictionally or constitutionally control the outcomes of the States' cases, the proposed "negotiation class" cannot provide "global peace."

*Third*, the allocation system proposed by the MDL plaintiffs is at odds with their stated goal of "coordinated" solutions to the opioid crisis. Mem. 59. [2] The MDL plaintiffs propose to allocate settlement funds among up to 24,500 cities and counties based on the number of adverse opioid outcomes within their jurisdictions – regardless of whether caring for the victims falls to State, county or municipal officials. Doling out small buckets of funds without regard to how the funds should be spent is the opposite of a "coordinated" response, which would balance statewide efforts – such as public education campaigns, with local efforts. It also purports to

---

[2] The MDL plaintiffs' claim that "[t]he crisis requires nationwide remedies," Mem. 59, is perplexing and wrong. States bear the primary brunt of the opioid crisis, which has hit different States in different ways; this crisis calls for solutions that address the State-specific divisions of responsibility between State and local governments. Several States have fought successfully to keep their State-court cases from being removed to federal court.

override State decision-making about how best to apply resources to the epidemic and may well interfere with existing State programs and priorities.

*Fourth*, the conceded novelty of this motion also raises the prospect of lengthy appeals challenging whether Rule 23 allows for the certification of a "negotiation class," as well as whether the proposed class satisfies the Rule 23 factors. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (plaintiffs who were all "exposed to asbestos products supplied by the defendants" but had various other differences did not meet predominance requirement under Rule 23(b)(3)). This delay and uncertainty may well further undermine the States' efforts to reach a timely resolution.

*Finally*, the Attorneys General have potential concerns about whether the motion's provisions concerning attorneys' fees, *see* Mot. ¶ 9, are consistent with providing maximum resources to abate the opioid crisis. Based on our initial review, there appear to be at least two different manners in which private counsel for the local governments could obtain attorneys' fees: the 10% "Private Attorneys' Fees Fund," Mem. 39-40, and a Class Counsel Fees fund "[a]t the Classwide level" that "includ[es] work done by any counsel for the common benefit under the Court's Orders prescribing same," *id.* at 42. Although the MDL plaintiffs' counsel should be paid fairly for their work in the complex MDL proceeding, it is also a reality that the MDL defendants will likely provide a finite amount of money to resolve all of the cases, with any excess award of attorneys' fees necessarily lessening the funds available to abate the crisis.

Although the States share the desire to resolve the many cases that have been filed, they respectfully submit that the proposal to create a federal "negotiation class" in this complex series of matters only promotes more uncertainty, more litigation, and less potential for resolution than if the States' efforts were not impeded. Again, the Attorneys General appreciate the Court's willingness to remain in communication with us as well as its recognition of the important role the States play in resolving this uniquely complex litigation in a way that has the potential to provide substantial and lifesaving resources to governmental entities for remediating the opioid crisis. We trust that the Court will continue to seek our counsel and take our perspective into account in ruling on the novel and complex legal issues addressed by the MDL litigation and the pending certification motion.

Respectfully,

Ashley Moody
Florida Attorney General

Joshua H. Stein
North Carolina Attorney General

Herbert H. Slatery III
Tennessee Attorney General

Kevin G. Clarkson
Alaska Attorney General

Xavier Becerra
California Attorney General

Philip J. Weiser
Colorado Attorney General

| | |
|---|---|
| William Tong<br>Connecticut Attorney General | Kathleen Jennings<br>Delaware Attorney General |
| Karl A. Racine<br>District of Columbia Attorney General | Leevin Camacho<br>Guam Attorney General |
| Kwame Raoul<br>Illinois Attorney General | Tom Miller<br>Iowa Attorney General |
| Derek Schmidt<br>Kansas Attorney General | Jeff Landry<br>Louisana Attoney General |
| Aaron M. Frey<br>Maine Attorney General | Brian E. Frosh<br>Maryland Attorney General |
| Keith Ellison<br>Minnesota Attorney General | Eric Schmitt<br>Missouri Attorney General |
| Doug Peterson<br>Nebraska Attorney General | Wayne Stenehjem<br>North Dakota Attorney General |
| Dave Yost<br>Ohio Attorney General | Peter F. Neronha<br>Rhode Island Attorney General |
| Jason Ravnsborg<br>South Dakota Attorney General | Ken Paxton<br>Texas Attorney General |
| Mark R. Herring<br>Virginia Attorney General | Patrick Morrisey<br>West Virginia Attorney General |

5



**National Association**
*of* **Attorneys General**

PRESIDENT
**Jeff Landry**
*Louisiana Attorney General*

PRESIDENT-ELECT
**Tim Fox**
*Montana Attorney General*

VICE PRESIDENT
**Karl A. Racine**
*District of Columbia*
*Attorney General*

IMMEDIATE PAST PRESIDENT
**Derek Schmidt**
*Kansas Attorney General*

EXECUTIVE DIRECTOR
**Chris Toth**

July 23, 2019

Honorable Dan Aaron Polster
Carl B. Stokes United States Courthouse
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113 1837
dan_polster@ohnd.uscourts.gov

cc:
Helen Norton, Judicial Assistant
Helen_Norton@ohnd.uscourts.gov
and
Katherine King, Deputy Clerk
Katherine_King@ohnd.uscourts.gov

*Via Electronic Mail*

RE: Plaintiffs' Renewed and Amended Notice of Motion for
Certification of Rule 23(b)(3) Cities / Counties Negotiation Class, *In
Re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Judge Polster:

The undersigned Attorneys General, having reviewed the July 9, 2019
Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule
23(b)(3) Cities / Counties Negotiation Class (the "amended proposal"), and
many having previously directed two letters to the Court's attention on June
24, 2019 regarding the original certification motion, respectfully submit this
letter to provide our views on the amended proposal.[1]

We appreciate the Court's statement at the June 25, 2019 hearing that
it was concerned about the issues raised in our June 24, 2019 letters and
expected that any revised class certification motion would incorporate the
input that we had offered. The undersigned Attorneys General respectfully
submit that the amended proposal does not resolve the problems we identified
regarding the original class certification motion; instead, Plaintiffs continue to
propose an unprecedented process that, among other problems, would make
"global peace" more, not less, difficult to achieve. Moreover, the proposal
continues to intrude on state sovereignty by purporting to regulate the States'
resolution of their state court enforcement actions. Accordingly, the
undersigned Attorneys General urge the Court to deny the Motion.

1850 M Street, NW
Twelfth Floor
Washington, DC 20036
Phone: (202) 326-6000
http://www.naag.org/

---

[1] The Attorneys General submit this letter only as *amici curiae* to offer their input on
the question before the Court as the chief legal officers of our respective States; this
letter is written without prejudice to any State's ability to enforce its consumer
protection laws or otherwise investigate claims related to the issues here in dispute in
its state courts, as the Court has repeatedly acknowledged it does not have
jurisdiction over the Attorneys General.

1

The Attorneys General are expending significant resources prosecuting state law enforcement actions in our respective state courts against the companies responsible for the opioid crisis. In bringing these actions, the Attorneys General are exercising our unique roles as the top law enforcement officers of our States, with broad statutory, constitutional, and common-law powers to bring suit and obtain meaningful relief on behalf of all of our citizens. A number of these suits rely on investigative powers, statutory enforcement mechanisms, and remedies available only to state enforcement authorities. While the Attorneys General recognize the tremendous impact the opioid crisis has had on many cities and counties within our States, the political subdivision Plaintiffs lack the broad powers and duties that are necessary to effectively protect the States' citizenry as a whole.[2]

Moreover, as previously noted, the Attorneys General have an overarching interest and express statutory role in protecting class members under the Class Action Fairness Act ("CAFA"), which prescribes a role for Attorneys General in the class action settlement approval process.[3] The Attorneys General again write to protect both of these interests.[4]

The Attorneys General have participated in discussions regarding possible resolutions with manufacturers and distributors who are also Defendants in this MDL and understand the difficulty in achieving any global resolution. We also appreciate the efforts that Plaintiffs' counsel took in drafting the amended motion and seeking to address at least some of the Attorneys General's previously stated concerns. However, while the Attorneys General share the parties' and the Court's desire to achieve a fair, appropriate, and comprehensive resolution, we would note that any vehicle chosen must be reasonably capable of achieving this important goal. The Negotiation Class is unlikely to provide such a solution, for at least the following reasons:

- The amended proposal would interfere with the States' ability to vindicate the rights of their citizens. The proposal continues to purport to give class counsel and this Court a role in the negotiations between each State and its political subdivisions over any allocation of settlement funds obtained through the state court enforcement actions. Notwithstanding the amended proposal's insistence that it does not encroach on the States' sovereignty, that is exactly its effect.
- The amended proposal's legal defects would almost certainly lead to objections from class members and ultimately appeals, delaying and possibly derailing any settlement process, including getting funds for remediation to our States and local communities.
- The amended proposal's approach cannot be fair, reasonable, and adequate at the point of a future settlement, as will be required under Rule 23(e)(2).
- The amended proposal's proposed Negotiation Class does not meet the prerequisites for certification under Rules 23(a) and 23(b)(3).

---

[2] See Hunter v. City of Pittsburgh, 207 U.S. 161, 178 (1907) ("It is basic in our structure of government that cities are political subdivisions of their states . . . created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them.").

[3] See 28 U.S.C. § 1715 (Pub. L. No. 115-281); see also S. REP. 109-14, 2005 U.S.C.C.A.N. 3, 6 (requirement "that notice of class action settlements be sent to appropriate state and federal officials," exists "so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.").

[4] Many of the undersigned Attorneys General have engaged in previous efforts to promote fairness in class action settlements, which have produced meaningful settlement improvements for class members.

- The amended proposal raises practical concerns.

**1)** **The Proposed Negotiation Class Settlement Process Would Intrude Upon State Settlement Allocation Discussions And Jeopardize The States' Ability To Settle State Enforcement Actions**

Plaintiffs recognize[5] that, in any enforcement action brought by an Attorney General, the defendants may very well propose a joint settlement to a State and its political subdivisions. The amended proposal contemplates that consideration of such an offer may require the State and its political subdivisions to decide how to negotiate its allocation, stating it would be "the preferred result of that discussion … for each State to reach agreement with the cities and counties within the State on the allocation and use of the money within the State." Plaintiffs propose that, in the event a State and its political subdivisions cannot reach agreement about how to allocate any such joint settlement offer, the State would be forced to negotiate with counsel who largely represent out-of-state non-parties over the allocation of settlement monies the Attorney General obtained through litigation of her or his own state court action.

The Motion and Memorandum provide conflicting indications about what would happen at that point. The Motion provides that any settlement allocation agreed to in a negotiation between a State and its political subdivisions (represented by proposed MDL class counsel) would then be submitted to the nationwide Negotiation Class of cities and counties for a vote and ultimately – if, as the proposal states, it is "treated as a settlement" – submitted to this Court for approval under Rule 23(e).[6] By contrast, the Memorandum provides that the negotiated in-State allocation would be submitted to members of the Negotiation Class "in that state for a vote"[7] – a dramatically different proposal. Either way, the amended proposal is not only unworkable but unconstitutionally impinges on state sovereignty in at least the following ways.

First, the proposed Negotiation Class interferes with the authority of the Attorneys General to settle their state court enforcement actions without the interference of out-of-state non-parties. To the extent Plaintiffs propose that there is any scenario in which the nationwide Negotiation Class is or may be entitled to vote on a State's allocation of settlement monies with its political subdivisions, they propose giving non-party, out-of-state cities and counties effective veto power over any State's resolution of its state court enforcement action. Such a result is both illegal and untenable.

As this Court has recognized, "nobody should construe the AG's participation in MDL settlement discussions as a limitation on litigation in the sovereign States."[8] Purporting to require Attorneys General to gain supermajority approval for an in-state allocation in settling their own state court enforcement actions would violate exactly that principle. The amended proposal inverts the relationship between each State and its own political subdivisions, even if, as the Memorandum indicates, the in-state political subdivisions would be the only class members who would have to "pass" the proposed allocation.[9]

---

[5] Memorandum at 53.

[6] Mot. at 10 ("Any agreed-to allocation would be treated as a settlement and submitted to the Negotiation Class for its consideration").

[7] Memorandum at 53.

[8] Dkt. 146.

[9] Even if, as the Memorandum states, only members of the Negotiation Class in the particular State would be allowed to vote on the negotiated allocation between that State and its subdivisions of a recovery obtained in a state court action, the proposal still gives counsel representing out-of-state non-parties an

Second, to the extent the amended proposal treats any negotiated intra-state allocation as a settlement requiring federal court approval under Rule 23(e),[10] the proposal improperly seeks to subject State enforcement actions to federal jurisdiction and strip state courts of the authority to settle cases properly before them. This violates the principles of federalism.[11] This Court has properly acknowledged that it "has no jurisdiction over (i) the Attorneys General or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting."[12]

The practical effect of Plaintiffs' amended proposal would be to allow political subdivisions within and outside of a State to hamstring the settlement of State enforcement actions that were properly filed and remain pending in state courts. Even if the Court decides to approve a Negotiation Class to settle the MDL despite our concerns, there is no reason for that class or this Court to approve or otherwise oversee State settlements or allocations, and the amended proposal does not offer one. If State cases brought by Attorneys General and federal cases brought by cities, counties, and other political subdivisions proceed on parallel, separate tracks, in different courts, as they have until now, there is little to no risk of double recovery in any event.

To safeguard this constitutionally-protected interest, the undersigned Attorneys General respectfully submit that the Court should decline to invade state sovereignty through the exercise of jurisdiction over the settlement of state enforcement actions brought in state court. States and their political subdivisions must be allowed to settle and resolve any allocation issues between themselves, without this Court's oversight and the unnecessary and improper federal court oversight and the Negotiation Class process proposed here.

## 2) The Proposed Negotiation Class Settlement Process Will Likely Generate Uncertainty and Delay and/or Derail Any Potential Settlement

As noted previously, given Plaintiffs' admittedly unprecedented approach, this settlement process is likely to generate numerous objections and appeals, causing additional delay to any potential resolution of this nationwide health crisis, including receiving funds for remediation. Contrary to the amended proposal's assertion that this process will help to buy "global peace," the approval of an unprecedented "negotiation class" at this stage will invite meritorious legal challenges to any eventual settlement, adding uncertainty and making it more difficult for the parties to achieve a global resolution. The amended proposal fails to provide even a cursory response to the Attorneys General's previously stated concerns regarding the likely delay and

---

unwarranted gatekeeping role as negotiators with the State while also subjecting States to the MDL process they have chosen to avoid.

[10] *See* Memorandum at 8.

[11] The U.S. Supreme Court has held that "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities," Horne v. Flores, 557 U.S. 433, 448 (2009), a principle that is particularly implicated by the amended proposal purporting to require a State to seek class and federal court approval for the allocation of resources obtained through its own state court action as between statewide and intra-state local initiatives to address the opioid crisis. Indeed, our established "constitutional structure" protects the 'dignity' to which States are entitled" by preventing them from being involuntarily "dragged" into any court, especially a federal one. West Virginia ex rel. McGraw v. CVS Pharmacy, Inc., 646 F.3d 169, 178 (4th Cir. 2011) (*quoting* Alden v. Maine, 527 U.S. 706, 713–18 (1999)).

[12] Dkt. 146.

uncertainty that would arise here if a Negotiation Class is certified, much less what would occur if the proposed negotiation class settlement process was ultimately deemed to be unlawful.

Additionally, although the amended proposal repeatedly cites the "benefit" of the proposed Negotiation Class as not requiring the same scrutiny as a class action settlement under Rule 23(e), in reality, the Negotiation Class is an additional hurdle and a hindrance to future Rule 23(e) approval, which would still be required once any settlement is reached with a particular defendant. Any eventual settlement would be subject to additional appellate proceedings at that stage due to the unprecedented nature of the process itself. Moreover, the unprecedented nature of the process leaves open the very real possibility that any class release that may be part of an eventual settlement would be subject to a potentially meritorious due process challenge through litigation years in the future by a purportedly bound class member.[13] It seems unlikely that there will be peace with all county and municipal governments – let alone global peace – with these significant legal uncertainties about finality that will remain unresolved for years.

### 3) The Proposed Negotiation Class Settlement Process Does Not Satisfy The Due Process And Fairness Requirements Of Rule 23(e)

Plaintiffs have stated that the Negotiation Class will be certified neither for settlement nor for trial, and the Attorneys General respectfully submit that such a procedure may not even be considered by the Court under Rule 23 despite Plaintiffs' assertions to the contrary. The nature of the proposed Negotiation Class settlement process demands additional protections like those afforded to putative settlement class members during the preliminary approval process. Proposed class members are being asked to opt out or to be bound by any settlement approved by a supermajority of the voting class members following an order certifying the Negotiation Class, like they would be asked similar to the preliminary approval stage of a traditional class action settlement. Therefore, the standards of Rule 23(e)(1)(b) should apply. Indeed, the fact that proposed class members will, by design, have very little idea what the terms of any settlement will be makes it all the more important to apply the due process requirements reflected in Rule 23(e)(1)(b).

"Courts have long recognized that 'settlement class actions present unique due process concerns for absent class members.'"[14] As the Court is aware, Rule 23(e) was amended just last year to provide for greater due process protections. As previously noted, the Attorneys General have significant concerns as to whether political entities differing in size, representation, and knowledge of the ongoing proceedings will be prejudiced due to the potential inability to evaluate this unprecedented Negotiation Class process and obtain the proper authority under their particular decision-making process within the proposed 60 day opt-out period.

Although the amended proposal mentions two methods of direct notice, such notice for a governmental entity is not as "direct" as it would be for an individual. The amended proposal also fails to provide details regarding how Epiq will determine where to send direct notice. It

---

[13] Cf. Elliott v. GM LLC (In re Motors Liquidation Co.), 829 F.3d 135, 158-66 (2d Cir. 2016) (overturning "free and clear" sale provision in GM's 2009 bankruptcy plan as applied to litigation brought after the plan's confirmation by plaintiffs who did not receive adequate notice of the plan).

[14] In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011); see also Taylor v. Sturgell, 553 U.S. 880, 901 (2008) (Rule 23 protections are "grounded in due process").

may take days or even weeks for the notice to reach the correct decision-maker, especially depending on the address or email that Epiq selects for notice.

In addition, an opt-out request must be notarized after it has been signed by an official or employee of that city or county itself, which may be burdensome on rural class members and on those who have outside counsel representing them. For instance, in New England the practice of a "town meeting" is common. Under this form of government, residents of the towns gather only once a year and act as a legislative body, voting on operating budgets, laws, and other matters. Maine annual town meetings, for instance, are traditionally held in March.

Furthermore, the provided notice itself appears to be both inaccurate and inadequate. The proposed notice does not provide the easy to read "options" chart that standard settlement notices provide, explaining what will happen if class members "do nothing," "opt out," etc. There is significant ambiguity in the description of the Special Needs Fund, even though its terms will likely be of great interest to class members, especially those that may not receive funds directly from any proposed settlement, as discussed below.

Moreover, the notice describes a process regarding allocations of funds from a hypothetical State settlement that the States themselves have not approved and do not support. The proposed notice describes the Negotiation Class as promoting global resolution and global peace, and making settlement offers more likely, a characterization that the undersigned vehemently disagree with.

The notice and FAQ description of the allocation of settlement proceeds is insufficient to inform class members, particularly municipalities, of their potential allocation. They refer to an online Allocation Map that uses an example with a $1 billion settlement to illustrate county and city allocations; however, that settlement amount is far from certain and may provide an overinflated view at first glance to class members who do not further calculate their percentage.

Without the class member's percentages provided, or a calculator to facilitate, any detailed analysis becomes more difficult for potential class members and less like the Tool described by Plaintiffs in their original motion. Additionally, the Memorandum describes only in a footnote, as does the Allocation Map, that if a municipality's share would be less than $500, that amount will instead be distributed to the county by default in the absence of another arrangement. If the city has less than $500 and it is within a county without a county government, that amount would revert to the Special Needs Fund.

In Pennsylvania, for instance, this would result in 52.2% of class members being allocated less than $500, and thus, potentially receiving nothing through a proposed Negotiation Class settlement. This allocation procedure should be described more prominently to provide adequate notice, given the sizeable portion of the class that it will likely affect, if it is permitted at all.

Additionally, as discussed in the June 24, 2019 letters, class members receiving notice would have insufficient information to allow them to make an informed choice regarding opting out of the Negotiation Class. They do not know the defendants with which they may be settling, the amount of a settlement fund, how much they will be paying the Class Counsel through the Common Benefit Fees, or even how much of the settlement they will be permitted to keep due to the further allocation between counties and cities. Moreover, for those who become bound by the Negotiation Class by failing, or choosing not, to opt out, it appears the Negotiation Class process does not contemplate a further opportunity to opt out despite the availability of such an opportunity under Rule 23(e)(4).

Because many of these proposed class members are headed by elected officials, it is even more concerning that they might become subject to the collective will of other jurisdictions – ultimately being required to bow to the will of the supermajority of voting political subdivisions nationally, including parts of the country that have been impacted by the opioid crisis very differently.

Plaintiffs also argue that the Negotiation Class would allow class members a more "active voice" and role in the settlement process than a settlement where the terms have already been decided. However, proposed class members are only provided with a singular up-down vote regarding the overall settlement fund, and no further opportunity to opt out. Unless they are a representative class member, the proposed class members actually have a far less active voice than in an ordinary settlement, where they would be permitted to make objections or provide comments to a settlement, while retaining opt out rights at the point any particular settlement is proposed.

Plaintiffs characterize this structure as permitted through the *Principles of the Law of Aggregate Litigation* ("ALI Principles") but the amended proposal omits the significant differences between the two scenarios. The plaintiffs in the ALI Principles model "opt in" and affirmatively agree to participate; in contrast, the Negotiation Class involves a negative option, forcing class members to be bound.

Finally, the Negotiation Class procedure does not meet the requirements for preliminary approval under Rule 23(e)(1)(B), which requires that the court likely will be able to approve a proposed settlement under Rule 23(e)(2). The Court would at least have to determine that the amended proposal met the requirements for certification of a class for settlement, the more lenient standard. Due to the lack of fairness and due process outlined above, as well as the numerous violations of the provisions of Rule 23, the undersigned respectfully submit that the Court will be unable to approve any ultimate settlement to which the Negotiation Class would be bound, thus demonstrating the fatally flawed nature of the amended proposal's approach.

### 4) The Negotiation Class As Currently Proposed Cannot Meet The Requirements Of Rules 23(a) And 23(b)(3)

Rule 23(a) and Rule 23(b)(3) identify prerequisites to be met for certification, prerequisites that the amended proposal recognizes must be met before the Negotiation Class can be certified. These prerequisites are particularly difficult to meet in the proposed Negotiation Class because no subclasses are currently designated. Such a nationwide class of varying political subdivisions likely could not meet the requirements of adequacy of representation, typicality, commonality, and superiority.

Conflicts of interest between class members and their counsel are a particular concern regarding adequacy of representation in the Negotiation Class structure. Intra-class conflicts exist that can only be remedied through sub-classes. Class Counsel have already laid the groundwork through their Memorandum for other plaintiffs' counsel to receive common benefit awards, prior to any settlement even coming to fruition, creating further opportunities for intra-class conflicts.

In addition, the claims or defenses of the proposed representative class members are not "typical." Despite the "diverse array" Plaintiffs purport to have chosen as representatives, many types of representatives have been omitted from the list of forty-nine, such as representatives from twenty States, and representatives from smaller counties and cities.

The proposed representative class members also cannot fairly represent the class if they have assisted in developing the plan for distribution. It is likewise unclear whether they will

receive "awards" as representatives after other class members are bound. Additionally, urban or city-dwelling class members' citizens may be counted more than rural class members' citizens in the supermajority voting mechanism since they could be, for example, counted both in a municipality and a county, again evidencing against typicality. This information has now been omitted from the amended proposal but is still relevant.

With the current Negotiation Class definition, commonality and predominance cannot be satisfied. Class members have different litigation postures, political structures, and thus damages, claims, and even potential defendants. The amended proposal relies upon the Class Representatives chosen by Plaintiffs' counsel and a random sample of only the litigating class members to prove commonality and predominance when this approach overlooks the vast majority of class members who have not sued and likely will have divergent interests from litigating class members.

Furthermore, because political subdivisions differ in the ways they operate and are funded, their harms would necessarily differ, not to mention the differences in the scope of the harms. Although this issue alone may not, by itself, necessarily defeat commonality or predominance, it should not be disregarded, especially since damages are already decided under the Negotiation Class model.[15] This is precisely one of the flaws inherent in the Negotiation Class model itself – that the allocation system should not be determined based on the class definition proposed.

In fact, the proposed allocation presents more commonality problems, because cities are treated differently than counties, with counties receiving certain funds by default, including potentially all of a city's funds should that city's allocation be less than $500, as discussed above. Differences in the claims asserted include state law public nuisance claims, the variety of effects of the opioid crisis in those areas, and the varying conduct of Defendants in subdivisions.

The amended proposal claims that these varying issues do not "predominate" and that the most important issue is the marketing itself, which it says is common to all Defendants and thus a common question overriding all other individual questions. However, the sheer number and the overall importance of the questions that differ for class members demonstrate that common issues do not in fact predominate, despite the self-serving examples taken from litigating class members. Furthermore, while many proposed class members are pursuing damages remedies, other litigating members are bringing public enforcement actions seeking only non-damages remedies.[16]

Superiority is also unlikely to be met, as there are existing, alternative methods to resolution that are superior to the amended proposal's Negotiation Class structure. For example, class counsel could, even without a certified Negotiation Class in place, negotiate a settlement on behalf of all cities and counties that includes a blow-up provision allowing a defendant to back-out of a deal if a minimum number or percentage of proposed class members opt out of the

---

[15] *See* Memorandum at 86.

[16] *See* Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581 (9th Cir. 2012) (Vacating class certification ruling because differences between California law and other jurisdictions were material and that class members' claims were governed by consumer protection laws of their own jurisdictions); Jamie S. v. Milwaukee Pub. Schs., 668 F.3d 481, 497 (7th Cir. 2012) ("superficial common questions—like whether each class member … 'suffered a violation of the same provision of law'—are not enough. ... Rather, '[c]ommonality requires the plaintiffs to demonstrate that the class members "have suffered the same injury."'").

settlement. The likelihood of meritorious objections and lengthy and possibly successful appellate proceedings regarding this untested and unprecedented Negotiation Class process also undermines any claim of superiority here.

### 5) <u>Additional Practical Concerns</u>

The Attorneys General appreciate the revisions that were made to the Memorandum to attempt to address some of the practical concerns raised in our prior letters. Nevertheless, many of our practical concerns remain, likely because they are inherent to the proposed Negotiation Class structure itself.[17]

The allocation system under the amended proposal is at odds with the stated goal of "coordinated" solutions to the opioid crisis. Doling out small buckets of funds without regard to how the funds should be spent is the opposite of a "coordinated" response, which would balance statewide efforts – such as public education campaigns – with any local efforts. Indeed, this problem has been made worse in the amended proposal, as thousands of often tiny townships have now been added to the proposed class definition. It also purports to override State decision-making about how best to apply resources to the epidemic and may well interfere with existing State programs and priorities. Additionally, a notice for a Negotiation Class competing with a potential future motion for settlement under another mechanism would likely create mass confusion amongst the proposed class members, who may ultimately believe that the separately filed settlement is subject to a vote or that they have already "opted in" when they have not.

Finally, the Attorneys General respectfully submit that the amended proposal's provisions concerning attorneys' fees, including the awarding of common benefit fees, are contrary to the goal of providing maximum resources to abate the opioid crisis. The Attorneys General question whether there need to be two different manners in which private counsel for the local governments can seek to obtain attorneys' fees: the 10% "Private Attorneys' Fee Fund," and a separate application for Class Counsel / Common Benefit Fees to be approved by the Court pursuant to Rule 23(h). Most troubling, it appears there is no requirement that the fees awarded from the Private Attorneys' Fee Fund be tied to work that advanced the litigation for the benefit of Plaintiffs generally, which is the applicable standard for awarding Common Benefit Fees. Although Plaintiffs' counsel should have the opportunity to seek fair compensation for their work in this complex MDL proceeding, it is also a reality that Defendants will likely provide a finite amount of money to resolve all the cases, and any grant of excess compensation to Plaintiffs' counsel would unnecessarily lessen the funds available to abate the crisis.

In light of the foregoing practical, procedural, and sovereignty concerns, the Attorneys General respectfully request the Court deny the Motion. However, in recognition of the shared interest in pursuing "global peace," the Attorneys General are willing to participate in further discussions with Plaintiffs' counsel or to provide additional input to this Court upon its request.

Respectfully submitted,

---

[17] Under the amended proposal it is still not clear exactly how closely the operation of the settlement class, if approved, would follow the procedures and mechanisms explained in the filing. The submitted proposed order still makes explicit reference only to the class action notice and frequently asked questions, but not to the memorandum in support of the amended proposal, which provides the most granular detail about many aspects of the proposed settlement class's operation.

Xavier Becerra
California Attorney General

Ashley Moody
Florida Attorney General

Herbert H. Slatery III
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Steve Marshall
Alabama Attorney General

Kevin G. Clarkson
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Phil Weiser
Colorado Attorney General

William Tong
Connecticut Attorney General

Kathleen Jennings
Delaware Attorney General

Karl A. Racine
District of Columbia Attorney General

Chris Carr
Georgia Attorney General

Leevin T. Camacho
Guam Attorney General

Clare E. Connors
Hawaii Attorney General

Lawrence Wasden
Idaho Attorney General

Kwame Raoul
Illinois Attorney General

Tom Miller
Iowa Attorney General

Derek Schmidt
Kansas Attorney General

Jeff Landry
Louisiana Attorney General

Aaron Frey
Maine Attorney General

Brian Frosh
Maryland Attorney General

Maura Healey
Massachusetts Attorney General

Dana Nessel
Michigan Attorney General

Keith Ellison
Minnesota Attorney General

Eric Schmitt
Missouri Attorney General

Doug Peterson
Nebraska Attorney General

Gurbir S. Grewal
New Jersey Attorney General

Letitia A. James
New York Attorney General

Josh Stein
North Carolina Attorney General

Wayne Stenehjem
North Dakota Attorney General

Dave Yost
Ohio Attorney General

Josh Shapiro
Pennsylvania Attorney General

Peter Neronha
Rhode Island Attorney General

Jason Ravnsborg
South Dakota Attorney General

T.J. Donovan
Vermont Attorney General

Mark Herring
Virginia Attorney General

Patrick Morrissey
West Virginia Attorney General

Josh Kaul
Wisconsin Attorney General



Administration
Office 614-466-1653
Fax 866-365-3465

July 23, 2019
*Via Electronic Mail*

Honorable Dan Aaron Polster
Carl B. Stokes United States Courthouse
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113-1837
dan_polster@ohnd.uscourts.gov

cc:
Helen Norton, Judicial Assistant
Helen_Norton@ohnd.uscourts.gov
and
Katherine King, Deputy Clerk
Katherine_King@ohnd.uscourts.gov

RE: Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule 23(b)(3) Cities / Counties Negotiation Class, *In Re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Judge Polster:

> " '[I]f the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them.' "
>> - *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 604, (1982), *quoting Missouri v. Illinois*, 180 U.S. 208, 241 (1901).

On behalf of the State of Ohio, I express grave concerns regarding the July 9, 2019 Plaintiffs' Renewed and Amended Notice of Motion for Certification of Rule 23(b)(3) Cities / Counties Negotiation Class. This class is proposed primarily to resolve claims derivative of the *parens patriae* authority of States. Political subdivisions are precluded from pursuing *parens patriae* claims in federal courts. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). In short, neither America nor Ohio has sovereign cities or counties. The negotiating class should not be certified.

My primary concern is both structural and constitutional. This unprecedented endeavor by private class action counsel, seeking to represent every local political subdivision of every State of the Union ignores our structure of government and usurps the sovereignty of the States. Plaintiffs attempt to insert themselves into negotiations between the States and the defendants in an effort to "extract the maximum amounts possible" for the political subdivisions. Plaintiffs' Counsel also seek to insert themselves between each State and its political subdivisions by "participat[ing] in any necessary negotiations to

allocate portions of any overall settlement between states and political subdivisions." Federal courts are not instrumentalities for political subdivisions to restructure the internal affairs of a State, i.e., the relation between a State and its component parts. *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53-54 (1982) (noting that our system of government "**has no place for sovereign cities**"). Because of this, the proposed negotiating class is not in the public interest.

Additionally, the predominant issue for the 34,000 political subdivisions that plaintiffs' counsel seek to represent on an opt-out basis, is not liability as counsel contends. This is particularly true for a "negotiation class," where liability is essentially presumed.[1] The predominant issue for negotiating a settlement is remedy. Counsel attempt to gloss over the remedy issue with a prepackaged distribution formula. While I do not undertake to unpack the fairness of the proposed allocation, it is improper and unfair that the proposed class representatives all are larger political subdivisions. This gives the appearance that smaller governments might not view the proposed allocation formula favorably. This is particularly troublesome considering that the opioid epidemic hit rural counties much harder than urban counties. One would think that the hardest hit putative class members would be class representatives. But even more predominate is the self-admitted power grab being made by unelected private attorneys to control the distribution of public moneys within the States.

*Parens Patriae*

When ratifying the Constitution, the States delegated certain aspects of their sovereignty to the Federal Government. However, the federal government, including this court, may "not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *Nat'l League of Cities v. Usery*, 426 U.S. 833, 842-43, 96 S. Ct. 2465, 2470 (1976).

The U.S. Supreme Court has recognized each State has maintained quasi-sovereign interests though the *parens patriae* doctrine. There are two legs of the *parens patriae* doctrine. "First, a State has a quasi-sovereign interest in the health and well-being -- both physical and economic -- of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607, 102 S. Ct. 3260, 3269 (1982). *Parens patriae* standing remained firmly lodged with the States—and the States alone. *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53-54 (1982). *See also, Mormon Church v. United States*, 136 U.S. 1, 57, 10 Sup. Ct. 792, 808, 34 L. Ed. 481 ("The state, as a sovereign, is the parens patriae.")

The federal republic is The United States of America, and not the United City-States of America or the United Counties of America. Accordingly, "[t]he federal courts have unequivocally held that political subdivisions cannot bring claims as *parens patriae* because their power is derivative, not sovereign." Kathleen C. Engel, *Do Cities Have Standing? Redressing the Externalities of Predatory Lending*, 38 CONN. L. REV. 355, 365 (2006). As the Supreme Court put it, our system of government "has no place for sovereign cities". *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53-54 (1982). The proposed

---

[1] Political subdivisions are creatures of statute, with different powers and authorities delegated to them in each state. Accordingly, it is questionable that even liability could be litigated on a class-wide basis.

negotiating class, and perhaps this very litigation, threatens the sovereignty of the States like nothing else in recent history. It seeks to represent not a single political subdivision asserting *parens patriae* standing, but all of them. In other words, this motion seeks to permit the class to stand in the shoes of the States—nothing short of usurpation.

The plaintiffs are aware of the U.S. and State Constitutional problems they are creating. Thus, they attempt to avoid stating that *parens patriae* is the basis of their claims. Cities are often reluctant to classify their interests as quasisovereign even when that appears to be the basis for standing. Laura L. Gavioli, *Who Should Pay: Obstacles to Cities in Using Affirmative Litigation as a Source of Revenue*, 78 TUL. L. REV. 941, 959-60 (2004). This Court has noted the strained nature of the plaintiffs' claims. "While these allegations do not fit neatly into the legal theories chosen by Plaintiffs, they fit nevertheless." [Opinion and Order, Doc. #: 1203, at 39, PageID #: 29058 (Dec. 19, 2018)]. The reason they do not fit neatly is because the claims, if properly pled, are *parens patriae* claims and belong not to the plaintiffs, but to the States.

As this Court recognized, "It is accurate to describe the opioid epidemic as a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated. As this Court has previously stated, it is hard to find anyone in Ohio who does not have a family member, a friend, a parent of a friend, or a child of a friend who has not been affected." [Id. at 38, PageID #: 29057]. In their motion, Plaintiffs state this class is to remedy "the impact of the opioids epidemic on their communities, including the costs and challenges of battling the epidemic, and the financial and human strain of the law enforcement, health and welfare, and social services resources". [Plaintiffs' Memorandum in Support of Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, Doc #: 1820-1, PageID #:56658].

The universal impact on the residents of Ohio is the basis of the claims being litigated. This impact is directly to "the health and well-being -- both physical and economic -- of its residents in general", and is *parens patriae* in nature. *Alfred L. Snapp & Son*, 458 U.S., at 607. These claims belong to the States and cannot be pursued by political subdivisions.

### Statewide Concern Doctrine

Within its state courts, Ohio enforces a form of the *parens patriae* doctrine through what is known as the Statewide Concern Doctrine. This doctrine represents an exception to local "home rule" and gives the State authority over local matters where those local matters impact the general public. "[E]ven if there is a matter of local concern involved, if the regulation of the subject matter effects the general public of the state as a whole more than it does the local inhabitants the matter passes from what was a matter for local government to a matter of general state interest." *Cleveland Electric Illuminating Co. v. Painesville*, 15 Ohio St. 2d 125, 129,239 N.E.2d 75, 78 (1968). *See also*, *Complaint of City of Reynoldsburg v. Columbus S. Power Co*., 2012-Ohio-5270, ¶ 35, 134 Ohio St. 3d 29, 37, 979 N.E.2d 1229, 1237. As mentioned above, this court has already noted the issue is statewide. By arguing that they can represent a class of every Ohio political subdivision, Plaintiffs agree.

The plaintiffs' alleged purpose is "to establish and maintain an identified, unified, and durable nationwide body of cities and counties that can credibly claim to represent the best interest of all its Class members." [Plaintiffs' Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, at 3, Doc #: 1820, PageID #:56633]. In other words, Plaintiffs' Counsel want to represent the United Cities & Counties

3

of America. Such a political entity cannot be created while respecting the dual-sovereign system. A "class" that includes every Ohio political subdivisions has existed since 1803 when Ohio was granted Statehood and admitted into the Union. It is not within the province of plaintiffs' counsel or this court to reorder the system of government adopted by State and Federal Constitutions.

This is not merely an academic debate. The State of Ohio's ability to resolve its claims against the opioid defendants is seriously impinged by a purported national class action of local governments claiming the right to pursue overlapping claims. No matter how useful and powerful Rule 23 and the MDL process may be, they must yield to the structural constitutions and the jurisdictional limitations of this Article III Court. To do otherwise will allow plaintiffs' counsel to lord over the States by commanding the allegiance of all of the political subdivisions of each state. Accordingly, the Statewide Concern and the *parens patriae* doctrines align to require the court to deny private counsel their requested lordship over Ohio's political subdivisions.

## Superiority

The suits filed by State Attorneys General are superior to the negotiation class proposed here. The States are permitted to pursue *parens patriae* claims. Political subdivisions are not. 50 State Attorney Generals are better representatives of the people of their state (and the smaller political subdivisions) than private attorneys hired by the 51 largely urban cities and counties from only 30 states. The States are also better positioned to do good work with the settlement dollars. The distribution map available on plaintiffs' website demonstrates this. Distributing a few thousand dollars to local communities is meaningless. It is the pooled impact of coordinated expenditure of the settlement dollars on a statewide basis that can best resolve this statewide problem.

As the Supreme Court unequivocally stated, " '[I]f the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them.' " *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 604, 102 S. Ct. 3260, 3267 (1982), *quoting Missouri v. Illinois*, 180 U.S. 208, 241 (1901). With all due respect to Plaintiffs' Counsel, as Ohio Attorney General, I am best situated to represent the interests of the State of Ohio, including the 2,075 political subdivisions Plaintiffs' Counsel seek to represent.

Deferring to State Attorneys General will also prevent another travesty of Plaintiffs' Counsel's formula. There is no requirement of a threshold level of agreement within a particular state. Thus, while there are supermajority requirements within different classes, nothing protects the unified interests of State political subdivisions.

Finally, allowing the State Attorneys General to serve our constitutional roles will prevent this court from creating a class intended to negotiate against the States regarding the allocation of resources within each State. Such a class would be nothing short of a federally "imposed displacement of state decisions [that will] substantially restructure traditional ways in which the local governments have arranged their affairs." *Nat'l League of Cities v. Usery*, 426 U.S., at 849 (1976). Allowing State Attorneys General to negotiate on behalf of their States without the interference from local governments is superior because it keeps the federal judiciary from displacing the structure of State government.

## Opt-Out Class is Insufficient

Even if this court were to push past the above concerns, this class should never be certified as an opt-out class. Unelected, out-of-state attorneys, hired by out-of-state local

governments are not the representatives of the citizens of Ohio or its political subdivisions. At a minimum, this must be an "opt-in" class.

If plaintiffs intend to represent over 34,000 political subdivisions, some with various forms of charters or home rule, mostly led by elective representatives—and with no representative from 20 states—then plaintiffs should be required to obtain the affirmative opting-in of each class member. This is especially true here where the overwhelming difficulty of certifying a negotiating class of over 34,000 political subdivisions is the allocation of monetary payments among them. The proposed negotiating class recognizes this difficulty and addresses it by not addressing it. It leaves it to each county to negotiate with political subdivisions within its boundaries to distribute any funds. This is naïvely both overbroad and overly narrow. In Ohio, for instance, municipalities often cross county lines. Political subdivisions also have the right to contract with one another for police, fire and EMS services. They also have the right to create joint fire and EMS districts. There are mutual-aid agreements, and task forces, formed to address issues in multifaceted ways across jurisdictional boundaries. Simply dumping cash upon a county and requiring its political subdivisions to work it out on their own or be bound by an arbitrary national formula abandons the heavy lifting of a "global resolution."

Also troubling and requiring an opt-in provision is that there is no adequate representative for Ohio's small governments. The proposed class representatives from Ohio include three metropolitan counties and a city within one of them. There is no representative for suburban or rural counties. No representative of medium or small metropolitan areas. No representative for small cities or villages. No representative for townships—some of which are larger than many cities.

There is not a single representative from hard-hit southern Ohio. Over Ohio's 9-year average, the number of solid opioid doses per person in Cuyahoga county *was less than half* that in each of Jackson, Vinton, Adams, Perry, Scioto and Ross Counties. Summit and Franklin Counties also pale in comparison, both having averages less than two-thirds of each of the six hardest hit counties. Because the negotiating class representatives have determined how to divide the pie before asking this court to command others to dine, and done so without including rural or suburban representation, any class should be opt-in.

*Conclusion*

The proposed negotiation class should not be certified. Certification runs afoul of our Federal system of government, ignores the role of the States, and usurps the *parens patriae* standing of the States. It also will delay final resolution of the Opioid Litigation and impinge the ability of the States to resolve their claims on behalf of their residents.

Yours,

Dave A. Yost
Ohio Attorney General

cc:     Helen Norton, Judicial Assistant (Helen_Norton@ohnd.uscourts.gov)
        Katherine King, Deputy Clerk (Katherine_King@ohnd.uscourts.gov)

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN RE: NATIONAL                )
PRESCRIPTION                   )
OPIATE LITIGATION,             )     Judge Polster
                               )     Cleveland, Ohio
          Plaintiff,           )
                               )     Civil Action
     APPLIES TO ALL CASES      )     Number 1:17MD02804
                               )
                               )


                    - - - - -

         TRANSCRIPT OF PROCEEDINGS HAD BEFORE

        THE HONORABLE DAN AARON POLSTER

              JUDGE OF SAID COURT,

           ON TUESDAY, AUGUST 6, 2019
                    - - - - -




Official Court Reporter:        Shirle M. Perkins, RDR, CRR
                                U.S. District Court
                                801 West Superior, #7-189
                                Cleveland, OH 44113-1829
                                (216) 357-7106


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1    APPEARANCES:

2       For the Plaintiffs:                    PETER WEINBERGER, ESQ.,
                                               Spangenberg, Shibley &
3                                              Liber
                                               Suite 1700
4                                              1001 Lakeside Avenue, E
                                               Cleveland, OH 44114
5                                              (216) 696-3232

6       Also Present:

7       Jenny Lee Anderson, Esq.,
        Jonathan Blanton, Esq.,
8       Mark Cheffo, Esq.,
        Jayne Conroy, Esq.,
9       Sam Issacharoff, Professor
        Robert Klonoff, Esq.,
10      Mark Lynch, Esq.,
        Christopher Seeger, Esq.,
11      Paul Singer, Esq.,
        Sonya Winner, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>TUESDAY SESSION</u>, AUGUST 6, 2019, AT 9:38 A.M.

2               THE COURT:  All right.

3          This is obviously Case 1:17MD2804, the National Opioid

4     MDL.

10:03:03 5          This is a hearing on Plaintiff's Renewed and Amended

6     Notice of Motion, the Motion for Class Certification of Rule

7     23(b)(3), Cities/Counties Negotiation Class.  So shorthand,

8     this is motion for certification of the negotiation.  It was

9     filed July 9th.

10:03:28 10         There's been a number of objections filed.  There were

11    responses.  The Court has reviewed them all carefully.  I

12    set today for hearing.  I will listen to anyone who wants to

13    address the Court.  My plan is then to take the matter under

14    advisement.  I certainly will listen carefully to what was

10:03:53 15    said and to issue a decision shortly.

16         My request in oral arguments is for the lawyers to

17    address what they feel the best arguments that have been

18    made by those fine lawyers on the other side.  That would be

19    most helpful to the Court.

10:04:11 20         I want to say at the outset that a whole lot of work

21    has gone into this.  I believe the initial idea was

22    Professor, Special Master McGovern, Francis McGovern, and

23    then a number of other very fine, knowledgeable, experienced

24    people have weighed in to create and develop this.  I know

10:04:43 25    Professor Issacharoff and Rubenstein had a lot to do with

1   it, a lot of fine lawyers did, people who know a lot more

2   than I do about class action litigation.

3       I have already determined that no lawyer who is also

4   representing a state, state or states, in this MDL will be

10:05:08  5   permitted to argue on behalf of the motion to conditionally

6   certify nor file any pleadings relative to that.  I think

7   those lawyers have a conflict at the moment because all or

8   most of the State Attorneys General are opposing this

9   motion.  So we'll have only lawyers arguing for the

10:05:35 10  proponents who are not representing states.

11      I also want to say that if I grant the motion for

12  certification, my plan is to appoint a neutral to represent

13  the non-litigating cities and counties.  I think that's a

14  good idea.  They're not formally -- obviously, they're not

10:05:58 15  parties to any litigation because they haven't filed but

16  they are potential beneficiaries and class members.  So I

17  think it'll be appropriate to appoint a neutral to represent

18  them, and that's what I'll do.

19      Also I want everyone to know that if I do grant the

10:06:17 20  motion and class certification, I'm going to limit -- limit

21  the claims and the parties based on the short form complaint

22  in the Summit County case.  So it will encompass a small

23  number of federal claims, not state claims.  I think it will

24  be unruly and unworkable to have, you know, state claims

10:06:44 25  from 50 states.  And I will limit it to 13 nationwide

1    defendant families.  I think that's the appropriate thing to

2    do.

3        So I have a number of other -- other comments,

4    observations, but I think I'll reserve those to the end

10:07:05 5    after I hear from the parties.

6        So I think it makes sense to have the counsel for the

7    moving parties start.  So who -- who's planning on

8    addressing the Court?

9            MR. WEINBERGER:  Your Honor, on behalf of the

10:07:18 10    Plaintiffs Executive Committee, this is Peter Weinberger,

11    and I'm simply going to introduce our proposed co-lead class

12    counsel, who will address the Court; Chris Seeger and Jayne

13    Conroy, and I know that there -- there are others who

14    have -- with whom we have consulted and who have worked on

10:07:39 15    this, who may be called upon to answer questions or make

16    presentations.

17        Thank you, your Honor.

18            THE COURT:  Okay.

19    So Mr. Seeger or Ms. Conroy.

10:07:49 20            MR. SEEGER:  Good morning, your Honor.

21            THE COURT:  Yes.  And it's important to stay

22    seated.  I know it's customary to stand, but the microphones

23    won't work as well.  So everyone can stay seated.

24            MR. SEEGER:  You anticipated the first

10:08:02 25    question I was going to ask.  Well, thank you for that, your

1    Honor.

2          Also I want to make sure you know Sam Issacharoff is

3    here at counsel table, Bob Klonoff, who has also assisted

4    the PEC, the Professor from Portland, Oregon, is here

10:08:14  5    assisting and can also answer questions.  And I intend to

6    draw upon their help today if that's okay with you.

7          I'd also like to quickly mention, you had mentioned

8    the people that put a lot of work into this.  There are two

9    lawyers in particular I'd like to call out who put a

10:08:29 10   tremendous amount of work into this; Elizabeth Cabraser and

11   Paul Geller, who were there from the very beginning in terms

12   of the concepts, drafting the briefs and research, and I

13   want to thank them for their help today.

14         I thought I would start, your Honor, with just sort of

10:08:44 15   a brief overview of what we're seeking and what we're not

16   seeking.

17         I didn't intend at this point to run through Rule

18   23(a) and (b)(3) factors unless --

19               THE COURT:  No.  All counsel should expect

10:08:55 20   that I have carefully read all the papers, the objections.

21   I'm not expert in class action, but I understand enough to

22   decide this.  And what I really want you to really focus on

23   is what you think are the strongest arguments that -- that

24   those who have filed opposition have made, Mr. Seeger.  That

10:09:17 25   will help me crystallize my decision.

1          MR. SEEGER:  So, your Honor, to answer that,

2     and I'll go into sort of where -- I think that duck tails

3     nicely into where I was heading.

4          Frankly, I don't think any strong arguments have been

10:09:29  5     made.  The arguments regarding commonality and typicality

6     and predominance, I say it as respectfully as I can, border

7     on frivolous simply because there really can be no question

8     that those factors, those important factors of Rule 23 have

9     been met.  The claims are the same, many of the facts are

10:09:48 10     the same.

11          And I guess the best example that highlights this is

12     that there's probably nobody in this courtroom that can

13     dispute this, and that is if you took the two Bellwether

14     plaintiffs out of the trial that you have upcoming, your

10:10:00 15     Honor, and you substitute them with any two other plaintiffs

16     that have a case in front of you, you're going to try the

17     exact same case.  It will be the same evidence, it'll be the

18     same experts, and it's all -- so I really -- when you say to

19     highlight, what I thought I would do is highlight some

10:10:16 20     things I think are important and then let the objectors go

21     because maybe we misunderstand their objections because they

22     seem pretty weak.  And there's no basis that's been provided

23     for not certifying a Negotiation Class on behalf of the

24     30,000 political subdivisions in the U.S.

10:10:32 25          So just to get to -- I'm only going to take a minute

or two -- what this is and what it isn't, this is simply a
tool to assist in the global resolution of some, most, or
maybe all of this litigation.  Like Rule 23 has been out
there, nonclass aggregate settlements are out there.  What
have been pejoratively, I think, referred to as inventory
settlements.  Plaintiffs lawyers on both sides know how to
settle cases but this will put one more tool in the tool
shed.

Now what it isn't is it isn't forcing any Defendant to
participate in it.  If a Defendant in this courtroom has no
interest in a class action settlement, so be it.  They can
go the route of a Vioxx settlement, non-class aggregate
settlement.  They can do that.  I have never heard your
Honor express a preference one way or another and so that is
still available to them.

And as we all know from people who do this kind of
work, there is no one-size-fits-all solution to every MDL.
Every single MDL presents its own problems.  So, your Honor,
as you know, I'm involved with Joe Rice and others and have
some input on the negotiating committee, and two big
questions and problems continue to come up over and over
again.  The that question gets asked by the Defendants, "Are
you unified?  Do you speak on behalf of all the political
subdivisions out there," and "if we settle with you, can we
get closure?"  Well this, what we propose to you today,

1    answers those two questions if they want it.

2         Now the other thing I'd like point out about this is

3    that this is a major improvement over the typical Rule 23(e)

4    settlement that probably your Honor has seen and most people

10:12:05  5    in this courtroom.

6         If you take a typical consumer case, your Honor, the

7    lawyers negotiate a settlement agreement, it's presented

8    through notice, and they're asked whether they accept it or

9    they don't accept it.  What we're doing here, which is very

10:12:18 10    different, is very smart people got together, led by Joe

11    Rice and his firm, and put together an allocation model

12    which distributes money potentially to the areas of the

13    country hardest hit.

14         Now more than that, there's a calculator that's

10:12:33 15    available on a website.  So every political subdivision in

16    the country -- and they're all watching this case.  They're

17    all aware of it -- can go to that calculator and determine

18    exactly what they would get from a hypothetical number.

19    Plug in any number you want, one billion, two billion, $100

10:12:52 20    billion, and they can figure out what they get now.  And

21    maybe the most important feature is it really turns this

22    case, if you want this tool, into a participatory class

23    action in the sense that the Class gets to vote yes or no

24    for the deal by 75 percent super majority.

10:13:07 25         So when -- I start out with that introduction because

1    when you look at it in that light, and it is voluntary,

2    there is no decent basis for objecting to this or denying

3    it, your Honor, respectfully.

4         Sam, I don't know whether you want to add anything to

10:13:24  5    that.

6              MR. ISSACHAROFF:  Your Honor, I just want to

7    focus on one feature of this, which is the role of the Court

8    at this point in the proceedings, as your Honor well knows,

9    is the protection of absent class members, is to make sure

10:13:37 10    that if a class is certified, there is adequacy of the

11    representation and the various due process considerations

12    identified by the Supreme Court in cases like <u>Amchem</u> and

13    <u>Ortiz</u> are satisfied.

14         Here, we have something quite extraordinary because

10:13:55 15    the -- as Mr. Seeger just mentioned, one of the features of

16    this is that there is a table that distributes or allocates

17    the funds if they come in, so that every class member is

18    aware right now, today, of what it will get if there is a

19    settlement.  And we have examples in the brief.  A $1

10:14:17 20    billion settlement, Cuyahoga County will get so much, Summit

21    County will get so much.  And the important and critical

22    issue is that that is known ahead of time what the

23    distribution is, how each class member will be treated

24    relative to each other class member, the obligation that the

10:14:37 25    similarly-situated is treated in similar fashion.  And there

1    have been effectively no objections from the Class as to the

2    distribution, the allocation formula we have.  This is

3    unheard of because the amounts are known, how one does

4    relative to another is known, and no objection.

10:14:58  5        We have a voting process that is novel in some sense

6    in its use in the Class action.  As the Court is well aware,

7    we've taken it from other places, from 524(g) of the

8    Bankruptcy Code, which has a similar type of voting

9    structure, from an American Law Institute proposal, which

10:15:17 10    expanded that into other kinds of aggregate litigation.

11        And here, we give the voting distributions so that

12    it's a very simple process.  Every class member just says

13    yes or no.  There's no complication to it but it's tabulated

14    in six different ways to make sure that there is no

10:15:37 15    crammed-down mechanism.  75 percent cut-offs at each of the

16    six different voting groups has to be satisfied in order for

17    this to go forward.

18        Again, no objection from within the Class.  I know

19    that there's six counties -- six cities in Ohio, now seven,

10:15:56 20    that have some objections that they want to raise, but

21    effectively, out of 33,000, there have been effectively no

22    objections, as we said in the brief.  It's over 99.98

23    percent.  We're in the Ivory Soap category of purity on

24    class representation here.

10:16:17 25        And so at this point, what are the objections, or who

1    is objecting?  There are Defendants who are claiming that

2    this is poor representation.  There's add -- it's not

3    adequacy, not typicality.  There's a certain crocodile-tear

4    quality to Defendants trying to stop the Class from getting

10:16:38  5    what it wants in the name of the sanctity of the Class'

6    interests.  That's always a bizarre situation in court.  But

7    putting that aside, this is a group of Class members who

8    have lawyers.  We have the lawyers here for several of the

9    Class members who are serving as -- have been offered a

10:16:59 10    subclass counsel.  These are political entities who are

11    accustomed to making decisions based on the information

12    available to them.  They got into office through the

13    elective process.

14        So the idea of voting and being part of a political

10:17:16 15    constituency is by no means alien to them.  We are not

16    taking a class of minors.  We are not taking a class of

17    consumers who bought a $20 toaster or something and have no

18    knowledge that they are a member of a punitive class.  Here,

19    we have self-conscious political leadership of every

10:17:36 20    City/County in the United States, and what's critical for, I

21    think for the Court's purposes, is there's no objection.

22    There's no objection meaningfully from within the Class.

23    And that is the first and most critical threshold that the

24    Court has to pay attention to, in my view.

10:17:55 25        The only other point we can get to is the relationship

1    with the states and that's, as the Court has already

2    indicated in its ruling on who can speak today and who

3    cannot, that is a source of concern.  And we would just say

4    the following:

10:18:12  5         There is no proposal here to alter relations between

6    states and counties, states and cities.  There is no

7    proposed change of state law.  We are not asking the Court

8    to issue any orders that change the relationship between a

9    state and its political subdivisions.

10:18:30 10        If a state has authority to step into the shoes of the

11   cities and counties in its state and say this is what we

12   want, X or Y in litigation or non-litigation, so be it.

13   There's nothing here that alters that.  If they do not have

14   that authority, which is true, which we know to be true in

10:18:48 15  some states, or if they do not wish to exercise that

16   authority and wish the cities and counties to pursue, as

17   aggressively as possible, the claims that they may have,

18   then this is a vehicle that helps achieve that.

19        Finally, with regard to the claim by the Defendants

10:19:06 20  that -- and the claims are curious because the same

21   distributor and pharmacy Defendants both say this is too

22   empowering of the Class, and this is a terrible idea, and it

23   can never be realized because 75 percent is too high a

24   threshold.  There's some ambiguity in which way they want to

10:19:29 25  go on that, but in regards to their claim they are

1   prejudiced, which is ultimately the issue they have to

2   answer, how were they harmed legally, the answer is quite

3   simple.  If they don't like this, ignore us.  The moment, if

4   this court certifies, the moment the certification takes

10:19:45  5   place, every single Defendant is as free as it was before to

6   simply ignore us.  Don't pay any attention to us.  You want

7   to go to trial, go to trial.  Good luck.  Have at it.  You

8   want to settle some other mechanism, fine.  You want to --

9   you want to attempt an aggregate settlement, a bankruptcy

10:20:06 10   solution, what have you, it doesn't matter.  You are as free

11   as before.

12        What is being proposed to the Court, as Mr. Seeger

13   said, is a tool, it's a novel one we admit, but it's in

14   keeping with the idea of Rule 23 as a mechanism for complete

10:20:22 15   resolution of common legal problems, and we believe that

16   this advances that.

17             THE COURT:  Okay.  Thank you, Professor

18   Issacharoff and Mr. Seeger.

19        Anyone else want to say anything from the moving

10:20:40 20   proponent side at this point?  All right.  Thank you.

21        Then is there anyone who'd like to speak from the

22   opponent or objector's side and --

23             MR. FERRARO:  Yes, your Honor.

24        I'm Jim Ferraro from Kelly and Ferraro, and we filed

10:21:05 25   an objection on the Plaintiff's side on behalf of the

1    handful of Ohio cities.  Okay.

2         The prior brief made reference to our objections as

3    odd and relevant, but by way of background, I tell you where

4    we've been.  Okay.  I was an objector in the Amchem case

10:21:27  5    from the very beginning all the way through the Supreme

6    Court over 20 plus years ago.  I've been involved with over

7    20, 524(g) asbestos trusts, and they have no relationship to

8    this particular matter.

9         We represent proposed members of this negotiating

10:21:44  10    Class.  We also represent third-party claims that are not

11    part of negotiating class.  We represent a rather large case

12    that's not part of the negotiating class and recovery for

13    the state of Florida, which is here in the Northern District

14    of Ohio now and in recovery services --

10:22:01  15              THE COURT:  Slow down.  Who exactly are you

16    representing, sir?

17              MR. FERRARO:  We're objecting on behalf of a

18    handful of Ohio cities.

19              THE COURT:  All right.  Which cities are

10:22:12  20    you -- are the litigating cities or non-litigating cities?

21              MR. FERRARO:  Litigating cities.

22              THE COURT:  Which cities?

23              MR. FERRARO:  One is East Cleveland.

24              THE COURT:  And what other cities do you

10:22:23  25    represent?

1          MR. FERRARO:  I know I don't have the list in

2    front of me but it's six.

3          THE COURT:  All right.

4          MR. FERRARO:  And --

10:22:29  5          THE COURT:  You mentioned Florida and I didn't

6    -- wasn't following you.  I thought you were representing

7    Ohio -- you're objecting on behalf of six -- seven Ohio

8    cities?

9          MR. FERRARO:  I have the list, by the way.

10:22:39 10       It's the City of North Royalton, Ohio.  I mentioned

11    the City of East Cleveland, the City of Mayfield Heights,

12    City of Lyndhurst, City of Huron, the City of Wick -- life.

13          THE COURT:  Wickliffe.

14          MR. FERRARO:  Wickliffe.  Thank you, your

10:22:54 15    Honor.

16       And the other Class is talking about the Florida class

17    was moved up here, is MSP Recovery.  They're the -- they're

18    the assignees of MSP Recovery for Medicaid.  There was also

19    a national class action that was filed right here.  Same

10:23:09 20    type of case, it's on behalf of Medicaid Recovery Benefits.

21    They're the assignee from a number of insurance carriers in

22    the United States.  It's a rather substantial case.  It may

23    be bigger than any city/municipality in this litigation.

24          THE COURT:  I don't see how that -- how that

10:23:27 25    even applies.  I mean they're not part of this potential

1    Class.

2              MR. FERRARO:  I agree with that, and I made

3    reference, your Honor, to the fact I represent them.

4              THE COURT:  All right.

10:23:36  5              MR. FERRARO:  We're here on behalf of the City

6    Classes.

7              THE COURT:  Tell me specifically what -- what

8    is the objection for these seven Ohio cities; East

9    Cleveland, et al.

10:23:45 10              MR. FERRARO:  Here's the objection.  It's

11   based on the facts, okay, that there's 1200 lawsuits

12   pending, the proposed negotiating class is 33,000 class

13   members.

14       Over 30,000 have filed nothing in this litigation.

10:23:59 15   Zero.

16              THE COURT:  All right.

17              MR. FERRARO:  In the papers, your Honor, it

18   states at Page 8 in the motion, no uncertain terms, that the

19   voting process is straight forward.  Each Class member will

10:24:10 20   vote only once.  The vote is simply yes or no in favor of or

21   against the proposed settlement.  That's not true.  That's

22   not the way the rule works that each Class member will vote

23   only once.  The reality is the overwhelming may never vote.

24   There may be zero votes.  And if you don't vote, you're in.

10:24:28 25   And where does that leave you if you're in?  Okay.

1          THE COURT:  Well, I'm not following you at

2     all, sir.

3          Everyone can -- everyone will be given an opportunity

4     to vote.  If someone chooses not to vote, they choose not to

10:24:40  5     vote like in the election.  You have the opportunity to

6     vote.

7          MR. FERRARO:  Here's the problem.  If you

8     don't opt out, if you don't opt out based on the data we

9     have now, okay, there is absolutely no monetary component to

10:24:53 10     this as it stands.

11          We have the three factors.  How many people died in

12     your city, how many opiate -- how many milligrams of opiates

13     went to the County, so forth.  No monetary component.  Sure,

14     you go to the website, you could be some county from

10:25:07 15     wherever city, municipality, look it up and say my

16     percentage is .0021 percent of what?  Right now it's zero.

17     Zero is zero or it could be a big county, maybe a .001

18     percent, or 01 percent of zero is zero.  The problem that I

19     have is three fold.

10:25:28 20          THE COURT:  Well, that's not an objection.  I

21     mean, of course, it's zero.  It only goes into effect if

22     there is a settlement, which will be not zero but some

23     amount of money.

24          MR. FERRARO:  That's correct, but it's a blind

10:25:41 25     settlement, your Honor.

1          For instance, say East Cleveland does not opt out,

2     okay, and supposed to be, I guess, within 60 days, now

3     you're in.  You're in.

4                    THE COURT:  Right.

10:25:51  5                    MR. FERRARO:  You don't know what the numbers

6     are.  Say negotiate for the next six months and come up with

7     a number, and if you -- if the 75 percent vote occurs,

8     you're in.  You don't have a choice.  You can't get out at

9     that point.  There's no way out.  There's no way out.  You

10:26:07 10    don't know if it's a zero or $100 billion.  You don't know

11    that.  That is a glaring deficiency.

12                    THE COURT:  No.  There would still be a vote

13    on the settlement itself.  What you're accepting is the

14    allocation model.

10:26:20 15                    MR. FERRARO:  You're right, 75 percent vote,

16    but if you didn't opt out, you were bound by that vote.

17                    THE COURT:  Right.

18                    MR. FERRARO:  I know but --

19                    THE COURT:  You can opt out if East Cleveland

10:26:30 20    looks at this and says, "Hey, I don't like this.  I don't

21    like this even this very thoughtful way of allocation" --

22                    MR. FERRARO:  They can opt out.  They can opt

23    out, you know.  They can opt out blindly right now.  Why not

24    let them opt out without the blinders?  Why don't we do it

10:26:46 25    like most single opt-out cases?

1          THE COURT:  All right.  Okay.  I -- your

2     objection -- I understand the objection.

3          MR. FERRARO:  So that's Part 1.  You don't opt

4     out, you're in.  Okay.  If the 75 percent, you can vote

10:27:01  5     against the 75 percent vote, but still be bound by it if it

6     passes.  So that's something that is a very problem -- but

7     at a minimum, at a minimum, the way this should work, it

8     should be at best an opt-in class.  There's no problem

9     notifying the 33,000 municipalities, townships, and the like

10:27:22 10     of a --

11          THE COURT:  Have all seven of these cities

12     filed lawsuits?

13          MR. FERRARO:  I'm sorry?

14          THE COURT:  Have all seven of the Ohio cities

10:27:30 15     you represent --

16          MR. FERRARO:  Yes.

17          THE COURT:  So you need to understand that

18     you've got, you know, seven that oppose this and the other

19     2000 seem to think it's fine.  So we're in a very tiny

10:27:44 20     minority, but maybe you're right.  So you need to recognize

21     that.

22          MR. FERRARO:  Another problem with that, your

23     Honor, I will tell you that.  And it's in the reply brief.

24     They say we represent, these seven cities or six cities that

10:27:53 25     I mentioned, represent .02 percent.  I get that.  And they

1    say of the thousands of public entities in the proposed

2    class, none has taken issue.  Of course, they haven't taken

3    issue because they didn't get notified of this.  They don't

4    know of this, know about this.  The last time I looked at

10:28:10  5    the certificate of services case, I didn't see 33,000 --

6                THE COURT:  I referred not to the 33.  I

7    referred to the -- let's do the sub group.  You're in a

8    litigating, represent seven litigating cities.  Out of 2000

9    litigating cities, I certainly know all this because the

10:28:27 10    lawyers help negotiate it and they're in the case and they

11    got notice.  So I'm just pointing out that there are roughly

12    2000 litigating cities that appear to have no objection to

13    this.  There's seven who do.  All right.  But, those are the

14    facts.

10:28:41 15                MR. FERRARO:  You look at the fraction, which

16    is it's less than 2000 but a small fraction of the 33,000

17    that may go into this blind settlement or be bound by --

18                THE COURT:  You don't represent any of those,

19    do you?

10:28:54 20                MR. FERRARO:  Other than my seven, no, I am

21    not.

22                THE COURT:  Okay.  So I don't think you have

23    standing to raise an objection on behalf of the other 30,000

24    cities and counties.

10:29:04 25                MR. FERRARO:  All right.  I mean we're going

1   to object and we'll take it to wherever it goes from here.

2   If we get -- if that's the way it goes, that's the way it

3   goes.  I mean that we're basically voting right now.

4               THE COURT:  I'm just making an observation

10:29:18  5   that you appear to be raising an objection on behalf of

6   cities and counties you don't represent.  So I don't -- I

7   just made that observation.

8               MR. FERRARO:  As an objector, we -- and as a

9   lawyer, I think it's wise to put out there that for parties,

10:29:37 10   municipalities that aren't here and didn't get notice of

11   today's hearing, we don't know what they would say.  We're

12   speculating.  Now, of course, the small group --

13               THE COURT:  Well, they will be notified if

14   I -- if I send out this -- if I certify this class, they

10:29:50 15   will be notified --

16               MR. FERRARO:  Right.

17               THE COURT:  -- next 60 days, and they will

18   have an opportunity to vote.  Absolutely.  They will be

19   notified, those elected officials representing them will

10:30:00 20   know, and they can -- they will have the opportunity to

21   weigh in, one way or another.

22               MR. FERRARO:  I agree.  But it's still a blind

23   vote because there's no monetary component.  That's the

24   systemic problem with what we're doing here.  It should be

10:30:14 25   an opt-in Class, or at best or at worse --

1          THE COURT:  Okay.  I understand.  I read your

2     papers, sir.  I understand your objection.

3          MR. FERRARO:  Okay.

4          That would be the substance of the objection, is that

10:30:28  5     this is three-fold.

6          By the way, there's a third factor that we may be

7     bringing parties into this litigation through the opt-out

8     Class that may be blind and may be wasting funds that could

9     go to the real parties and interests, the ones that have

10:30:43 10     filed cases that do have damages, and the model may be

11     correct or may not be correct.  That's -- is that -- is that

12     a --

13          THE COURT:  Wait a minute.  Are you -- are you

14     saying that that 30,000 cities and counties who have not

10:31:00 15     filed lawsuits should be ignored?

16          MR. FERRARO:  No.  I think that they should be

17     noticed.  First of all, they should have been noticed about

18     today, Number 1, and Number 2, before they go into a final

19     settlement, second opt-out where you get presented -- like

10:31:16 20     literally, every single case I looked at where there's a

21     single opt-out, no second opt-out, they have the monetary

22     component.  It's a full settlement.  It's like the 524(g),

23     you have everything in front of you.  You know the number,

24     you know what you're voting on, you know what you're going

10:31:30 25     to get.

1          THE COURT:  All right.

2          MR. FERRARO:  We don't know that here.  We

3     don't -- simply don't know that.

4          So my suggestion is that the Court, at a minimum, have

5     a second opt-out after the financial component is out there.

6     And the best scenario should be an opt-in Class.  It's easy

7     to notify the 33,000 of an opt-in Class and get a full vote

8     and see how fair it is.

9          And the other objection is these adopted from 524(g),

10    where it's the 75 percent of who votes.  Okay.  So depends

11    on how many of these entities vote.  Maybe ten will vote,

12    maybe 30,000 will vote, maybe four will vote, maybe three

13    out of four wins.  Who knows?

14         THE COURT:  Well, sir, that's always an issue.

15    In any election I know, it's very often determined by who

16    chooses to vote and who doesn't.

17         MR. FERRARO:  Right.  I understand that but

18    that's --

19         THE COURT:  That's always the case in an

20    election.  No one has a gun to anyone's head in this

21    country.  That's the point of free election.

22         MR. FERRARO:  Right, but again --

23         THE COURT:  Or you cannot vote.

24         MR. FERRARO:  Again, the blindness of the

25    settlement is the biggest issue.

1      And the other is I'm not here on behalf of Attorneys

2   General.  I don't represent them.  But if you want to get to

3   the 33,000, maybe that's a better way through 15 Attorneys

4   General who control the counties and cities, municipalities

10:32:47  5   in their respective states.

6                THE COURT:  I'm not following that.  I

7   understand your objection, sir.

8                MR. FERRARO:  Okay.  Okay.

9                THE COURT:  Thank you.

10:32:56 10                MR. FERRARO:  You're welcome.

11                THE COURT:  Okay.

12      Is there anyone else who wants to speak for any of the

13   opponents to the motion?

14                MR. LYNCH:  Your Honor, Mark Lynch for

10:33:10 15   McKesson.  I'd like to introduce my partner, Sonya Winner,

16   who will address the objections of the distributors.

17                THE COURT:  I should indicate the distributors

18   filed collective objections.

19      Okay.  Ms. Winters.

10:33:21 20                MS. WINNER:  It's Winner, your Honor.

21                THE COURT:  Sorry.

22                MS. WINNER:  Thank you, your Honor.

23      Your Honor, this is a very unusual kind of opposition.

24   It's not like the usual situation where Defendants are

10:33:34 25   opposing class certification.  I am not here today because

1    Defendants are unalterably opposed to pursuing anything that

2    would offer a legitimate mechanism for pursuing global

3    resolution of this litigation.

4        I'm here because the Defendants who oppose this motion

10:33:56  5    believe that the opportunity for global resolution that this

6    motion purports to offer is a mirage.

7        For any class to be a reliable counterparty the

8    Defendants can negotiate with for settlement, the Defendants

9    would need comfort that any settlement that they reached

10:34:19 10   with that class would survive, would survive objections,

11   would survive any subsequent appeals.

12       So when we look at this, we don't just look at how we

13   would object to this class.  We must also look at how absent

14   Class members would object to this Class and would pursue

10:34:43 15   appeals of approval of any settlement with this Class.  That

16   is -- that is the framework that we have to focus on.

17            THE COURT:  There wouldn't be any absent class

18   members.

19            MS. WINNER:  There are absent Class members.

10:34:56 20   Anybody -- absent Class members are the members of the

21   Class, whether you use the word absent or not.  Anybody who

22   doesn't opt out is going to be bound by the settlement.  If

23   it's --

24            THE COURT:  They're not -- they're not absent

10:35:12 25   they're in.

1          MS. WINNER:  They're in.  I'm sorry.  Absent

2    class members is a term sometimes used to refer to the Class

3    members who aren't named plaintiffs.  That's all I meant by

4    that term.  I'm sorry if I was confusing.

10:35:23  5          The problem is that this proposal does not provide the

6    assurances of a valid viable settlement that the Defendants

7    would need.  And Defendants are concerned --

8          THE COURT:  Well, you may be right, Ms.

9    Winner, but no Defendant has to -- Number 1, no Defendant

10:35:50 10    has to settle, period, under any model.  Okay?

11          MS. WINNER:  Of course.

12          THE COURT:  You can go to trial, win or lose.

13    If you lose, you can appeal and you can try 2000 cases, plus

14    the several hundred in State Court, so-called 2500 trials.

10:36:07 15    Any Defendant can choose the 2500 trials.

16          Second, any Defendant that doesn't like this model and

17    wants to pursue settlement can develop any other model.

18          MS. WINNER:  I understand.

19          THE COURT:  And use it -- and use it.  And if

10:36:23 20    you think this model isn't -- doesn't -- if your client

21    wishes to pursue resolution and doesn't think this is a good

22    model, then more power to you.  You can come up with another

23    model.

24          And I understand other models have been proposed in

10:36:41 25    settlement discussions.  I'm not going to discuss them

1   because they're private.  But I understand other models have

2   been discussed, floated, and that's fine.  No one has a

3   monopoly on good ideas.  I think the more good ideas

4   floated, all the better.

5        And so I just want to point that out that if your

6   client doesn't like this model and doesn't think it provides

7   certainty and wouldn't -- and would not be upheld on appeal

8   if there are objectors, then you come up with a better model

9   or -- or take this model and say this is not a bad model how

10   it goes, but I want to change this, this, and this to make

11   it better and use that.

12             MS. WINNER:  Well, your Honor, I fully

13   appreciate what you've said, and you're, of course, right.

14   But Defendants are concerned that certification of this

15   Class, nonetheless, creates real -- would create real

16   problems here.

17             THE COURT:  That's what I'd like -- what

18   problem?

19             MS. WINNER:  The problems it would create

20   would include for, one thing, it would take up the resources

21   of this Court and of the Special Masters on a process that

22   we believe at the end of the day would not be viable.

23   Second --

24             THE COURT:  All right.

25        But, it wouldn't be your resources, okay, your

1    client's resources.  I appreciate that you're mindful of

2    mine and I'm glad that you are, and I -- but if -- if a

3    defendant who you're not representing disagrees with you and

4    thinks this is a pretty good model and wants to pursue it,

10:38:32  5    why shouldn't they be allowed to pursue it?

6                    MS. WINNER:  Your Honor, I would point out

7    although not all Defendants have affirmatively opposed this,

8    there's no Defendant that has come out affirmatively in

9    support of it.

10:38:45 10                    THE COURT:  I didn't ask for that.  I mean,

11    you know, that's -- they don't -- I didn't -- I didn't

12    require Defendants to say, "I think this is great.  I

13    approve it."  I certainly wanted and expected anyone who

14    opposed it to file something.

10:39:04 15        So I'm just -- I'm trying to get at what -- if your

16    objection is that your client doesn't think this model, if

17    you pursued it, would provide what your client wants and

18    would ultimately be that a settlement would be approved by

19    the Court of Appeals, all right, but no one's making you do

10:39:22 20    it.

21        Why are you opposing providing the opportunity for

22    some other Defendant who thinks it might be a pretty good

23    model from trying it?

24                    MS. WINNER:  I think, your Honor, because

10:39:34 25    first of all, as I said, there are only so many resources to

1    go around, including resources of the Court and of the

2    Special Masters that are attempting to assist with the

3    settlement process.  Dedicating those resources to this

4    would divert them from other options.  That's Number 1.

5    Number 2, we're concerned that this -- I'm going to go

6    further into this in a few minutes.  We're concerned that

7    this proposal, as it has been put forward, is going to sow

8    considerable confusion among the proposed class, and in

9    fact, has already started to do that.  We've already seen

10   some indication of that.

11   And third of all, we are very concerned that

12   notwithstanding all of the protestations by the Plaintiffs

13   that they -- that this isn't solely for negotiation

14   purposes, there will be no implications of this for any

15   merited class issues, that could very readily be

16   misunderstood, even if your Honor were to adopt their

17   proposal on that, could very readily be misunderstood by

18   other courts.

19   Your Honor, in order to certify this Class, under

20   Supreme Court, very clear Supreme Court law, has to make

21   explicit findings under each of the Rule 23 factors.  Those

22   Rule 23 factors, for the reasons we've set out in our brief

23   -- and I'm only going to talk about one or two of them

24   today.  I'm not going to belabor it -- but those 23 fact --

25   Rule 23 factors are not satisfied here.

1          The Plaintiffs are asking your Honor to basically shut

2     your eyes and make those findings for purposes of

3     expediency.

4                    THE COURT:  What -- first of all, you're

10:41:14  5     correct.  If there would be a settlement, I would still have

6     to have a fairness hearing and entertain objections and make

7     a decision.  And if I adopted it, I would have to go through

8     all those 23, Rule 23 factors and make findings.

9                    MS. WINNER:  No, you have to make those

10:41:34 10     findings now if you're going to certify this Class.  Those

11     findings have to be made now.  That's the part.

12                    THE COURT:  What findings -- what findings do

13     you think I cannot make in good faith now?

14                    MS. WINNER:  You cannot make in good faith --

10:41:46 15     I mean I think the only findings you can make in good faith,

16     based on what has been presented to you, is numerosity.  I

17     think that's satisfied.  Everybody agrees on that.  But,

18     there are three other factors under Rule 23(a and there are

19     two factors under Rule 23(b) on which specific findings are

10:42:04 20     required.

21                    THE COURT:  What findings do you think the

22     facts don't warrant?

23                    MS. WINNER:  The facts do not warrant -- let

24     me give you a couple of examples.

10:42:15 25          One of the findings that is required under Rule 23(b)

1    is predominance.  The Amchem case from the Supreme Court

2    made very clear that you cannot find predominance merely

3    because a settlement would be good for everyone.  And so

4    that swamps everything.  You have to look at the underlying

10:42:37  5    claims and the proof that would be used to satisfy those

6    claims.

7        And the Supreme Court, by the way, has been very clear

8    in some of its recent decisions.  The Amgen case --

9    different from Amchem, the Amgen case, the Tyson Foods case

10:42:55 10    from the Supreme Court, the Supreme Court has said you have

11    to make a rigorous analysis that looks at evidence, that

12    determines will the claims be -- not whether the claims are

13    the same causes of action for everybody, but rather, whether

14    those claims can be proven in one fell swoop with common

10:43:18 15    evidence; whether you can prove the issues with common

16    evidence.

17        THE COURT:  Well, I think -- I think that's

18    fairly easy to say.  All right?  I've studied this, I've

19    studied these -- the complaints.  I've been reading a whole

10:43:33 20    lot of motions.  Okay?  I think Mr. Seeger is essentially

21    right in terms of liability.  In terms of liability, I could

22    probably substitute almost any other city or county for

23    Summit and Cuyahoga and the trial would be similar.  For

24    damages, there would be -- there would be differences.

10:43:53 25        MS. WINNER:  In fact, your Honor, the issues

1    would be quite different, and I was actually going to bring

2    up what he said about that.

3                    THE COURT:  I think they're a lot more similar

4    than different.

10:44:01  5          MS. WINNER:  They're -- particularly if you

6    look at the distributors, if you -- the trial in this, in

7    October, that you have set for this October, is going to

8    look at what was shipped in to Summit and Cuyahoga County,

9    what impact those shipments had, whether those shipments

10:44:19 10   were diverted, what impact those shipments had on the

11   community, if any.  And you look at that -- by the way, on a

12   Defendant-by-Defendant basis, this is not a finding that you

13   can make just sort of globally and say well, if you look at

14   all the Defendants together, it sort of looks the same.

10:44:37 15   This finding has to be made individually for every

16   Defendant.  You cannot substitute Cumberland County, Maine

17   and prove the case from Cumberland County, Maine, or

18   Phoenix, Arizona, based on what the shipments were in Summit

19   County.

10:44:54 20         The shipments into Summit County, the impact of those

21   shipments on the residents or the community of Summit County

22   has nothing to do with the case of Cumberland County, Maine,

23   or Phoenix, Arizona.

24                   THE COURT:  Would just be different

10:45:11 25   statistics.  All right?

1          MS. WINNER:  No, it's going to be more than

2     just statistics because it has to be statistics where they

3     were coming from.  They're different distributors in

4     different cases, in different jurisdictions.  Some of these

10:45:22 5     jurisdictions, my clients shipped very little into.  Some of

6     them they shipped more into.  That's true of all the

7     distributors.

8          THE COURT:  Let me ask you this.  I mean

9     what -- if this model, if you don't think this model passes

10:45:40 10    legal muster, what are you proposing?

11         MS. WINNER:  Well, your Honor, I can

12    understand your frustration --

13         THE COURT:  No, no.  What are you -- what are

14    you -- how do you think this model can be improved Ms.

10:45:55 15    Winner, or if it's so bad that it needs to be scrapped, what

16    are you proposing in its alternative as an alternative?

17         MS. WINNER:  Well first of all, your Honor, I

18    can't propose an alternative here today.  That's not, I

19    think, what we're here for --

10:46:11 20    THE COURT:  I disagree.  I disagree.

21         MS. WINNER:  -- because your Honor cannot

22    certify a class that does not satisfy Rule 23 merely because

23    there's not a better alternative out there.  I mean,

24    unfortunately, that's what the Supreme Court --

10:46:26 25    THE COURT:  We may differ on that, Ms. Winner.

1        MS. WINNER:  We may but that's what the

2    Supreme Court held in the Amchem case.

3        THE COURT:  Amchem, let's see what they do

4    with this if this gets that far.

5        MS. WINNER:  The Supreme Court confronting

6    Amchem was confronting similar situations where there was a

7    very --

8        THE COURT:  No court has ever confronted a

9    similar situation.  That I'm confident of.  So you have no

10    idea what -- if this gets to the Supreme Court, you have no

11    idea what they'll do.

12        I'm -- but I -- but I'm not worried about the Supreme

13    Court.  The issue is what I will do, and I am open to all

14    suggestions but I would simply say just to say that this

15    model isn't adequate isn't helpful to me and it isn't

16    helpful to the process.  What is helpful is if you say, "All

17    right, Judge, you should -- you should make these following

18    changes, A, B, C, or here's a much better model."

19        MS. WINNER:  Well, let me say, your Honor, our

20    brief does address several problems with this proposal that

21    are fixable.

22        THE COURT:  All right.  What do you think

23    needs to be fixed?

24        MS. WINNER:  One thing that is -- that would

25    be fixable but is not fixed -- I'm not saying it would cure

1    all the problems, but one is that this is not proposed as a

2    class action.  It's not a class proposed to be certified in

3    any particular lawsuit, involving distinct parties with

4    distinct plaintiffs and distinct plaintiffs.  That's --

10:47:55    5    THE COURT:  I've already said that's -- I've

6    already fixed that.  It's going to be a specific number of

7    specific federal claims, and it will be 13 national

8    Defendant families.

9    MS. WINNER:  But it has to be in a specific

10:48:09    10    case.  It can't just be -- MDL is not a case; it's an

11    administrative mechanism.  It's not a case.  It's not a

12    case --

13    THE COURT:  I got 2000 cases.  There has to be

14    a vehicle for resolving them as a group, so.

10:48:23    15    MS. WINNER:  But, your Honor, again, I'm not

16    saying that that's not fixable.  I'm saying we raised this

17    before and they chose not to fix this.

18    THE COURT:  I'm not understanding what you're

19    suggesting should be fixed.

10:48:34    20    MS. WINNER:  There is no case in which they

21    are seeking to have this case certified.  This motion is

22    filed just generally in the MDL.  It's -- they're not

23    seeking certification against specific Defendants.  And I

24    understand that your Honor does intend to address that.

10:48:49    25    THE COURT:  I'm fixing that.  There will be 13

1    Defendant families.

2            MS. WINNER:  But, your Honor, we'll need to

3    make the Rule 23 findings for each Defendant.  That is,

4    again --

10:48:59  5            THE COURT:  If I need to, if you think I

6    can -- I can make findings if I need to.

7            MS. WINNER:  But let me talk about another

8    area where there are some clear problems here.  And that is

9    the conflict of interest within this class.  And I go back

10:49:14 10   to -- and the real problems with the notice.

11           We might return here to the article from Professors

12   McGovern and Rubenstein that was sort of the foundation of

13   this proposal.  And that article, if you read it, it's very

14   interesting.  They did a lot of work to try to address the

10:49:37 15   adequacy of representation issues in light of Amchem and to

16   come up with a design, particular structure for a proposed

17   Negotiation Class.

18           Now we don't think even that would satisfy Rule 23,

19   but if you leave that issue aside, that -- they at least

10:49:56 20   made -- do make an effort to try to make -- get it as close

21   to Rule 23 as possible.  This proposal doesn't follow that

22   pattern.  It doesn't do what that -- what the original

23   concept envisioned because the original concept was -- it

24   has two critical parts that are not satisfied here.

10:50:20 25           One is that you get to get -- you identify all the

1    claimants who would need to participate in a settlement in

2    order to get a global settlement, and you make that your

3    class.

4              THE COURT:  I thought that's what happened.

10:50:36  5              MS. WINNER:  They don't -- well, they don't

6    really do that here because you leave out the states, and

7    that's pretty critical.  The states are not part of the

8    Class.

9              THE COURT:  Of course, not.  They're not -- no

10:50:47 10   state has a federal lawsuit, Ms. Winner.  So they can't

11   be -- I mean the State Attorneys General have each decided

12   to file one or more cases --

13             MS. WINNER:  I believe Montana has a

14   federal -- I believe Montana actually has a federal suit.

10:51:02 15             THE COURT:  I don't think so.  Alabama was the

16   only one who did.  I'm not aware of any counsel --

17             MR. LYNCH:  Your Honor, we just had it

18   stipulated that Montana has filed a federal lawsuit.

19             COUNSEL:  No, no, no.

10:51:13 20             THE COURT:  No.  There is no -- Alabama

21   voluntarily dismissed their federal lawsuit and refiled in

22   State Court.  It did not include any State Attorney General.

23             MR. LYNCH:  Excuse me for interjecting this.

24   It was Idaho, not Montana.

10:51:30 25             THE COURT:  I don't think this is going

1   anywhere.

2            MS. WINNER:  Your Honor, let me go to the

3   second piece, which I think is more critical, and I don't

4   think there's any basis for dispute here.

5        The second piece, the critical piece here is that

6   there will be an advance agreement that sets up, upfront

7   what each class member's share of any settlement will be.

8            THE COURT:  I think that's probably the best

9   part of the proposal.  Why do you think that's bad?

10           MS. WINNER:  Because it's not true.  They

11  haven't done that.  That's the problem.  If they'd done, you

12  know, we might be talking differently but that's not what

13  they've done here.  That's not what this proposal does.

14       This proposal only provides an allocation that goes to

15  the County level.  It provides no allocation between the

16  cities and between the counties and the cities and towns and

17  villages that are within each county.  That is left either

18  to later negotiation between each county and its

19  constituents or to the Special Master.  If they can't reach

20  agreement with the Special; Master, it will have to be

21  re-litigated.

22       So they have a partial allocation, not a complete

23  allocation.  This is kind of hidden in their -- in their

24  filing.  But if you read it closely, it becomes very

25  apparent.

1          THE COURT:  Well I mean that's --

2          MS. WINNER:  That's a very real problem.

3      Let me just give you an example.

4          THE COURT:  How is that a problem for you?

10:53:02  5   Again, you don't have to use it.  If you've got a better

6   way, I mean.

7          MS. WINNER:  It's a problem because it's being

8   held out there as the golden way to solve this.  It's being

9   held out there as a way the Court should invest its time and

10:53:21 10   its energy and its resources.  It's being held out as

11   something that the Court is being invited to make findings

12   that this record does not support.

13      It is a problem because we have a very, very

14   complicated litigation here.  Your Honor has stressed that

10:53:42 15   more than anyone.  This is -- this is as complicated a

16   litigation as there's ever been, and adding another layer of

17   complication through a class action that is not supportable,

18   that does not follow the Federal Rules, does not even do

19   what the Plaintiffs claim it does, is wasting everybody's

10:54:06 20   time, is wasting everybody's energy.

21      Let me just give you the example --

22          THE COURT:  Ms. Winner, if -- if every

23   Defendant feels the way you do, there will be no time wasted

24   because no one will ever use it.

10:54:23 25          MS. WINNER:  But your Honor will have gone on

1    record making findings that are not supported by the record.

2    Your Honor --

3                THE COURT:  That's on me but it's going to be

4    academic because no one's ever going to use it.

10:54:34  5                MS. WINNER:  It will not be academic if other

6    people copy those findings, your Honor.  That is --

7                THE COURT:  No one -- I mean copy the

8    finding -- no one can copy the findings in another case.

9    Any other Judge in another case will have to see what's

10:54:48 10    proposed in his or her case.

11               MS. WINNER:  We're also concerned that it

12   would create a considerable amount of confusion out there

13   about what the situation is, whether class members are, in

14   fact, entitled to negotiate separately with defendants.

10:55:03 15   That is something that's come up in the submissions that

16   have been presented to your Honor, the written submissions.

17        There's also confusion in the notice, and the -- let

18   me just give you an example from the notice of what the

19   problem is with the notice.

10:55:18 20        The idea is that allocation is made clear.  All you

21   have to do, if you're a small town in America, all you have

22   to do is just look up on this website and you'll find out

23   what your allocation is.

24        Well, let's just take the example of DuBois, Wyoming.

10:55:34 25   Very nice little town in Wyoming I visited once.  Dubois,

1    Wyoming looks up -- opens up their browser.  They look up

2    the website, they look up their county, Fremont County,

3    Wyoming, and see that Fremont County is going to get either

4    the billion-dollar settlement, Fremont County will get about

10:55:52  5    $68,000, and that DuBois will get $98 out of that.

6        Well that, in fact, isn't true.  If you read the fine

7    print, you find out -- and you actually have to sort through

8    the FAQ's and their brief in support of this motion.  You

9    find the fine print, it actually says they're proposing if

10:56:16 10   your allocation is less than $500, you actually get nothing.

11       So the proposal is actually that out of a

12   billion-dollar settlement, DuBois would get zero.  But, this

13   website says they get $98.  But, then there's more on the

14   fine print.  The fine print also says well by the way, this

10:56:36 15   is only sort of a default allocation that might be applied

16   because there's no actual agreed allocation for DuBois or

17   for Chicago or for Montgomery, Alabama, or any other city or

18   town in America.  There is no specific allocation agreed to

19   here.  There's just this default idea of what it might be,

10:56:59 20   but you still have to negotiate it afterwards.

21       That creates two very serious problems here.  One is

22   this notice is not adequate.  It is, I would argue,

23   affirmatively misleading.  I think, you know, DuBois looks

24   this up, they think they're getting $98.  They're not

10:57:19 25   getting $98.  They're not guaranteed --

1          THE COURT:  Okay.  We'll have to look

2     carefully at the notice --

3          MS. WINNER:  There's another problem.

4          THE COURT:  -- not that kind of confusion.  We

10:57:28  5     can look at that.

6          MS. WINNER:  There's another problem here, in

7     that there's conflict of interest within this Class, a very

8     fundamental conflict of interest.

9          THE COURT:  What's that?

10:57:37 10          MS. WINNER:  Between the cities and the

11     counties.

12          All of these entities have got to be able to negotiate

13     with each other.

14          THE COURT:  Well --

10:57:42 15          MS. WINNER:  I did note at the beginning that

16     your Honor said --

17          THE COURT:  That happens all the time.

18          MS. WINNER:  No.

19          The whole idea of this structure, the reason why they

10:57:51 20     try to circumvent other aspects of Rule 23 and say this

21     Negotiation Class idea will work is because this is all set

22     upfront.  You don't have to negotiate it after the fact and

23     that would eliminate conflicts within the Class.  That's the

24     whole idea of --

10:58:09 25          THE COURT:  What are you -- what are you

1    proposing as an alternative, Ms. Winner?

2              MS. WINNER:  Your Honor, I think -- I don't

3    have a specific alternative.  I think that the -- if you

4    look at the article, that what the article presents, it says

10:58:25  5    that the alternative is you actually have to have an

6    agreement that actually does allocate everything.  That --

7    that would be the fix.  That was the concept that the

8    Plaintiffs borrowed in coming up with this motion, is that

9    there had to be a full allocation formula for everybody.

10:58:44 10              THE COURT:  All right.  So --

11              MS. WINNER:  Now the other way the Amchem case

12    says that you can address this kind of conflict problem is

13    that you can have subclasses.  And the Plaintiffs make

14    their -- I think a very persuasive argument in their

10:59:00 15    motion -- I don't agree with all of their reasons for why

16    subclasses wouldn't work here.  It just wouldn't be

17    practical.  And frankly, I think the main reason it wouldn't

18    work here is you then have to have rather than one global

19    settlement which, is the whole idea here, you'd have to

10:59:15 20    negotiate a whole bunch of different settlements.

21              THE COURT:  Right.  It defeats the purpose.

22              MS. WINNER:  That defeats the purpose.  And

23    that is why the concept that is set out in the article from

24    Professors McGovern and Rubenstein is to have the allocation

10:59:31 25    completely established upfront so that you don't have to

1   worry about subclasses.

2        So, your Honor, I'm not going to go --

3             THE COURT:  That would put this off

4   indefinitely for every county to negotiate with every city

10:59:45  5   and township that has filed a lawsuit and everyone that

6   hasn't so -- before we do anything, but I hear what you're

7   saying.

8             MS. WINNER: Your Honor, there are several

9   other fundamental problems with this motion and we do set

11:00:01 10   them out in our brief.  I'm not going to recite them.  Your

11   Honor has said you've reviewed our brief.  And if you have

12   questions, obviously I'm happy to address them.  I

13   appreciate your patience with me today.

14        We do have very serious concerns here and we do think

11:00:17 15   that this motion, at least as it's currently framed, should

16   be denied.

17             THE COURT:  Okay.  Thank you, Ms. Winner.  All

18   right.

19        Anyone -- I guess anyone want to speak on behalf of

11:00:31 20   the States?

21             MR. SINGER:  Yes, your Honor.

22        Good morning.  I'm Paul Singer, the chief attorney of

23   the tax division of the Texas Attorney General's Office.

24        And first, I want to thank you for giving the States

11:00:48 25   another opportunity to address the Court.  Despite your

1      repeated recognition that we are not parties or bound by

2      your Honor or the rulings of this Court, obviously the

3      States play a critical role in this process and we are

4      active litigants in this case and also importantly, we are

11:01:07   5      active -- we have engaged in active investigations, using

6      our pre-investigative powers.

7          I just want to lay that out because I think the

8      States, like member of the Plaintiffs Committee, have been

9      very active participants and are very knowledgeable about

11:01:21   10     the facts that are here and before us that have led to this

11     hearing today.

12         And as to the matter at hand, the AG is also an

13     important player when it comes to class action.  We have a

14     role under the Class Action Fairness Act to review class

11:01:36   15     action settlement proposals, such as this novel approach,

16     and raise any concerns on behalf of our citizens with the

17     Court.

18         As your Honor knows, 38 AG's submitted a letter to the

19     Court, outlining many of our concerns that we have.  I think

11:01:53   20     it's somewhat unprecedented to see that many AGs united in

21     expressing their concerns, especially given the short time

22     that was available to review these motions.

23         But I want to address -- rather than go through the

24     letter, I do want to address a few things that your Honor

11:02:11   25     has raised today and a few points that have been made by the

1    Plaintiffs as well.

2         First, your Honor, I understand and recognize the

3    notion that if parties don't like this model, they just

4    don't have to use it.  Unfortunately, I don't think it's as

11:02:30 5    simple as that, and especially when it comes to the States.

6         The motion that's been put out there goes into great

7    detail about the role that it -- that this negotiation class

8    would play in determining allocation between the States and

9    the Counties, including purporting to allow out-of-state

11:02:50 10   representatives ultimately to vote on how that allocation

11   would work within a particular state, and then also

12   subjecting any final allocation that's reached between a

13   state and its counties to ultimate approval by this Court.

14        So that directly conflicts with your Honor's previous

11:03:08 15   orders that make it clear that this Court does not have

16   jurisdiction over the states and it infringes on state

17   sovereignty.  That's really the underlying sovereignty issue

18   that the States have raised.

19        I know Professor Issacharoff spoke earlier about

11:03:23 20   States stepping in the shoes of counties.  I agree.  It's

21   largely a very claim-by-claim issue --

22             THE COURT:  I understand your point, but I

23   don't, I don't think this proposal infringes one iota on

24   state sovereignty.

11:03:42 25        Everyone understands that no defendant or group of

1   defendants is going to settle with the States alone and not

2   with the cities and counties, or with the cities and

3   counties alone and not the states.  Okay?  That would be

4   lunacy, and no one would do it.

5   And so the challenge has been, all right, how to

6   create some -- some semblance of a team on the Plaintiffs'

7   side so any Defendant who wishes to pursue settlement could

8   do it.

9   Now it's easy to set -- establish a team of 50AGs.

10  It's 50 men and women.  That kind of team has been put

11  together in lots of other lawsuits very effectively.  They

12  were here from the beginning.  It's not so easy with 2000

13  litigating cities and counties and potentially 20 or 30,000

14  others.  So that, to me, is purpose the of this proposed

15  class.  It's so that a Defendant who says I want to settle

16  with everyone now can say all right, I've got the AG's and

17  I've got this litigating subdivision, and I can figure out

18  -- I do one of two things.  I decide the allocation.  I'm

19  offering X to the states and X to the cities and counties,

20  or I'm offering Y to the two groups and you allocate it.

21  Okay?  And you figure it out.

22  So all this mechanism does is take care of the portion

23  that is allocated to the cities and counties.  It doesn't

24  say what that portion will be.  In fact, it explicitly says

25  it will be the product of negotiation between the states and

1    the cities and counties, which it would have to be.  Quite

2    frankly, if it didn't exist you would have to do it.  And it

3    doesn't say how you do it.  It just says you do it.  And it

4    doesn't say if you can't come to an agreement, the Court

11:05:47  5    decides.  I don't decide.  If you can't come to an

6    agreement, there's no settlement with that Defendant or

7    group of Defendants.

8         So I don't -- I wouldn't approve anything that I

9    thought infringed on state sovereignty.

11:06:02 10                MR. SINGER:  So, your Honor, I think the

11    motion, though, purports to do more than just focus on the

12    County allocation.

13         It does include reference to the fact that this

14    mechanism could be used to decide how that allocation occurs

11:06:16 15    between a state and its counties and how the relationship

16    between state and counties goes.

17                THE COURT:  I didn't read it.  I didn't read

18    it, and I don't think it could.  I don't -- I don't -- I

19    don't think that I have the power, directly or indirectly,

11:06:37 20    to make that decision.  All right?  Either a Defendant wants

21    to settle, either that will be explicit in the settlement

22    agreement, all right, which would be a three-way

23    negotiation, or it would have to be worked out afterward

24    between the states and the cities and counties and it would

11:06:57 25    be a product of negotiation, and no one could dictate it.

1    All right?  If I tried, it would be appealed in a minute and

2    reversed without even an argument.

3         So I don't -- I mean can you point to something in

4    this agreement which you think tells a one-state AG or 50 as

11:07:20  5    a group this is how you've got to -- how you've got to

6    allocate your money that's awarded in any settlement?  If

7    so, I'll fix it.

8              MR. SINGER:  I think in the motion, I mean I'm

9    just referencing on Page 10 of the motion, it does reference

11:07:38 10    that any agreed-to allocation gets treated as a settlement

11    and submitted to the Negotiation Class for consideration.

12         So if in Texas, the AG reaches a separate agreement

13    with its counties, what this motion is purporting to do is

14    then force that agreement to be taken to this Negotiation

11:07:56 15    Class for a vote.

16         And what unclear between the motion and the memorandum

17    is that whether or not this entire National Class gets to

18    then vote on how that allocation works within Texas, for

19    example.

11:08:08 20              THE COURT:  Well, it doesn't --

21              MR. SINGER:  And, your Honor, I appreciate

22    what you're saying because I mean some of this can be

23    remedied, and which I think is part of the offer that the

24    states have made is to continue to work as we have from day

11:08:22 25    one as this proposal was originally created, we are happy to

1    continue to work with the parties about how alternatives can

2    be approached.

3              THE COURT:  And I would simply say,

4    Mr. Singer, you know, picking up on what I said to Ms.

11:08:38  5    Winner, there are other models.  No one, no defendant has to

6    use this model.  If someone proposes another model that says

7    hypothetically we're going to rely on each State AG to

8    figure out and work it out with the cities and counties in

9    his or her state, all right, but there's still going to have

11:09:02  10    to be a lot of negotiation.  And if you don't work it out,

11    there's nothing.

12         So this is a -- I think one of the strengths of this

13    model is the allocation system because it -- a lot of time

14    and effort and money was spent coming up with something that

11:09:20  15    looks fair.  It looks like it gets the money to where the

16    harm is, which is the idea, and it gets the money to where

17    the harm is even if a particular subdivision hadn't filed a

18    lawsuit because no one wants to encourage another 20 or

19    30,000 lawsuits.

11:09:38  20         I said from the start, if there's any settlement, the

21    money needs to go where the harm is and where the treatment

22    facilities are.  And I think -- I think this does this.  So

23    I think it would be -- it would be helpful toward those

24    discussions under some other model, but again, I welcome

11:09:57  25    your offer.

1          And this is a work in progress.  And quite frankly, if

2     it's approved and if a given Defendant wants to use it, I am

3     sure that during that process, there will be changes made

4     because people are going to say, "Geez, we didn't anticipate

11:10:17  5     this.  And we've got to fix this and we've got to fix that."

6     This is all theoretical.  There will be a whole lot -- a lot

7     legislation.  All right?  You pass it, you think -- you

8     think it works, and then you start trying to implement it

9     and you see there are things you've got to change and you

11:10:35 10     change it.  So I expect that to happen here.

11          But, I -- if you think that there's some language

12     which just -- which appears to say that this Court, in any

13     way, shape, or form is going to tell an Attorney General of

14     Texas or any other 49 states what they're to do with money

11:11:00 15     that they are -- they get in a settlement, I want to fix

16     that language because I -- that's -- it's not appropriate

17     for a Federal Court, directly or indirectly, to do that.

18               MR. SINGER:  Yes, your Honor.

19          And we can do that.  But it's also the issue of how

11:11:17 20     the states interact with their counties and how we are going

21     to go forward within each state and allocate funds to do

22     exactly as your Honor wants because I think we share in that

23     goal, which is getting the money to the appropriate

24     locations where the problem is.

11:11:32 25          And certain states have had advanced discussions with

1    all of their subdivisions and are working that out.  Our

2    concern is that by including the states in these motions,

3    which they do, I mean there is reference to the states and

4    how this will impact the state discussions with its

11:11:48 5    counties, it's infringing on that inherent sovereignty that

6    we have to have those -- that relationship with our

7    subdivisions.

8        There's no reason the states need to be at all

9    referenced or included in motions like this because, as your

11:12:01 10   Honor has noted, none of the states have filed cases or have

11   cases before the Court.

12            THE COURT:  Well, I think it had, quite

13   frankly, Mr. Singer, it's in there to make it clear that

14   they're not trying to infringe on state sovereignty.  If

11:12:16 15   they say nothing, someone's going to -- raise a whole lot of

16   question and say, "Well, what about the states and what

17   about the state cases?"  So I think they have to -- they

18   have to mention that or else --

19            MR. SINGER:  I want to address that, too, your

11:12:32 20   Honor, because as your Honor knows, the states are active

21   participants in ongoing settlement discussions that have

22   been very active.  And frankly, the states are really the

23   leaders in those discussions for good reason because of the

24   nature of our claims and the nature of our offices.

11:12:51 25       And to the question of is there a better alternative,

1   I think the short answer is yes.  You know, we are happy to

2   separately and behind closed doors further brief your Honor

3   on sort of the nature of those discussions and what varying

4   models have looked like.  But, inherent in just sort of the

11:13:14  5   underlying power that your Honor recognized just a moment

6   ago, the States have to do this time and time again.

7       We are quite familiar with settling multi-state

8   matters and resolving issues at a nationwide level, and I

9   think we should be looked to, to conduct that here.

11:13:28 10       THE COURT:  That I was going to raise at the

11   end, but I'll raise it -- I'll point that out now.

12       The problem is that in a number of states, any money

13   that is, that a State Attorney General obtains, either by

14   victory in court, litigated judgment, or settlement, goes

11:13:53 15   into the general fund.  And the men and women who control

16   what happens in the general fund are the elected state

17   representatives and senators.  That's what they do.

18       And that's what happened in the tobacco litigation.

19   Over $200 billion, far more than 90 percent of that was used

11:14:12 20   for public purposes totally unrelated to tobacco smoking,

21   lung cancer, whatever.  And I believe that's why we have all

22   these counties and cities that filed separate lawsuits, to

23   make sure that doesn't happen again.

24       And so, again, no Defendant has to use this model at

11:14:37 25   all.  I know that there, as I alluded to, there are other

1   models being discussed actively, and if a given Defendant or

2   Defendants think that' a better model, more power to them.

3   I'm all in favor of it if it works.  And -- but that model

4   has to address -- because the model is encompassing cities

11:15:03   5   and counties, it has to address the problem of putting money

6   into the state general funds or else it isn't going to fly.

7        And so again, this is -- this is a nonexclusive

8   proposal, and it doesn't cut off -- in fact, I think the

9   more models out there, the better.  Okay?  Because it may be

11:15:27 10   that that given Defendant may say, "Well, I'd like something

11   for Model A and Model B, and this is" -- so whatever.

12                  MR. SINGER:  Your Honor, to your initial

13   point, and that is a -- the key issue of the model that is

14   under development, ensuring exactly that point.  I think the

11:15:47 15   States completely agree with your Honor on -- in terms of

16   again, making sure the money goes to where the problem is in

17   addressing the problem.  And so, you know, as I said, I

18   think we're happy -- and it does --

19                  THE COURT:  As I said, if you -- I mean if you

11:16:03 20   can identify, Mr. Singer, you or your colleagues, language

21   which you feel, you know, expressly infringes on state

22   sovereignty and say somehow this Court, me, directly or

23   indirectly, is telling a state, State AG how to do his or

24   her job or how to -- how to settle a case or not settle a

11:16:31 25   case, or how to in any way, shape, or form allocate money

1    that goes to a state, tell me, I will -- I will -- I'll

2    change that language.  Certainly if it says that expressly,

3    it's out.  And if it's subject to that interpretation, I'll

4    revise it so it's not subjected to that.

11:16:51  5          MR. SINGER:  I appreciate that, your Honor,

6    and I think we're happy to provide some alternative

7    language.

8          THE COURT:  All right.

9          MR. SINGER:  I would like to raise, though,

11:16:57  10   the fact that yes, more models in general are a good thing,

11   but I do want to underscore the point that was made earlier,

12   that there is going to be a lot of confusion as this process

13   moves forward, especially if there are other models that are

14   far more progressed and more likely to result in settlement

11:17:16  15   than the one under consideration today.

16       When all of our subdivisions receive formal notice of

17   this, there is no doubt that we are going to be overwhelmed

18   with questions and confusion.

19       I strongly do not believe that the comment made

11:17:32  20   earlier, I think by Mr. Seeger, that everybody knows about

21   this and all of our subdivisions are well aware of what's

22   happening, I do not believe that's the case.  In Texas alone

23   we have such varied subdivisions.  We have counties that

24   have four and a half million people.  We have counties that

11:17:47  25   have 130 people.  And when you get down to the individual

1    cities and towns, you're talking about a very different

2    level of sophistication and political structure.  You have

3    wide variance in how they can even consider these kinds of

4    notices and even raise an objection.

11:18:05  5        And so there's just inherent concern that there's

6    insufficient time and insufficient notice for those

7    subdivisions to properly object.

8        And then as the points have been made earlier, then

9    they're stuck, then they're bound.  And while I understand

11:18:19 10   the subdivisions all get a vote later, just a straight

11   up/down vote, what's unclear from the FAQs that's going out

12   to these subdivisions is that it's 75 percent of those

13   voting.  That is not made clear in the FAQ.  It's not made

14   clear in the motion.  It's made clearer in the memo that

11:18:38 15   accompanies it, and that's --

16              THE COURT:  Well, that's -- I will look at

17   that because it's -- I think, quite frankly, I think most

18   people would understand that because if it's not, and people

19   don't vote, they're essentially voting no.  I mean it's, you

11:18:57 20   know, generally elections are determined by the people who

21   vote.  And if you choose not to vote, you can't complain

22   about it.

23              MR. SINGER:  Sure.  And what's different here

24   is the unique --

11:19:08 25              THE COURT:  I'll make sure that the -- it's

1   made clear that it's 75 percent of those voters.

2                   MR. SINGER:  And, your Honor, we're happy to

3   provide, you know, as we've outlined other concerns in our

4   letter, we're similarly, to what we were talking about,

11:19:22 5   happy to provide alternative language.

6                   THE COURT:  All right.  I would encourage

7   you -- I would encourage you to do that because I don't

8   think any -- any of the drafters and any of the lawyers who

9   are proposing this are -- intended to infringe on state

11:19:42 10   sovereignty.  They understand that very well.  What the

11   heck, a bunch of them are representing states, so.

12                   MR. SINGER:  I wasn't going to get into that,

13   your Honor.

14                   THE COURT:  Well, I've alluded to it.  And

11:19:57 15   they were involved in this.  So the -- you know, I've said

16   enough on that.

17                   MR. SINGER:  And I think, you know, as further

18   outlined in our letter, the States share a lot of the Rule

19   23 concerns that have already been raised, and I don't need

11:20:12 20   to readdress them for the Court, but obviously in our role

21   and overseeing the integrity of that process, that's the

22   nature of why we raise those concerns.  And really the

23   concerns, not just for this particular case, but the

24   precedent in the future that it sets, and so you know, I --

11:20:30 25   I'm happy to go into more of those, but I think your Honor

1    has reviewed them in our letter and all of the other

2    briefing and understands those concerns as well.

3              THE COURT:  All right.  Thank you very much,

4    Mr. Singer.

11:20:41  5              MR. SINGER:  Thank you.

6              THE COURT:  All right.

7         Was there anyone else who has any, I guess, objections

8    that haven't been articulated by the speakers so far?

9              MR. BLANTON:  Good morning, your Honor.

11:20:56 10    Jonathan Blanton, Deputy Attorney General for Major

11    Litigation at the Ohio Attorney General's Office.  I will do

12    my best to be brief, your Honor.

13         If this were -- we appreciate the work Professor

14    McGovern and Professor Rubenstein put into this.  This model

11:21:09 15    would be interesting if it were dealing with a consumer

16    protection matter, if it were dealing with a stockholder

17    matter or property damages.  But, this is different.  This

18    is a case of public interest and public harm.  And the model

19    that's been set forth impinges on the role of the Attorney

11:21:27 20    General.

21         The Attorney General has authority, puts them in a

22    unique position to represent the state as a whole, in the

23    interest of the state as a whole.

24         The Attorney General is best situated to work with the

11:21:39 25    legislature to make sure the money goes where the harm

1   really is.

2        Your Honor, the metrics that have been chosen in this

3   class voting concept clearly disfavor smaller jurisdictions,

4   less popular jurisdictions.  The fact that we're talking

5   about gross Morphine milligram equivalence rather than per

6   capita is troubling because in any large political

7   subdivision, as you would expect, there will be a larger

8   stream of legitimate opioids.  Same with overdose deaths.

9   Same with opioid dependence.

10        The voting itself, your Honor, by the fact that it is

11  population based and then doubles on that, your Honor, with

12  the fact that it is metric based also, so the higher the

13  metrics score, the greater vote you get, puts a great risk

14  to the rights and interests of the smaller political

15  subdivisions, and that expands globally.

16        Your Honor, the danger -- you're talking about the

17  danger to the Attorneys General and their sovereignty lies

18  in the interest of the individual states.  There's no

19  requirement in this plan that there's a threshold of Ohio

20  subdivisions that agree.  It's a threshold of harm to Ohio

21  subdivisions that agree.  Ohio can be bound by the votes of

22  folks who don't even live here, your Honor.  New York, Los

23  Angeles, the double counting of the counties and cities

24  could easily overwhelm our southern part of the state, which

25  has been absolutely drenched and almost irrecoverably

61

1    damaged by the opioid epidemic.

2         Also, your Honor --

3              THE COURT:  Mr. Blanton, what are you

4    proposing as an alternative?  All right?  I mean I

11:23:14  5    understand that, you know, you can say that, all right,

6    there shouldn't be any of these lawsuits in the first place.

7    It is -- I mean the corollary of what you're saying is the

8    Attorney General represents everyone in Ohio, which he does.

9    And so these cases should all be dismissed.

11:23:33 10         If that -- if that's what you're saying, you should

11    say it overtly that the Court should dismiss -- should have

12    filed, you know, say these cases are not just issuable;

13    cities and counties in Ohio don't have a right to bring

14    them, they should be dismissed.

11:23:46 15         I understand there are some litigation like that in

16    Tennessee.  I don't know what the result of that's been, but

17    I think the Attorney General took that position.

18              MR. BLANTON:  Your Honor, the danger of the

19    city/county cases and any resolution outside of the state is

11:24:01 20    that assuming there's settlement with just the city/county

21    class, not with an Attorney General, say the State of Ohio

22    doesn't join the settlement --

23              THE COURT:  There won't be.  No state --

24    sorry.  No Defendant in his, in its right mind would settle

11:24:18 25    the constellation of cases filed by the cities and counties

1    and not cases filed by Attorneys General.  The whole point

2    is that they need -- every Defendant has made clear that

3    before they'll seriously discuss settlement, they'll need

4    some vehicle to provide global peace.  All right?

11:24:37  5        It's easy to negotiate with the 50 AG's.  It's a model

6    that's done in countless other cases.

7                    MR. BLANTON:  It's somewhat monolithic, your

8    Honor.  But there are outliers --

9                    THE COURT:  I didn't say it's monolithic.  I

11:24:47 10   said if you've got 50 people, 50 men and women, you can

11   actually have them all there together if you want.

12                   MR. BLANTON:  If the Class gets out ahead,

13   your Honor.  The argument is that any recovery received by

14   the City and County, we offer as offset against the state

11:25:01 15   damages --

16                   THE COURT:  No one is going to settle

17   piecemeal, okay?  So it isn't going to happen.  Any

18   settlement is going to be with the Attorneys General and

19   with the cities and counties.  Okay?  So this -- this

11:25:17 20   vehicle is a way of getting a handle around this numerous

21   and somewhat fractious group so no one is going to -- no

22   one's going to settle with this group alone without the

23   AG's.

24                   MR. BLANTON:  We appreciate that commitment on

11:25:36 25   behalf of the Court, on behalf of the Special Masters, your

1    Honor.

2         As Mr. Singer hinted to, there are other potential

3    models being discussed and proposed that would not encompass

4    these types of challenges, that would not create the risk,

11:25:50  5    not create risk to our community, the risk of Ohio being

6    overwhelmed by other states' votes because of greater

7    populations, that would allow for greater cooperation and a

8    greater state-by-state consideration of the authorities, the

9    needs and the powers existing within that state at that

11:26:08 10   time.  We would be happy to talk to you about that.  Again,

11   this isn't quite the right forum because they are

12   confidential discussions.

13                   THE COURT:  Right, but again, again, and I'll

14   say it again, I'm aware that there are other models under

11:26:19 15   discussion.  And if a Defendant or group of Defendants

16   believes there's another model that is more effective, and

17   the overall aggregate amount is acceptable, it's going to

18   fly, and it will work.  And the cities and counties will

19   join.  And if you have some other, you know, other vehicle,

11:26:49 20   again there's going to have to be a vehicle, a process of

21   allocating the money that's acceptable or they won't buy

22   into it.  But if you've got a better one, that's fine.

23   Nothing, nothing prevents that from happening.

24                   MR. BLANTON:  I understand that, your Honor,

11:27:03 25   but once this model is created, once the pressure begins

1    from -- there's a large group of cities and counties who

2    have bonded together in a national class style, that would

3    result in -- essentially crams down these Defendants where

4    there will not be a settlement offered to them, does not

11:27:24  5    incorporate this class structure and, therefore, it gets

6    into the same issues with the states, your Honor.

7            THE COURT:  I assume -- nothing is being

8    crammed down -- this is a -- this is a model.  There's

9    another model under discussion.  No Defendant has to choose

11:27:38 10    any model.  It can go to trial in October and go to trial

11    for the next umpteen years in the 22,000 cases around the

12    country.

13            MR. BLANTON:  Your Honor, this model creates a

14    known for those who represents the cities and counties,

11:27:52 15    creates a known pot of dollars, a known percentage; 10

16    percent plus the 15 that's allocated.  I know there's a

17    waterfall provision.  But once that's established, what

18    interest would any of these plaintiffs have, especially when

19    you can roll in the unrepresented unvoting members of the

11:28:10 20    political subdivisions with negotiation of any of these

21    Defendants?  Why would they want to do that, your Honor?

22        It creates a system where this becomes the only

23    acceptable model to the subdivisions because it's their

24    benefit for it to be that way, whether it's the benefit of

11:28:23 25    each individual state, each individual community or not, it

1    stops being the question --

2                    THE COURT:  I disagree.  They're represented

3    by lawyers.  The lawyers are negotiating with any Defendant

4    who wants to negotiate.  They're never going to say no.

11:28:37  5    They're never going to say no, we won't consider another

6    model.  In fact, they're duty bound, they're ethically bound

7    representing their clients to consider any reasonable model.

8    All right?  They can't say we're not going to consider any

9    model other than this ethically.

11:28:53 10        And if they started to, I wouldn't let them.  I'd

11    throw them off the MDL in a heart beat.

12                    MR. BLANTON:  Thank you, your Honor.

13                    THE COURT:  So I -- and again, I would echo if

14    you feel, Mr. Blanton, that there is language in here that

11:29:15 15    that interferes with state sovereignty or says or suggests

16    that this Court in some way is going to tell an Attorney

17    General how to allocate money that is -- that is given to

18    the state, I want you to promptly tell me that, show me that

19    and I will look very hard, and if I think you're right, I'll

11:29:39 20    change it, I'll fix it because that's not -- I don't think

21    it's the intention of the movants, but maybe there's some

22    ambiguity.  But, get that to me, any suggestions as soon as

23    possible.

24                    MR. BLANTON:  Thank you, your Honor, for your

11:29:56 25    time.

1          MS. ANDERSON:  Good morning, your Honor.

2    Jenny Lee Anderson on behalf of the City of Fargo, North

3    Dakota.

4          As I mentioned in our papers, for a variety of

11:30:12  5    reasons, practical and logistical, the City of Fargo was

6    unable to get its complaint on file by June 14th.  That puts

7    it in a non-litigating class.

8          Now, on one hand, the City, therefore, became

9    concerned about being in a less concentrated group and

11:30:30 10    representation of that group.  On the other hand, the City

11    of Fargo generally supports the motion and understands

12    proposed class counsel needs to have a definite closure date

13    for litigating and non-litigating classes.  So we understand

14    those tensions.

11:30:46 15          Just this morning, I had an opportunity to discuss the

16    issue very briefly with Professor McGovern and also with

17    some members of leadership, Elizabeth Cabraser and others,

18    and it was suggested that perhaps we could explore

19    harnessing the City of Fargo's enthusiasm and desire to roll

11:31:04 20    up its sleeve in event of either litigation or global

21    settlement to act as a representative of some type for the

22    non-litigating class members under the currently proposed

23    settlement class structure if approved by your Honor.

24          Now as I mentioned, this was only discussed as an idea

11:31:21 25    this morning.  So the City of Fargo would like the

1    opportunity to explore the idea further with Plaintiffs

2    leadership and with Special Master McGovern and report back

3    to the Court promptly.

4                    THE COURT:  Okay.  Thank you.

11:31:34 5        When did Fargo file its case?

6                    MS. ANDERSON:  On July 9th.

7                    THE COURT:  Okay.  All right.  There obviously

8    needs to be some cut off.  And any cut off is going to be

9    somewhat arbitrary, but if not, no one will know who -- who

11:31:53 10   is litigating and who's non-litigating.  Okay.

11        Thank you very much for that offer.

12                    MS. ANDERSON:  Thank you, your Honor.

13                    MR. CHEFFO:  Your Honor, Mark Cheffo.  I just

14   have one --

11:32:06 15                   THE COURT:  Yes, Mr. Cheffo.

16                    MR. CHEFFO:  -- thank you, your Honor.  One

17   very discreet point.

18        As you know, the Manufacture Defendants have not

19   opposed at all.  But, hearing a number of things that your

11:32:16 20  Honor has said today, I think we will digest.  One in

21   particular, you referenced both the 13 groups and also

22   referenced you don't plan to focus on certain claims, I

23   think you were focusing on federal claims, and I guess this

24   is really more of an observation in kind of your invitation

11:32:32 25  to invite, you know, discourse about it.

1          The only thing that came to my mind and I think a few

2     of the folks who are kind of sitting next to me here was how

3     that might have -- how, to the extent this was used, any

4     releases would work if --

5          THE COURT:  Well, releases would encompass any

6     and all claims.  I've -- I've raised that already.  I picked

7     that up in my reading of this.

8          The releases, I mean the releases can be broader.  And

9     any obviously any Defendant who settles or wants release of

10    any and all claims that were brought and candidly could be

11    brought, you always have language there, too, so that isn't

12    going to be a problem, but I felt it was -- that -- there

13    had to be some boundaries so that -- so the Class members

14    would know what exactly these cases are and there's -- there

15    needed to be some uniformity and you can have uniformity

16    with federal claims.

17         So any releases will encompass any and all claims that

18    were brought or could be brought.

19                    MR. CHEFFO:  Thank you, your Honor.

20                    THE COURT:  Thank you for highlighting that.

21    Okay.

22         Anyone else who wanted to weigh in?  All right.  Well,

23    I very much appreciate first the hard work of all the

24    lawyers, academicians who helped create this proposed

25    negotiation.

1              MR. ISSACHAROFF:  Your Honor, could we address

2     two short points that were raised that may help clarify

3     things for the Court?  You want to go first?

4              MR. SEEGER:  Your Honor, I had a couple of

11:34:22  5     quick observations which I think are important to bring out.

6         On the AG's point, and I think you made the point but

7     if you didn't, I'd like to just -- there are -- I don't

8     represent AG's, your Honor.  I represent cities and

9     counties, and I can tell you --

11:34:34 10              THE COURT:  If you didn't, you wouldn't be

11    arguing.

12              MR. SEEGER:  I wouldn't be at this table.

13        There are cities and counties in Ohio that strongly

14    disagree with the idea that the Ohio AG owns those claims.

11:34:45 15    I think the best evidence of the fact that there's a

16    disagreement is you've got a couple trials about to go and

17    nobody, as far as I know, has come into the courtroom and

18    said stop.  So that's just an observation I'd like to make

19    on behalf of the Class here.

11:34:58 20        And I just want to express gratitude to Ms. Winner for

21    looking after our Plaintiffs.  It kind of reminds me of the

22    phrase in the Eggleston case in the Seventh Circuit, "That's

23    kind of an issue of the fox expressing worry about the

24    safety of the henhouse."  But I wanted to thank her for

11:35:10 25    that.

1          Your Honor, I have nothing else.

2              MR. ISSACHAROFF:  Two quick points, your

3    Honor, just to clarify some statements that were made.  One

4    was on the voting, voting system.

11:35:18  5          The voting system needs a requirement of 75 percent of

6    each of the six voting trusts.  It's not three out of six,

7    four out of six.  It's six out of six.  And they're designed

8    to, in one instance, overrepresent the power of small

9    jurisdictions because it's by each entity gets one vote.  In

11:35:41 10    some instances, it gives more power to the larger

11    jurisdictions because it's by population.  And in one

12    instance, it's by impact because it's based upon the same

13    formula that's used in the -- in the allocation system.

14          And so we tried three different metrics before and

11:35:57 15    after the cut off date, and so there's no risk at all of a

16    cram down.  And the only system -- the only time this would

17    be called into question is if some Defendant wanted to

18    settle, and as part of the settlement, wanted to give X

19    amount, a billion dollars let's say, to the cities and

11:36:15 20    counties, this then is the voting mechanism for that part of

21    the settlement and it's the allocation for whatever portion

22    is designated to the cities and counties.  There is no

23    effort made whatsoever to get inside the State/County

24    relations.

11:36:31 25          The second point is on the allocation itself.  We are

1       -- Ms. Winner discovered through her diligence that how this

2       money is distributed to the cities is not present here.  Let

3       me read the first sentence where we introduce the allocation

4       model.

11:36:47  5       The allocation model uses three factors to determine

6       the share of the global settlement that each county will

7       receive.  We do not purport anywhere to take this down below

8       the county level because as Mr. Singer expressed from Texas,

9       there is a huge variety in the size of counties and in the

11:37:07 10       functions that counties play, vis-a-vis, the various

11       municipalities within them.

12       I used to live in Texas.  And there, the counties are

13       very big and incorporate many cities.  I now live in New

14       York.  We have five counties but one city.

11:37:23 15       So it is -- this cannot be a "one size fits all."  And

16       so we are distributing down to the county level.  And then

17       there are suggested ways because there's a different

18       distribution of resources and services provided between

19       cities and counties.

11:37:38 20       This is known, and this has been communicated to the

21       2000 plus that already has cases on file.  And in addition,

22       we have a website where this is active and has been down --

23       has been hit many, many times by Class members.

24       So yes, we have not given notice yet but this is no

11:37:59 25       secret to the most actively involved litigating entities.

1      And as I said very, very beginning, there is no opposition

2      from within the Class.  So the smaller towns of Wyoming will

3      have to get the money from their counties which is the way

4      they get things now.

11:38:19  5           Thank you very much, your Honor.

6                 THE COURT:  All right.  Thank you, Professor

7      Issacharoff.

8           Anyone else?  I don't want to slight anyone.  All

9      right.

11:38:34  10          Well, I -- I again appreciate all the hard work of

11     those who helped develop and devise and refine this

12     proposal.  I appreciate the many people who weighed in with

13     comments or suggestions to improve the finding.  I

14     appreciate all the comments made today.  The Court will take

11:38:55  15     it under advisement and I'll make a decision in the near

16     future.

17          I just want to highlight some of the key factors that

18     I'm weighing, wrestling in my mind.

19          There needs to be some vehicle to provide resolution

11:39:23  20     of these cases.  Everyone knows that trying probably 2500

21     now between the federal ones and the ones in State Court, is

22     -- first, it would sink the state and federal judiciaries,

23     but also the amount of private resources would be

24     staggering.  And no one -- no one would want to do that.

11:39:53  25          So there has to be a vehicle to resolve them.  There

1    doesn't have to be one vehicle alone.  So I've -- I've

2    encouraged all settlement discussions, I've encouraged all

3    ideas, I'm continuing to do so.  And this is just one.  And

4    no one had to use it.  And no one has to use all of it.

11:40:15  5    Someone could use part of it or use it as a spring board.

6    And I think it's a product of the Defendants' justifiable

7    insistence that before they would engage in serious

8    settlement discussions, they needed to have a vehicle, a

9    mechanism to provide a reasonable chance of global

11:40:38  10    resolution and global peace.  That's -- that's always

11    expressed by virtually every Defendant I've encountered in

12    my years as a lawyer and now as a Judge.  It's a fair and

13    acceptable one.

14        It's a lot more complicated.  We've never had, I don't

11:40:54  15    believe in our country, a constellation of cases like we

16    have in this opioid MDL.  I believe it's a, you know, a

17    product of some things that have happened in the past, but

18    whether it is or not, we have it here and there has to be

19    some vehicle to resolve these lawsuits.

11:41:21  20        I think this vehicle has some merit.  Is it perfect?

21    No.  Does it have problems?  No.  Is it certain it would be

22    affirmed on appeal if challenged?  Of course not because

23    it's never been tried before.  And that's simply -- but that

24    isn't -- that isn't a reason to say no, because you've never

11:41:37  25    had a set of lawsuits like this.  So the vehicle isn't going

1    to be one that's been tried and tested.

2        I don't believe that the proposed Negotiation Class

3    interferes or infringes on state sovereignty but again I've

4    invited the Attorneys General promptly to point out to me

11:42:03  5    any language which says to the contrary, and I will -- I

6    will address it.

7        But again, there's nothing coercive about this

8    process.  No Defendant has to employ it.  There's nothing

9    exclusive.  It does not prohibit any Defendant or State

11:42:22 10    Attorney General from taking a lead in some other vehicle

11    and/or structure.  And of course, there's nothing intrusive.

12    No Defendant has to settle at all.

13        So those are the considerations.  But I will -- I will

14    weigh all the comments and all the objections that were

11:42:47 15    filed, and I will endeavor to come to a decision as quickly

16    as possible.

17        And again, I think this hearing highlights the

18    challenges and difficulties presented by this MDL.  I mean

19    if someone says why is the federal judiciary trying to

11:43:13 20    address a 20-year social epidemic, why is it in this branch

21    of government and not the other two, I might share that

22    question, but we didn't choose it.  These cases came to our

23    branch, and we're not shirking our responsibility.  And I

24    was asked to undertake it on behalf of our branch.  I'm

11:43:37 25    essentially the fiduciary.  These aren't my cases.  Only a

1    handful of these cases are actually my cases or my court's

2    cases in the Northern District, a fraction of the 2000.  I

3    haven't added it up but it's a tiny fraction.

4         I'm the fiduciary, the trustee for -- almost every one

11:43:56  5    of my colleagues in the Federal Court has at least one of

6    these.  I haven't looked, but certainly a majority has at

7    least one.  And I've been asked to be the steward.

8         I'm trying the case in my district.  But, again, the

9    fact is that there has to be some vehicle to address these.

11:44:22 10    And, of course, the cases are -- have highlighted this

11    social epidemic and the social problem.

12         And I've also tried, along with this, to focus on

13    changes in conduct and behavior to turn that curve down and

14    candidly, a number of things have already been put into

11:44:45 15    place.  And as part of the discussions that are ongoing,

16    there are a number of other ideas and suggestions.

17         So again, those can't be implemented.  Most of them

18    can't be implemented outside of a -- outside of a resolution

19    or a settlement.  And that's why it's paramount to have at

11:45:03 20    least one vehicle or two vehicles or three vehicles for

21    resolution.

22         So with that, I want to thank everyone for their

23    participation.  And this hearing is adjourned.

24              COUNSEL:  Thank you.

11:45:14 25         (Proceedings adjourned at 11:45 a.m.)

1          C E R T I F I C A T E

2              I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    s/Shirle Perkins_____
     Shirle M. Perkins, RDR, CRR
9    U.S. District Court - Room 7-189
     801 West Superior Avenue
10   Cleveland, Ohio 44113
     (216) 357-7106
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25