No. 19-3827

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

IN RE: STATE OF OHIO

[COUNTY OF SUMMIT, OHIO, ET AL., vs. PURDUE PHARMA, L.P., ET AL.]

[CUYAHOGA COUNTY v. PURDUE PHARMA, ET AL.]

{RELATES TO: NATIONAL PRESCRIPTION OPIATE LITIGATION}

:
:
:
:
:
:
:
:
:
:

United States District Court
for the Northern District of Ohio
Eastern Division

District Court Case Nos.
1:18-op-45090
1:17-op-45004
[relates to: 1:17-md-02804]

---

## REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS OF STATE OF OHIO

---

CHARLES MILLER
Office Counsel
BENJAMIN M. FLOWERS
Ohio Solicitor General
MICHAEL HENDERSHOT
Chief Deputy Solicitor General
SAMUEL PETERSON
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-728-1171

DAVE YOST
Ohio Attorney General

JONATHAN BLANTON*
Deputy Attorney General for
Major Litigation
  *Counsel of Record
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-728-1171
Jonathan.Blanton@ohioattorney
  general.gov

*Counsel for the State of Ohio*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.....................................................................................ii

REPLY .......................................................................................................1

    I.    Ohio has no adequate remedy to prevent the threatened infringement of its sovereign interests.................................................3

    II.   Ohio has been diligent in protecting its interests. ................................6

    III.   Ohio has "standing" to seek mandamus relief. ...................................8

    IV.   Ohio, and not its political subdivisions, has sole authority to seek relief on a *parens patriae* theory. ........................................................12

CONCLUSION...................................................................................................18

CERTIFICATE OF COMPLIANCE ....................................................................19

CERTIFICATE OF SERVICE..............................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Alfred L. Snapp & Son v. Puerto Rico*,
    458 U.S. 592 (1982) ................................................................ 1, 12

*Am. Fin. Servs. Ass'n v. City of Cleveland*,
    112 Ohio St. 3d 170 (2006) ............................................. 16

*Aref v. United States*,
    452 F.3d 202 (2nd Cir. 2006)............................................. 10, 11

*Bd. of Comm'rs of Union Cty. v. McGuinness*,
    80 N.E.3d 164 (Ind. 2017) ............................................. 17

*Carl F. Schier PLC v. Nathan*,
    924 F.3d 890 (6th Cir. 2019) ............................................. 9

*CBS, Inc. v. Young*,
    522 F.2d 234 (6th Cir. 1975)............................................. 9

*Cheney v. United States Dist. Court*,
    542 U.S. 367 (2004) ............................................. 7, 8

*City of Cleveland v. Ameriquest Mortg. Sec. Inc.*,
    615 F.3d 496 (6th Cir. 2010)............................................. 13

*City of Cleveland v. State*,
    128 Ohio St. 3d 135 (2010) ............................................. 16

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ............................................. 11, 12

*Doe v. Univ. of Mich. (In re Univ. of Mich.)*,
    936 F.3d 460, 2019 U.S. App. LEXIS 25304 (6th Cir. 2019) ............................................. 10

*Donovan v. Dallas*,
    377 U.S. 408 (1964)............................................. 3

*Evans v. Buchanan*,
    582 F.2d 750 (3d Cir. 1978)............................................. 9

*Georgia v. Pa. R. Co.*,
    324 U.S. 439 (1945) ................................................................................ 12

*Illinois v. Kentucky*,
    500 U.S. 380 (1991) .................................................................................. 7

*John B. v. Goetz*,
    531 F.3d 448 (6th Cir. 2008) ................................................................... 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .................................................................................. 9

*In re Multidistrict Vehicle Air Pollution*,
    481 F.2d 122 (9th Cir. 1973) ............................................................. 12, 16

*Ne. Ohio Coal. for the Homeless v. Husted*,
    No. 2:06-CV-896, 2012 U.S. Dist. LEXIS 66111 (S.D. Ohio May 11,
    2012) .......................................................................................................... 3

*Principality of Monaco v. Mississippi*,
    292 U.S. 313 (1934) .................................................................................. 5

*Seeley v. Thomas*,
    31 Ohio St. 301 (1877) ............................................................................ 7

*Seminole Tribe v. Florida*,
    517 U.S. 44 (1996) .................................................................................... 5

*Thomas v. FAG Bearings Corp.*,
    50 F.3d 502 (8th Cir. 1995) ..................................................................... 5

**Statutes, Rules, and Constitutional Provisions**

28 U.S.C. §1651 ..................................................................................... 10

Fed. R. App. P. 21 ................................................................................... 9

Ohio Const. art. XVIII, § 3 ................................................................... 16

# REPLY

Ohio—from the River to the Lake—is being ravaged by opioids. Every day, these drugs are ending lives, shattering families, and destroying communities. In hopes of seeking statewide relief and remediation for its citizens, Ohio filed two state-court suits against opioid manufacturers and distributors. *State ex rel. Yost v. Purdue Pharma, L.P.* No. 17 CI 000261 (Ross Cty. Ct. C.P.); *State ex rel. Yost v. McKesson Corp., et al*, No. CVH 2018055 (Madison Cty. Ct. C.P.). In each, Ohio sought relief as *parens patriae*. It thus sought to vindicate its "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents." *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982).

Ohio filed its mandamus petition to protect this interest. Specifically, it seeks an order preventing the District Court from allowing Cuyahoga and Summit Counties—the respondents here—to proceed on, or interfere with, *parens patriae* theories that the State alone has the power to pursue. The bellwether trial, by allowing political subdivisions to litigate *parens patriae* claims that may properly be asserted by the State alone, undermines Ohio's sovereignty. Add to that intrinsic harm an instrumental one: whatever verdict the Counties wrongfully obtain for themselves will limit the pool of assets that the State can use to vindicate the interests of *all* its citizens and political subdivisions.

Last week, this Court ordered the Counties and the District Court to respond. The responses from the Counties and the District Court are remarkable for what they do not say. Neither disputes that Ohio has, and that the Counties lack, the power to bring *parens patriae* claims. And neither argues that Ohio agreed to have its *parens patriae* claims litigated in the District Court.

So what do they argue? They insist that Ohio has adequate remedies outside of mandamus; they claim that Ohio's claim is barred by laches; they deny that Ohio, as a non-party below, may seek mandamus relief in this Court; and they argue that they "do not purport to assert claims in a *parens patriae* capacity." None of these arguments denies the merits of Ohio's legal arguments. Most are procedural. And all fail.

*First*, Ohio has no adequate remedies at law—the respondents suggest options that either do not exist, or would not "remedy" the threat to Ohio's sovereignty. *Second*, laches does not apply, both because the doctrine is inapplicable to States at all and because Ohio has been diligent. *Third*, the Counties' argument that non-parties may not seek mandamus relief is wrong as a matter of precedent and unsupported by federal law. *Finally*, even if it is true that the Counties do not "*purport* to assert claims in a *parens patriae* capacity," that is in fact what they are

doing.  In other words, whatever the Counties' intentions, they are interfering with

Ohio's sovereignty by asserting claims that rightfully belong to the State.

This reply addresses these four points in turn

## I.  Ohio has no adequate remedy to prevent the threatened infringement of its sovereign interests.

In its order requesting a response to Ohio's petition for a writ of mandamus,

the Court specifically asked whether Ohio "has no other adequate means to obtain

relief."  Order, Doc. 22-2, p.2.  It does not:  there is no other adequate legal remedy

that Ohio could invoke to protect its interests from interference by the political

subdivisions.  Neither the District Court's response, nor the response from the

Counties, provides a reason to conclude otherwise.

**A.**  Begin with the District Court's suggestion that Ohio's challenge to the

bellwether trial belongs in state court, not federal court.  *See* Dist. Ct. Letter, Doc.

23, p.3.  This suggestion fails because Ohio is petitioning to stop a *federal* trial from

going forward.  State courts "are completely without power" to provide such

relief.  *See Donovan v. Dallas*, 377 U.S. 408, 412–13 (1964).  Even if Ohio were

seeking relief short of stopping a federal trial, it is doubtful whether any state court

could award relief that would interfere significantly with pending federal

proceedings.  *Cf. Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2012

U.S. Dist. LEXIS 66111, at *30 (S.D. Ohio May 11, 2012) (enjoining state-court

action that may have conflicted with federal proceedings). And comity would likely prevent a state court from acting, even if it could. The District Court did not identify any contrary authority.

The District Court proposed this novel-yet-unexplained state-court solution based on a purported concern about how mandamus relief might affect States other than Ohio. *See* Dist. Ct. Letter, Doc. 23, p.3. Its concern is misplaced. As an initial matter, the fact that thirteen States and the District of Columbia are *amici* supporting the petition is a good sign that mandamus relief poses no threat to their interests. *See* Motion to File Amicus Brief, Doc. 6. More fundamentally, Ohio's petition does not seek relief related to the all 2,000 MDL cases. It seeks relief related to the bellwether trial alone, based on the State's specific relationship to Cuyahoga and Summit counties. Enjoining *those* trials can have no direct effect on the sovereign interests of any other State. And no State has opposed the writ.

**B.** The Counties take a different tack. According to them, Ohio has an adequate remedy because it could have intervened in the District Court if it felt its sovereign interests were in jeopardy. This argument misunderstands the nature of Ohio's sovereign interests. Ohio sought mandamus relief to protect its sovereignty, which the bellwether trial threatens by allowing the municipalities to litigate claims that rightfully belong to the States. But Ohio *also* has a sovereign right to

4

litigate its opioid-related *parens patriae* claims in its own courts. *See, e.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 506 (8th Cir. 1995); *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322–23 (1934). Ohio is exercising that right. But it could no longer do so if it intervened in the federal case, as that would require Ohio to subject itself to federal jurisdiction and pursue its claims in federal court. Because intervention would require Ohio to sacrifice the sovereign interests it is petitioning to protect, it is not a "remedy" at all, let alone an "adequate" remedy.

The fact that Ohio had limited involvement in settlement discussions with some of the parties to the litigation below does not contradict any of this. Ohio (and several other States) accepted the District Court's offer to assist with settlement discussions. It would have been irresponsible *not* to participate in these discussions, since they held at least some remote possibility of prompt relief for Ohioans impacted by the opioid epidemic. But participating in those discussions *did not* make Ohio a party to any of the proceedings below, and *did not* subject Ohio to the District Court's jurisdiction—a point on which Ohio sought clarification before it decided to participate. *See* February 22, 2018 Ohio Attorney General Letter, Respondents' Appendix at 047. More importantly, the District Court has repeatedly disavowed jurisdiction over Ohio. *See* Order re: AG participation, R.94,

PageID# 523 ("the Court recognizes it has no jurisdiction over the AGs or their representatives…but invites their participation because it is essential if there is to be any resolution"); *see also* Order re: State Court Coordination, R.146, PageID# 806 ("[The District Court] "it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting.").

There are two fatal problems with any argument that the option to participate in settlement discussions constitutes an adequate remedy. *First*, a settlement is not a "remedy" in the relevant sense; it is not something that a court awards to a prevailing party. The States are not aware of any precedent suggesting otherwise. *Second*, all Ohio received was the option to informally participate in the settlement negotiations—negotiations in which it had to negotiate against plaintiffs asserting claims that rightly belong to the State itself. That cannot plausibly be described as an "adequate" remedy, if it is a remedy at all.

## II.   Ohio has been diligent in protecting its interests.

Both the District Court and the Counties complain about the timeliness of Ohio's petition. Their complaints lack merit.

Ohio has repeatedly voiced its objection to the planned bellwether trial on the ground that the trial will litigate claims that belong to the State as a whole, not

any subdivision. *See, e.g.*, R. 1726, June 24, 2019 Letter of 26 State Attorneys General, PageID#51634; R.1951, July 23, 2019, Letter of 38 State Attorneys General, PageID#119886; R.1973, Letter of Attorney General Yost, PageID#209117 ("These claims belong to the States and cannot be pursued by political subdivisions."). Ohio also raised this point directly with the District Court through an Assistant Attorney General who spoke during some of the hearings. *See, e.g.,* 2147, Aug. 6, 2019 Transcript at 61:7–14, 65:13–23 (acknowledging Ohio's concern). And so its petition is not barred by laches.

To begin with, "the laches defense is generally inapplicable against a State." *Illinois v. Kentucky*, 500 U.S. 380, 388 (1991). To the extent that either the District Court or the Counties suggest that state law should control here, the rule in Ohio is the same. *Seeley v. Thomas*, 31 Ohio St. 301, 308 (1877) ("[N]o laches is to be imputed to the government, and against it no time runs so as to bar its rights.").

Even if laches could apply, it does not bar this petition. Mandamus is an extraordinary remedy. Ohio thus waited until it was sure it needed mandamus relief before filing the petition. That is exactly what the Supreme Court has said mandamus petitions *ought to* do. *See Cheney v. United States Dist. Court*, 542 U.S. 367 (2004). The District Court's response cites *Cheney* for the proposition that laches can bar a mandamus petition. But *Cheney* determined that laches *did not* bar the

petition at issue. *Id.* at 379. And its reasons for rejecting the laches argument apply with full force here. Recognizing "the drastic nature of mandamus," *Cheney* held that the Government properly waited to seek mandamus until it was clear that its dispute could not be resolved "through less drastic means." *Id.* To do otherwise, the Court determined, would "put litigants in the impossible position of having to exhaust alternative remedies before petitioning for mandamus, on the one hand, and having to file the mandamus petition at the earliest possible moment to avoid laches, on the other." *Id.*

Instead of filing "at the earliest possible moment," Ohio appropriately waited to seek mandamus relief. Indeed, if Ohio had filed its petition any earlier— for example, if it had sought mandamus relief when the defendants' summary-judgment motions were pending—the petition would have been unripe, since a ruling in the defendants' favor might have mooted the petition.

## III. Ohio has "standing" to seek mandamus relief.

The Counties suggest that Ohio lacks standing to seek a writ because it is not a party to the MDL proceedings. Ohio certainly has Article III standing, since it has "suffered an injury in fact" (the invasion of its sovereign interests) that "is fairly traceable to the challenged conduct" (the litigation of the State's claims by the wrong parties in the wrong court) "that is likely to be redressed by a favorable

judicial decision." *Carl F. Schier PLC v. Nathan*, 924 F.3d 890, 894 (6th Cir. 2019) (internal quotation marks omitted). So the Counties presumably mean that Ohio lacks "prudential standing," which the Supreme Court recently explained is not properly thought of as "standing" at all. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Instead, prudential "standing" is nothing more than another way of talking about whether someone has the right to pursue a particular claim.

Ohio does have the right to pursue mandamus relief, both as a matter of precedent and Federal Rule of Appellate Procedure 21. This Court's precedent recognizes the power to award mandamus relief to non-parties. *See John B. v. Goetz*, 531 F.3d 448, 461 (6th Cir. 2008); *see also CBS, Inc. v. Young*, 522 F.2d 234, 237 (6th Cir. 1975) (granting writ to non-party affected by district court's gag order); *Evans v. Buchanan*, 582 F.2d 750, 778 (3d Cir. 1978). The State is not aware of *any* case holding that mandamus relief is unavailable to non-parties. And that is consistent with Rule 21, which governs mandamus writs. The rule nowhere limits relief to petitioners who were parties below. To the contrary, it discusses the obligations of a "party petitioning for a writ of mandamus," which include the responsibility of serving all "parties to the proceeding in the trial court." Fed. R. App. P. 21(a)(1). There would be no need to include "in the trial court" if the par-

ties to a mandamus proceeding and the parties in the trial court were always the same. Moreover, if the rule *did* limit mandamus relief to parties to a trial-court proceeding, it would run afoul of the All Writs Act. That Act broadly empowers federal courts to issue writs where necessary and appropriate. 28 U.S.C. §1651; *see also Doe v. Univ. of Mich. (In re Univ. of Mich.)*, 936 F.3d 460, 2019 U.S. App. LEXIS 25304 at *14–15 (6th Cir. 2019). And its broad grant never even suggests a party-status requirement.

Against all this, the Counties point to *Aref v. United States,* 452 F.3d 202 (2nd Cir. 2006), which they say supports their argument that Ohio lacks standing because it was not a party to the MDL proceedings. In *Aref*, the New York Civil Liberties Union, a non-party, petitioned the Second Circuit for a writ of mandamus seeking public access to all classified district court orders and government filings in a criminal case before the district court. *Id.* at 205. The Second Circuit denied the petition for lack of jurisdiction, noting: "We are aware of no authority authorizing a non-party to petition the Court of Appeals for a writ of mandamus in *a criminal case*." *Id.* at 207 (emphasis added). The Court instead emphasized that the New York Civil Liberties Union had remedies other than mandamus available to it, such as intervening in the district court action or filing its own civil action. *Id.*

*Aref* is irrelevant. Needless to say, this is not a criminal case. And as explained above, intervention is not an adequate remedy for reasons related to the State's sovereignty. On top of that, Ohio has no option to file its own civil action (aside from this mandamus petition); whereas the New York Civil Liberties Union could have sought the documents in a lawsuit of its own, Ohio could not sue the District Court in another district court in hopes of enjoining the bellwether trial.

Finally, the Counties have called Ohio's petition "a request for abstention in other guise" and challenge Ohio "to fit its petition into any recognized category of abstention." Doc. 25, p. 36. As an initial matter, Ohio is not seeking abstention: Ohio wants the federal courts to stop the bellwether trial, not just postpone it, since the Counties seek relief that rightly belongs to Ohio. In any event, *even if* the States' petition is properly thought of as a request for abstention, its petition ought to be granted. "Abstention is … appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976). In *Colorado River*, the Court cited three exemplar cases where the issue of "the scope of the [powers] of municipalities under state law" made abstention appropriate. *Id.* (*citing Louisiana Power & Light Co. v. City of Thibodaux*, 360 U. S. 25 (1959)

(eminent domain powers); *Kaiser Steel Corp. v. W. S. Ranch Co.*, 391 U. S. 593 (1968) (power to confer water rights); *Hawks v. Hamill*, 288 U.S. 52 (1933) (power to revoke a perpetual toll-bridge franchise)). *Colorado River* further explained that "[i]t is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." 424 U.S. at 814.

This is such a case. The State of Ohio is attempting to establish a coherent statewide response to the opioid crisis—an unquestioned matter of substantial public concern. Both the statewide opioid crisis and the internal distribution of powers between the State and its subdivisions transcend the bellwether trial. Allowing a bellwether trial with conflicting claims to proceed would be, to say the least, disruptive. Thus, viewed through the lens of abstention, Ohio is entitled to the relief it seeks: dismissal of the Counties' overlapping claims, or (at the very least) delay of the bellwether trial.

## IV. Ohio, and not its political subdivisions, has sole authority to seek relief on a *parens patriae* theory.

Only Ohio, as a sovereign, may assert *parens patriae* claims for harms to its citizens' health and welfare. *Alfred L. Snapp*, 458 U.S. at 607; *Georgia v. Pa. R. Co.*, 324 U.S. 439 (1945); *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 131 (9th Cir. 1973). Municipalities may not—as some of the Counties' own authorities

show.  Take, for example, *City of Cleveland v. Ameriquest Mortg. Sec. Inc.*, 615 F.3d 496 (6th Cir. 2010), which the Counties cite on page 34 of their response.  In that case, this this Court held that Cleveland's claims against certain mortgage lenders failed because the City could not assert claims on behalf of its individual citizens. *Id.* at 506.

The municipalities apparently recognize that their cases could not be allowed to proceed if they were indeed seeking relief on a *parens patriae* theory.  So they argue that they have *not* brought *parens patriae* claims, that the relief that they seek is different from the relief Ohio seeks in state court, and that Ohio will therefore not be harmed should the bellwether trial be allowed to proceed.  According to them, they are seeking relief only for direct injuries that they themselves suffered—not for injuries to the public at large.

The problem with this argument is that it contradicts the Counties' complaints, and also their $8 billion dollar abatement demand.  In their complaints, the Counties do more than seek relief based on a narrow class of proprietary harms. They instead seek a remedy "for the public health, safety and welfare of their citizens," "in an effort to remedy or mitigate the societal harms caused by Defendants' conduct." R.513, Compl., PageID#10579, 10892.  They aim to recover for "decreased funding available for public services ... because it was diverted to

other public services designed to address the opioid epidemic," costs of mental-health services, the increased burden on the Ohio judicial systems, child care, "decreased efficiency and size of the working population," "diminished property values," and "decreased business investment and tax revenue." *Id.*, Page ID#10843. 10851, 10857, 10864–65. They also seek treble, punitive, and exemplary damages. *Id.*, PageID#10896. Despite what the Counties and the District Court may now argue, *see* Doc. 25, p.9 and Doc. 23, p.2, the basis for the Counties'claims—and their requested relief—goes far beyond direct injuries to the Counties and duplicates the much-more expansive relief that Ohio seeks in its own lawsuits.

The Counties' insistence that they are seeking only their own damages is belied by the fact that they seek multiple billions of dollars to abate the same public nuisance that Ohio seeks to abate. Both Ohio and the Counties seek to abate the opioid crisis within Summit and Cuyahoga Counties (with Ohio seeking to remedy the crisis in all 88 counties). This is a harm to *the public*. It would seem at least arguable that an award to the Counties to fully abate the nuisance within their borders would necessarily preclude Ohio from receiving any abatement award for the same harm if the counties co-own the claims with Ohio. This is why Ohio contends that, to the extent the Counties seek only damages for their past hard-

dollar expenditures (as opposed to expenditures of Ohio pass-through-dollars), then the claims could proceed. But the Counties and the District Court have failed to appropriately limit these claims.

Further indication of the overlap between the State's and Counties' claims comes from the defendants, many of whom have argued that the claims overlap, and that the resolution of the Counties' claims will limit the amounts Ohio can collect. Allergan PLC, one of the defendants that has settled with the Counties, has indicated that it intends to "seek set-off of any overlapping claims or alleged harm … to the extent such claims have been resolved through settlement." Letter, Doc. 16, p. 6. Endo International PLC, another settling defendant, has taken a similar position. *See* Letter, *see* Appendix.

The defendants who have chosen to settle are not alone in this respect. On October 1, many of the litigating defendants filed a motion seeking to delay the start of the bellwether trial, arguing in part that the trial should not go forward unless it binds Ohio as "the real party in interest." Motion, R.2696, PageID#418661. Otherwise, the defendants contended, they would be "threatened with a second adjudication of those claims in the separate actions against the Defendants by the State, in violation of due process." *Id.* at 418662. This threat to Ohio's ability to prosecute its claims is the precise type of threat that caused Ohio to file its petition

for a writ of mandamus with this Court. (Although the District Court denied the defendants' motion, its stated reasoning—that the Counties seek to recover only for "damages they suffered themselves," Order, R.2702, PageID# 418854—repeats the same erroneous argument that the District Court and the Counties make here.)

Finally, it is worth addressing the Counties' suggestion that preventing them from moving forward with their trial somehow contradicts the home-rule provision in Ohio's Constitution. The home-rule provision gives municipalities the "authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Ohio Const. art. XVIII, § 3. But the "powers of local self-government" are legislative in nature and do not include the power to manage issues of "statewide concern." *Am. Fin. Servs. Ass'n v. City of Cleveland*, 112 Ohio St. 3d 170, 174 (2006); *accord City of Cleveland v. State*, 128 Ohio St. 3d 135, 137 (2010). And that defeats any argument that the home-rule provision in Ohio's Constitution empowers the Counties to litigate *parens patriae* claims. After all, "political subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae*." *Multidistrict Vehicle Air Pollution*, 481 F.2d at 131. It follows, as night the day, that the *local* power conferred by the home-

rule provision does not give localities *parens patriae* authority to litigate on behalf of a State's citizens. *E.g. Bd. of Comm'rs of Union Cty. v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017) (county lacked such authority). On this issue of statewide concern, the Counties must give way to the State. And besides, enforcement of a local ordinance is not even at issue here, taking this matter wholly outside of the home-rule realm.

*     *     *

Ohio's sovereign interests justify halting the bellwether trial. This Court should grant Ohio's petition for a writ of mandamus.

## CONCLUSION

The Court should grant a writ compelling the District Court to dismiss or limit all claims that seek to remedy societal harms and to delay the bellwether trial until after Ohio's state-court actions conclude.

Respectfully submitted,

CHARLES MILLER
Office Counsel
BENJAMIN M. FLOWERS
Ohio Solicitor General
MICHAEL HENDERSHOT
Chief Deputy Solicitor General
SAMUEL PETERSON
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-728-1171

DAVE YOST
Ohio Attorney General

*/s/s Jonathan Blanton*
JONATHAN BLANTON*
Deputy Attorney General for
Major Litigation
  *\*Counsel of Record*
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-728-1171
Jonathan.Blanton@ohioattorney
   general.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 3,955 words, and was prepared in Microsoft Word with 14-point Equity font.  *See* Fed. R. App. P. 21(d)(1).

*/s/ Jonathan Blanton*
JONATHAN BLANTON

# CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. I further certify that a copy of the foregoing has been served via United States First Class Mail upon the following:

Hon. Dan Aaron Polster
Carl B. Stokes Court House
801 West Superior Avenue,
Courtroom 18B
Cleveland, OH 44113-1837
Email: Polster_Chambers@
  ohnd.uscourts.gov

Sarah Carroll
Attorney, Appellate Staff
Civil Division, Room 7511
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington D.C. 20530
Email: sarah.w.carroll@usdoj.gov

*/s/ Jonathan Blanton*
JONATHAN BLANTON

# APPENDIX



**Endo**
1400 Atwater Drive
Malvern, PA 19355
484.216.7752
610.884.5568 fax
maletta.matthew@endo.com

endo.com

Matthew J. Maletta
Executive Vice President,
Chief Legal Officer

September 16, 2019

***Via Electronic Mail and U.S. Postal Service***
The Honorable David Yost
Ohio Attorney General
30 E. Broad Street, 17th Floor
Columbus, Ohio 43215

Re: *The County of Cuyahoga, et al. v. Purdue Pharma, L.P., et al.*, Case
No. 17-OP-45004 (N.D. Ohio); and *The County of Summit, et al. v. Purdue Pharma, L.P., et al.*, Case No. 18-OP-45090 (N.D. Ohio)

Dear Attorney General Yost:

I write in response to your August 20, 2019 correspondence which, among other things, characterized Endo's settlement of the above-captioned actions (the "Actions") as "a nuisance value settlement," claimed that "several" of the settled claims are "owned by Ohio" and "can only be settled by me as Attorney General," and contended that the settlement does not resolve "any portion of any claim brought by the State." For the record, Endo respectfully disagrees with each of the foregoing assertions. Endo's settlement resolved all claims that were or could have been brought in the Actions, expressly including those that the Cuyahoga County and Summit County prosecuting attorneys brought in the name of the State of Ohio.

In any event, I observed with interest your recent *mandamus* petition (which was supported by several other Attorneys General and the U.S. Chamber of Commerce) seeking to dismiss or limit the scope of claims filed by political subdivisions in Ohio and to block or delay trial of the Actions against the remaining defendants. As you know, Endo and other defendants have long been articulating the problems posed by the multiplicity of government entities asserting duplicative claims. I share your frustration with the current state of affairs. When cities and towns, the counties in which they sit and the states in which all are located clash with one another over the right to control similar or identical legal claims—such as claims for the "abatement" of an alleged public nuisance within their overlapping borders—the resulting waste of resources and threat to the orderly administration of justice cannot be overstated.

Indeed, we see this reality playing out every day and with increasing intensity. Setting aside the merits, how is infighting and jockeying for control among plaintiffs helping to solve the opioid abuse crisis? How is that goal advanced by requiring litigation targets to defend themselves simultaneously on thousands of fronts in cases brought by all levels of government for the very same alleged harm(s)—other than possibly, as you state in your *mandamus* petition, creating "settlement pressure [that] threatens to override the rule of law"?

And yet there is another growing threat from the present course of action. As you know, two defendants have now filed for bankruptcy protection. Perhaps some intended or are celebrating this result. But it would not advance society's interests to force other defendants across the pharmaceutical supply chain—companies that directly and indirectly employ millions of people (including thousands of Ohioans), discover and develop new medications and reliably supply a multitude of existing medications having nothing to do with opioids—into a similar fate. The public should understand that for defendants with significant secured leverage, plaintiffs almost certainly will recover nothing in bankruptcy. The only parties who will recover in those circumstances will be the financial institutions and others to whom such defendants already have debt obligations. I understand this result is not appealing but it is an indisputable fact.

In addition, forcing serial bankruptcies or restructurings, whether by refusing to agree to reasonable settlements or seeking astronomical judgments that cannot be satisfied, may lead to other unintended consequences: significant job losses, explosive cost increases, product shortages, retirement savings value destruction, complete supply failures, lost innovation, quality assurance issues and overall instability that could jeopardize patient well-being and inject chaos into the healthcare system and economy. For example, I note that as part of Endo's recent settlement, we provided our Vasostrict® and Adrenalin® critical care products (for which Endo is the only FDA-approved source) free of charge to Cuyahoga and Summit Counties. What if those or other lifesaving medications manufactured or distributed by the defendants had to be sourced from suppliers or distributors without appropriate quality assurances or were completely unavailable even for a short time? These are serious questions that are not being widely considered.

Plaintiffs must recognize that continuing the current morass of litigation will not solve the opioid abuse crisis. To the contrary, the end result of this approach may be that many of them receive nothing for their efforts—and instead trigger the above-described outcomes. Progress toward a comprehensive solution can be made only when relevant stakeholders work collaboratively. I therefore encourage all plaintiffs to participate in discussions with defendants through you and the other Attorneys General. Endo agrees that states are best situated to engage in those discussions and to direct resources in the most effective manner.

I very much appreciate your consideration and I am hopeful we can work together toward our shared goal of addressing the opioid abuse crisis.

Very truly yours,

Matthew J. Maletta

cc:     Jonathan Blanton, Office of the Ohio Attorney General
        Jonathan L. Stern, Arnold & Porter Kaye Scholer LLP
        Carole S. Rendon, Baker Hostetler LLP